# In the
# United States Court of Appeals
## for the Seventh Circuit

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

v.

DAY PACER LLC, et al.,

*Defendants-Appellants,*

and

MARGARET E. CUMMING, in her capacity as personal representative
of the Estate of David T. Cumming,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:19-cv-01984.
The Honorable Lindsay C. Jenkins, Judge Presiding.

## BRIEF AND APPENDIX OF DEFENDANTS-APPELLANTS DAY PACER LLC, EDUTREK L.L.C., RAYMOND FITZGERALD and IAN FITZGERALD

TERANCE A. GONSALVES
terance.gonsalves@alston.com
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 telephone
***(Counsel of Record)***

RAYMOND FITZGERALD
rfitzgerald@bffmlaw.com
BUTLER, FITZGERALD & FIVESON PC
65 East Monroe Street, Suite 4305
Chicago, Illinois 60603
(917) 301-9006

Nine East 45th Street, Ninth Floor
New York, New York 10017
(212) 615-2200

*Attorneys for Defendants-Appellants*

 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1289

Short Caption: FTC v. Day Pacer, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald, and Ian Fitzgerald

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Butler, Fitzgerald & Fiveson PC; Alston & Bird LLP

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _Terance A. Gonsal_    Date: 02/26/2024

Attorney's Printed Name: Terance Gonsalves

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: 1201 West Peachtree Street, Atlanta, Georgia 30309

Phone Number: (404) 881-7983    Fax Number: (404) 881-7777

E-Mail Address: terance.gonsalves@alston.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1289

Short Caption: FTC v. Day Pacer, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald, and Ian Fitzgerald

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Butler, Fitzgerald & Fiveson PC; Alston & Bird LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Raymond Fitzgerald      Date: 02/26/2024

Attorney's Printed Name: Raymond Fitzgerald

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✓]

Address: 65 East Monroe Street, Suite 4305 Chicago, Illinois 60603

9 East 45th Street, Ninth Floor, New York, New York 10017

Phone Number: (917) 301-9006; (212) 615-2215      Fax Number:

E-Mail Address: rfitzgerald@bffmlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS...................................................i

TABLE OF AUTHORITIES ...................................................................vi

JURISDICTIONAL STATEMENT ............................................................. 1

ISSUES PRESENTED ........................................................................... 2

STATEMENT OF THE CASE.................................................................. 3

    A.    The Telemarketing Sales Rule.................................................. 4

    B.    Plaintiff's Allegations. ............................................................. 5

    C.    The September 1, 2023 Memorandum Opinion and Order Regarding Summary Judgment.................................................. 7

SUMMARY OF ARGUMENT ............................................................... 11

ARGUMENT ........................................................................................ 14

    I.    Standard of Review ................................................................ 14

    II.    Whether the Corporate Defendants' Business Model Was Subject to the TSR is a General Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC. ............................................................. 15

    III.    Whether the Corporate Defendants Had Knowledge That Their Business Model Was Subject to the TSR is a Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC........... 17

    IV.    Whether the Corporate Defendants Limited Their Telemarketing to Consumers Who Solicited and/or Consented to Receive Telephone Calls About For-Profit Educational Opportunities is a Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC. .............................................................. 20

    V.    Whether the Corporate Defendants Had Knowledge Concerning the Validity of Consent to Call Numbers on the DNCR is a Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC. .............................................................. 25

    VI.    Whether the Individual Defendants Were Liable For Alleged TSR Violations Committed by the Corporate Defendants Is A Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC. ............................................................. 26

        A.    Raymond Fitzgerald Did Not Participate in the Alleged Deceptive Acts or Practices at Day Pacer or EduTrek L.L.C...................... 27

B.    Ian Fitzgerald Did Not Participate in the Alleged Deceptive Acts or Practices Nor Had Authority to Control Them at EduTrek L.L.C. ............................................................................................ 27

VII.   The Injunction Is Overly Broad. ........................................................ 29

VIII.  The January 23, 2024 Order for Civil Penalties is Excessive. ............. 35

A.    The Amount of Civil Penalties Exceeds the Relief Requested by the FTC. ....................................................................................... 36

B.    The District Court Failed to Consider the Applicable Factors When Awarding a Civil Penalty. .................................................. 38

CONCLUSION ............................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Albermarle Paper Co. v. Moody*,
    422 U.S. 405 (1975) .......................................................................... 29

*Antonio v. Ford Motor Co.*,
    238 F.3d 919 (7th Cir. 2001) ........................................................... 15

*Beneficial Corp. v. FTC*,
    542 F.2d 611 (3d Cir. 1976) ............................................................ 34

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S.Ct. 2548 (1986) ............................................... 15

*Computrol v. Newtrend, L.P.*,
    203 F.3d 1064 (8th Cir. 2000) ......................................................... 29

*Contreras v. Suncast Corp.*,
    237 F.3d 756 (7th Cir. 2001) ........................................................... 14

*Craftwood II, Inc. v. Generac Power Sys., Inc.*,
    63 F.4th 1121 (7th Cir. 2023) ......................................................... 19

*Deimer v. Cincinnati Sub-Zero Prods.*,
    58 F.3d 341 (7th Cir. 1995) ............................................................. 29

*Fed. Sav. & Loan Ins. Corp. v. PSL Realty Co.*,
    630 F. 2d 515 (7th Cir 1980) ........................................................... 28

*FTC v. Credit Bureau Ctr., LLC*,
    937 F.3d 764 (7th Cir. 2019) ........................................................... 26

*FTC v. Pac. First Benefit, LLC*,
    472 F. Supp. 2d 974 (N.D. Ill. 2007) ............................................... 26

*Gerdes v. Menard, Inc.*,
    No. 18-2170, 2020 WL 8254261 (C.D. Ill. Dec. 23, 2020) ................. 4

*Hilton v. Braunskill*,
    81 U.S. 770 (1987) .......................................................................... 32

*Horton v. Tarrant Cnty. Hosp. Dist.*,
    No. 4:22-CV-9-P, 2022 WL 702536 (N.D. Tex. Feb. 4, 2022) ........... 16

*Hulce v. Zipongo, Inc.*,
   No. 23-C-0159, 2024 WL 1251108 (E.D. Wis. Mar. 18, 2024) ............................ 16

*ITT Cont'l Baking Co. v. FTC*,
   532 F.2d 207 (2d Cir. 1976) ................................................................. 34

*Jackson v. Stubenvoll*,
   No. 16-cv-05746, 2022 WL 991950 (N.D. Ill. Mar. 31, 2022) ................................ 4

*Kornea v. J.S.D Mgmt., Inc.*,
   366 F.Supp.3d 660 (E.D. Pa. 2019) ......................................................... 33

*MacDonald v. Chicago Park Dist.*,
   132 F.3d 355 (7th Cir. 1997) ............................................................... 29

*McCann v. Iroquois Mem'l Hosp.*,
   622 F.3d 745 (7th Cir. 2010) ............................................................... 19

*Moreno-Nicholas v. City of Indianapolis*,
   CAUSE NO. IP 98-1398-C H/G, 2000 WL 1707970 (S.D. Ind. Oct. 26,
   2000) ........................................................................................ 3

*Morris v. UnitedHealthcare Ins. Co.*,
   No. 4:15-CV-00638, 2016 WL 7115973 (E.D. Tex. Nov. 9, 2016) ........................ 16

*Murphy v. DCI Biologicals Orlando, LLC*,
   No. 6:12-cv-1459, 2013 WL 6865772 (M.D. Fla. 2013) .................................. 16

*N. Tex. Speciality Physicians v. FTC*,
   528 F.3d 346 (5th Cir. 2008) ............................................................... 34

*Runkel v. City of Springfield*,
   51 F.4th 736 (7th Cir. 2022) ............................................................... 19

*Salve Regina College v. Russell*,
   499 U.S. 225 (1991) ........................................................................ 29

*Schulz v. Infogroup, Inc.*,
   No. 3:19-CV-1620-N, 2020 WL 4201636 (N.D. Tex. July 21, 2020) .................... 16

*Spiegel v. Reynolds*,
   No. 15 C 8504, 2017 WL 4535951 (N.D. Ill. Oct. 11, 2017) .............................. 16

*Taylor v. Rodriguez*,
   No. 16-cv-8159, 2018 WL 4635647 (N.D. Ill. Sep. 27, 2018) ............................... 4

*Trujillo v. Free Energy Savings Co.,*
    No. 5:19-cv-02072, 2020 WL 7768722 (C.D. Cal. Dec. 21, 2020) .......................... 16

*Washington v. Haupert,*
    481 F.3d 543 (7th Cir. 2007) ............................................................. 4, 19

## RULES

Fed. R. Civ. P. 56(c) .......................................................................... 15

## STATUTES

15 U.S.C. § 45 ................................................................................. 17

15 U.S.C. § 6101 .............................................................................. 3

15 U.S.C. § 6102 .............................................................................. 3

15 U.S.C. § 6103 .............................................................................. 3

15 U.S.C. § 6104 .............................................................................. 3

15 U.S.C. § 6105 .............................................................................. 3

15 U.S.C. § 6106 .............................................................................. 3

15 U.S.C. § 6107 .............................................................................. 3

15 U.S.C. § 6108 .............................................................................. 3

## OTHER AUTHORITIES

16 C.F.R. § 310.2 .......................................................................... 3, 4, 5

16 C.F.R. § 310.3 .............................................................................. 5

16 C.F.R. § 310.4 .............................................................................. 4

16 C.F.R. § 310.6 .............................................................................. 33

60 Fed. Reg. 43,842, at 43,854-55 (Aug 23, 1995) ....................................... 8

*In re R. & R. Implementing the Tel. Consumer Prot. Act of 1991, Report and
Order,* 7FCC Rced. 8752 (Oct. 16, 1992) ............................................... 21

19 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 206.05
(3d ed.) ..................................................................................... 29

# JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of Illinois ("District Court") has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, because District Court civil action no. 1:19-cv-01984 arises under 15 U.S.C. § 45(a). The United States Court of Appeals for the Seventh Circuit ("Seventh Circuit") has jurisdiction to decide this case pursuant to 28 U.S.C. §§ 1291, 1292(a)(1), and 1294, Rules 3 and 4 of the Federal Rule of Appellate Procedure and Circuit Rule 3.

This appeal is taken from the District Court's following opinions and orders and final judgment:

1)     Memorandum Opinion and Order dated September 1, 2023 (A-2-62) ("Summary Judgment Order") granting in part and denying in part the Federal Trade Commission's ("FTC") motion for summary judgment (Dkt. 211) and Day Pacer Defendants'[1] cross-motion for summary judgment (Dkt. 227), and the minute order entered on September 1, 2023 (A-1);

2)     Order For Permanent Injunction and Other Relief dated November 21, 2023 (A-65-74) ("Injunction") and the minute orders entered on November 8, 2023 (A-63) and November 21, 2023 (A-64);

---

[1] Day Pacer Defendants include Defendants Day Pacer LLC ("Day Pacer"), EduTrek L.L.C. (EduTrek") (collectively "Corporate Defendants"), Raymond Fitzgerald and Ian Fitzgerald ("Individual Defendants"). The Corporate Defendants and Individual Defendants are referred to collectively herein as the Day Pacer Defendants.

3)    January 12, 2024 Order granting in part and denying in part Day Pacer

Defendants' Motion to Stay Permanent Injunction Pending Appeal (A-

76-83) and the minute entry entered on January 12, 2024 (A-75);

4)    Order for Civil Penalties dated January 23, 2024 (A-90-94) ("Civil

Penalty Order"), the minute order entered on January 23, 2024 (A-89),

Order regarding the amount of civil penalties entered on January 16,

2024 (A-85-88) and the minute order entered on January 16, 2024 (A-

84); and

5)    All other interlocutory orders in the case.

## ISSUES PRESENTED

1)    Whether the Corporate Defendants' business model was subject to the
Telemarketing Sales Rule ("TSR") is a genuine issue of material fact that precludes
summary judgment in favor of the FTC.

2)    Whether the Corporate Defendants had knowledge that their business
model was subject to the TSR is a genuine issue of material fact that precludes
summary judgment in favor of the FTC.

3)    Whether the Corporate Defendants limited their telemarketing to
consumers who solicited and/or consented to receive telephone calls about educational
opportunities is a genuine issue of material fact that precludes summary judgment
in favor of the FTC.

4)    Whether the Corporate Defendants had knowledge concerning the
validity of the consent to call numbers on the National Do Not Call Registry ("DNCR")

is a genuine issue of material fact that precludes summary judgment in favor of the FTC.

5)     Whether the Individual Defendants were liable for alleged TSR violations committed by the Corporate Defendants is a genuine issue of material fact that precludes summary judgment in favor of the FTC.

6)     Whether the scope of the injunction entered by the District Court is impermissibly broad.

7)     Whether the amount of civil penalties awarded by the District Court is excessive.

## STATEMENT OF THE CASE

The issues in this case involve the TSR,[2] which regulates "telemarketing". 16 C.F.R. § 310.2(gg). Whether the Day Pacer Defendants violated the TSR, as the FTC alleges, requires the determination of numerous genuine issues of material facts, which the District Court made in this case, despite a jury trial demand, under the guise of a "no reasonable and prudent person could find otherwise" excuse. However, "summary judgment is not a substitute for a jury's determination about credibility or about whether a reasonable inference should be drawn from circumstantial evidence of a person's intentions." *Moreno-Nicholas v. City of Indianapolis*, CAUSE NO. IP 98-1398-C H/G, 2000 WL 1707970, at *1 (S.D. Ind. Oct. 26, 2000). On summary judgment, district courts cannot "make credibility determinations, weigh the

---

[2] Codified in Title 16, Part 210 of the C.F.R., and promulgated under the FTC's Telemarketing Act, 15 U.S.C. §§ 6101-6108.

evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)); *Jackson v. Stubenvoll*, No. 16-cv-05746, 2022 WL 991950, at *6 (N.D. Ill. Mar. 31, 2022); *Gerdes v. Menard, Inc.,* No. 18-2170, 2020 WL 8254261, at *2 (C.D. Ill. Dec. 23, 2020); *Taylor v. Rodriguez,* No. 16-cv-8159, 2018 WL 4635647, at *4 (N.D. Ill. Sept. 27, 2018) ("Gill's relationship to Plaintiffs is relevant to her credibility, the Court does not make credibility determinations on summary judgment."). The District Court repeatedly made incorrect material credibility determinations and repeatedly failed to view material facts in the light most favorable to the Defendants in a result-oriented opinion to support its faulty conclusions.

### A.    The Telemarketing Sales Rule.

The TSR prohibits a seller or telemarketer from engaging in certain deceptive acts or practices. The TSR regulates "telemarketing" which is defined as "a plan, program, or campaign . . . to induce the purchase of goods or services or a charitable contribution" involving more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

Pursuant to the TSR, "[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in . . . (iii) Initiating any outbound telephone call to a person when: . . . (B) That person's telephone number is on the 'do-not-call' registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services. . . ." 16 C.F.R. § 310.4(b)(1)(iii)(B). However, a seller or telemarketer may initiate any outbound call

to a person on the "do-not-call" registry if the teller or telemarketer can demonstrate that the seller either (1) "has obtained the express agreement, in writing, of such person to place calls to that person"; or (2) "has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls …." *Id*. An "outbound telephone call" means "a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution." 16 C.F.R. § 310.2(x).

It is also "a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates . . . § 310.4 of this Rule." 16 C.F.R. § 310.3(b).

## B.     Plaintiff's Allegations.

The complaint alleges Defendants "initiated or caused others to initiate an outbound telephone call to a person's telephone number" on the DNCR (Count I) and that Defendants "provided substantial assistance and support to one or more Telemarketing Affiliates" to make calls to persons registered on the DNCR (Count II). (Dkt. 1, ¶¶ 53, 54.)

More specifically, the complaint alleges the Corporate Defendants called, and engaged in conversations with, consumers who solicited information concerning educational opportunities and jobs. (*Id.*, ¶ 17.) In addition, the complaint alleges that consumers provided their telephone numbers in response to website advertisements. (*Id.*, ¶¶ 15-17.) The complaint further alleges the Corporate Defendants purchased the consumers' data, including telephone numbers, from the companies that owned

or controlled the websites and then sold the contact information for the consumers who had consented to receiving informational calls. (*Id.*, ¶¶ 17-44.) The complaint acknowledges that consent language was contained in the websites consumers viewed.[3] The complaint does not allege, and the FTC has never claimed, that the Corporate Defendants sold, or offered to sell, any goods or services to the consumers.

There were two ways the Corporate Defendants spoke with the consumers who solicited information concerning educational opportunities. (Dkt. 219-3, ¶¶ 3-12; Dkt. 219-2, ¶¶ 4-12.)

*First*, a data provider, who received the contact information from consumers, would first speak with the consumer regarding their inquiry. (*Id.*) If, during the data provider's conversation the consumer asked about educational opportunities, the data provider would ask if the consumer consented to being transferred to someone who could provide the consumer with more information. (*Id.*) Once the consumer consented, the data provider decided to which company it would transfer the call. (*Id.*) The Corporate Defendants had no control over whether the call would be transferred to them. (*Id.*) However, if Corporate Defendants received the transfer, they would

---

[3] The complaint alleges that the consent language in some of the websites was inconspicuous, in a different size font, etc. (Dkt. 1, ¶¶ 20, 21, 27, 31, 41, 43.) The FTC's summary judgment papers ignored its admission in the complaint that the websites contained consent language, did not address its claim that some websites had purportedly different sized fonts for the consent language and did not tie these purportedly deficient consents to the alleged TSR violations. The FTC ignored these obvious fact issues and simply, and contrary to its complaint, stated that there was no consent language in the websites. (Dkt. 211, pp. 10, 11, 40.)

only accept it if they received, among other things, proof of the consumer's consent. (*Id*.)

*Second*, a dialing company employed by the Corporate Defendants would receive consumer contact information from data providers whose websites were accessed by the consumer. (*Id*.) Again, the Corporate Defendants had no control of whether the data provider would send the consumer contact data to a dialing company employed by them. (*Id*.) If and when such consumer contact information was received, the dialer company would provide the contact information of the consumer who made the inquiry to the Corporate Defendants. (*Id*.)

Regardless of how consumers were connected on calls with the Corporate Defendants, the Corporate Defendants did not offer to sell, or sell, any goods or service to consumers on the calls; the calls were purely informational. (*Id*. *See also* Dkt. 227, pp. 26-27; Dkt. 227-4, ¶ 23; Dkt. 227-6, ¶ 18.) The calls were also free of charge to the consumer. (*Id*.) The FTC did not provide the District Court with any evidence to the contrary.

## C. The September 1, 2023 Memorandum Opinion and Order Regarding Summary Judgment.

The FTC moved for summary judgment against all Defendants on August 2, 2021. (Dkt. 211.) Defendants filed cross-motions for summary judgment in October 2021. (Dkts. 216, 219, 227.) The Day Pacer Defendants argued that they did not violate the TSR for various reasons including because: 1) the telephone calls to

consumers were solicited by the consumer;[4] 2) the telephone calls were informational and did not offer to sell anything to consumers; 3) the called parties consented to have their data sent to educational institutions (Dkt. 227-2, ¶4; Dkt. 227-4, ¶ 4); 4) the TSR is unconstitutional or otherwise invalid; and 4) even if their conduct did violate the TSR, they did not have the requisite level of knowledge to be held liable for civil penalties.

Without a hearing or any oral argument, two years later, on September 1, 2023, the District Court entered the Summary Judgment Order granting in part and denying in part the FTC's motion for summary judgment and Defendants' cross-motions for summary judgment. Specifically, the District Court granted "summary

---

[4] Congress, in 15 U.S.C. §6102(a)(3)(A), expressly directed the FTC to include a rule prohibiting "a pattern of **unsolicited** telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right of privacy." 15 U.S.C. §6102(a)(3)(A) (emphasis added). When the FTC originally promulgated the TSR in 1995 it quoted this Congressional mandate as the basis for the original do not call provision in the TSR, stating:

> The Telemarketing Act directs the Commission to include in this Rule "a requirement that telemarketers may not undertake a pattern of **unsolicited telephone calls** which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy. Section 310.4(b) of the Final Rule sets forth two prohibitions on sellers and telemarketers which are intended to effectuate this requirement of the Act.

>       \*     \*     \*     \*     \*     \*

> The second prohibition in the Final Rule intended to limit **unsolicited telephone calls** is the "do not call" requirement set forth in §310.4(b)(1)(ii).

60 Fed. Reg. 43,842, at 43,854-55 (Aug. 23, 1995) (emphasis added).

judgment in favor of the FTC and against Defendants on Count I to the extent that count is based on calls initiated by the Corporate Defendants between March 2014 and June 2019 (the "Outbound Calls."). (A-62.) Summary judgment was granted in favor of Defendants and against the FTC on Count I to the extent that count is based on calls initiated by the IBT Partners (the "Inbound Transfers").[5] (*Id*.) Summary judgment was granted in favor of the FTC and against Defendants on Count II regarding the provision of substantial assistance to the IBT Partners. (*Id*.)

With regard to the Corporate Defendants under Count I, the District Court found that they had knowledge that their business model was subject to the TSR, that they did not limit their telemarketing to consumers who solicited and consented to receive calls about for-profit education opportunities, and that they had knowledge that they did not have valid consent to call numbers on the DNCR. (A-34-57.) All of these issues were, at the very least, genuine issues of material fact for a jury that should have precluded summary judgment in favor of the FTC.

Similarly, with regard to the Individual Defendants under Count I, the District Court held that they were liable for alleged TSR violations committed by the Corporate Defendants even though the Individual Defendants provided evidence that 1) Ian Fitzgerald was not a decision maker for the few months he worked at EduTrek

---

[5] The District Court defined IBT Partners as telemarketers that were allegedly acting as the Corporate Defendants' agents. (A-2.)

and did not take over managing Day Pacer until June 1, 2016[6] (Dkt. 227-4, ¶ 3; Dkt. 227-5, p. 26 at 97:10-11), 2) Raymond Fitzgerald was not an officer or employee of the Corporate Defendants (Dkt. 227-6, ¶¶ 5, 7), and 3) Raymond Fitzgerald did not participate in any telephone calls with consumers and was not involved in the day-to-day operations of the Corporate Defendants. (Dkt. 227-6, ¶¶ 5-7). Again, at the very least, there is a genuine dispute of a material fact regarding whether the Individual Defendants exercised sufficient control over the Corporate Defendants and their day-to-day operations that should have precluded summary judgment in favor of the FTC.

Regarding the Inbound Transfers, the District Court found that Defendants are liable for substantially assisting just one of the twenty-six IBT Partners under Count II. In coming to this conclusion, the District Court held:

> Based on the undisputed record, the FTC is entitled to summary judgment on its substantial assistance claim. ***The Court finds it unnecessary to determine whether the LLC Defendants substantially assisted each and every one of the IBT Partners, because the FTC does not seek civil penalties based on calls made by the IBT Partners, and its proposed injunction [see Dkt. 211-1] does not contain any provisions concerning the IBT Partners.*** It is enough for purposes of determining liability that the FTC has shown that the LLC Defendants substantially assisted Blue Water's violations of the TSR.

(A-51-52.)

---

[6] The District Court erroneously stated that Ian Fitzgerald became president of Day Pacer on June 1, 2015, (A-52) but stated the correct year earlier in its order (2016) (A-38).

# SUMMARY OF ARGUMENT

The District Court's Summary Judgment Order should be reversed for the following seven reasons.

*First*, whether the Corporate Defendants' business model was subject to the TSR is a genuine issue of material fact that precluded summary judgment in favor of the FTC. More specifically, the Corporate Defendants' business model consisted of telephone calls that were purely informational. *See* Statement of the Case, Section B, *supra*. The Corporate Defendants did not offer to sell, or sell, any goods or services to consumers on the telephone calls. *Id*. The FTC did not introduce any evidence demonstrating otherwise which creates, at the very least, a genuine issue of material fact as to whether the TSR applied to Corporate Defendants' business model.

*Second*, whether the Corporate Defendants had knowledge that their business model was subject to the TSR is a genuine issue of material fact that precluded summary judgment in favor of the FTC. Representatives of the Corporate Defendants attested both in depositions and in affidavits that they believed that their business was not subject to the TSR. Chad Tatton, who managed EduTrek and Day Pacer, attested that the Corporate Defendants had no knowledge that the business model of EduTrek and Day Pacer was subject to the TSR. Similarly, Ian Fitzgerald, who worked at Day Pacer in human resources and had no control over EduTrek's operations for the two months he worked there, also testified that the Corporate Defendants had no knowledge that the business model of EduTrek and Day Pacer was subject to the TSR. Both Tatton and Ian Fitzgerald attested that they believed the only rule applicable to their business model was the Telephone Consumer

Protection Act ("TCPA") and they complied with the TCPA.[7] (Dkt. 228, ¶48.) They also attested that, at industry conventions and conferences, the TCPA was the only rule discussed as being applicable to the Corporate Defendants' business, not the TSR, which, furthered their belief that the TSR was not applicable to their business. (*Id.* at ¶49.)

*Third*, whether the Corporate Defendants limited their telemarketing to consumers who solicited and/or consented to receive telephone calls about educational opportunities is a genuine issue of material fact that precluded summary judgment in favor of the FTC. Defendants provided ample evidence of consent. For example, consumers with whom the Corporate Defendants had conversations with had submitted their telephone numbers to the websites operated by the data providers— this is undisputed. (Dkt. 211, p. 9 ["These . . . consumers have merely sought information . . . on websites where they provided their contact information."].) Additionally, the Corporate Defendants provided their call records and transcripts which indicated consumers' consent. (*See* Dkt. 241, p. 9; Dkts. 241-2 through 241-15.) And yet, the District Court incorrectly held that Defendants provided no evidence that consumers wanted to receive the telephone calls.

*Fourth*, whether the Corporate Defendants had knowledge concerning the validity of the consent to call numbers on the DNCR is a genuine issue of material fact that precluded summary judgment in favor of the FTC. As explained above, the Defendants believed the TSR did not apply to their businesses. Even if they did, the

---

[7] The FTC has not alleged that the Defendants violated the TCPA.

District Court reached the conclusion that Day Pacer Defendants had knowledge concerning the validity of consent by relying on disputed facts supported by insufficient evidence.

*Fifth*, whether the Individual Defendants were liable for alleged TSR violations committed by the Corporate Defendants is a genuine issue of material fact that precluded summary judgment in favor of the FTC. With regard to the Individual Defendants, the District Court held that they were liable for alleged TSR violations committed by the Corporate Defendants even though the Individual Defendants attested at depositions and in affidavits that they did not have knowledge that that the Corporate Defendants' businesses violated the TSR. There was ample evidence in the record that the Individual Defendants did not have knowledge that the Corporate Defendants' businesses violated the TSR. For example, Raymond Fitzgerald was only an investor in the Corporate Defendants, was not an officer of the Corporate Defendants and was not involved in their day-to-day operations. (Dkt. 227-6, ¶¶5-7.) There was ample, undisputed evidence in the record that Ian Fitzgerald was not a decision maker with EduTrek. At the very least, there were genuine issues of material facts regarding their limited involvement with the Corporate Defendants' business practices that should not have been unilaterally decided by the District Court.

*Sixth*, if the District Court does not reverse the District Court's Summary Judgment Order, the scope of the Injunction should be narrowed. As written, the Injunction is too broad because it enjoins conduct unrelated to the conduct held as unlawful by this Court. The FTC's complaint involves calls by the Day Pacer

Defendants and/or its affiliates to persons on the DNCR to market for-profit education companies. However, the Injunction is not limited to enjoining the Day Pacer Defendants from making telemarketing calls to persons on the DNCR or from making telemarketing calls related to marketing for-profit education companies. Instead, the Injunction enjoins Day Pacer Defendants from engaging in any type of telephone calls to induce the sale or purchase of ***any goods or services***. This broad proscription is not related to the actions in the Complaint.

And *seventh*, if the Court does not reverse the District Court's Summary Judgment Order, the amount of the Civil Penalty should be reduced and not be joint and several. As entered, the civil penalty is excessive. The civil penalty includes the alleged violations of calls from the IBT Partners, or the "Inbound Transfers", even though the FTC did not seek civil penalties for these calls. (A-51 ["The Court finds it unnecessary to determine whether the LLC Defendants substantially assisted each and every one of the IBT Partners, because the FTC does not seek civil penalties based on calls made by the IBT Partners(.)"].)

The Day Pacer Defendants also respectfully join in Sections III and V as set forth in co-Defendant the Estate of David Cumming's brief and are incorporated by reference below.

## ARGUMENT

### I.    Standard of Review

Circuit Courts review a district court's decision to grant summary judgment *de novo*. *Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001). Summary judgment is only proper where the "pleadings . . ., together with the affidavits, if any,

14

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); s*ee also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In reviewing the district court's decision, this Court views the record in the light most favorable to the party opposing summary judgment, drawing all reasonable inferences in the opposing party's favor. *Antonio v. Ford Motor Co.*, 238 F.3d 919, 921 (7th Cir. 2001).

## II. Whether the Corporate Defendants' Business Model Was Subject to the TSR is a General Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC.

There is a genuine issue of material fact regarding whether the Corporate Defendants' business model was subject to the TSR. As noted above, the Corporate Defendants' business model consisted of telephone calls that were purely informational. *See* Statement of the Case, Section B, *supra*. The Corporate Defendants did not offer to sell, or sell, any goods or services to consumers on the calls. *Id*. As the District Court correctly notes, "[u]nder the TSR, '[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in ... (iii) *Initiating* any outbound telephone call to a person when: ... (B) That person's telephone number is on the 'do-not-call' registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services[.]'" (A-41-42.) Therefore, to prove a violation under the TSR, the FTC had the burden to prove that the Corporate Defendants' telephone calls were for the explicit purpose of offering for sale goods or services. But the FTC did not introduce into evidence any evidence that any consumer purchased any goods or services from the Corporate

Defendants much less that the Corporate Defendants induced or invited any consumer to purchase any goods or services.

Rather, the evidence clearly demonstrated that the Corporate Defendants' telephone calls were purely informational. (Dkt. 227, pp. 26-27; Dkt. 227-4, ¶ 23; Dkt. 227-6, ¶ 18.) Numerous courts have held that purely information calls are not subject to the TSR. *Hulce v. Zipongo, Inc.*, No. 23-C-0159, 2024 WL 1251108, at *6 (E.D. Wis. Mar. 18, 2024) (calls and messages that did not "encourage the purchase of any good or service" were not telephone solicitations); *Trujillo v. Free Energy Savings Co.*, No. 5:19-cv-02072, 2020 WL 7768722 (C.D. Cal. Dec. 21, 2020) (communications were not "telephone solicitations" because they did not encourage anyone to make a purchase); *Horton v. Tarrant Cnty. Hosp. Dist.*, No. 4:22-CV-9-P, 2022 WL 702536 (N.D. Tex. Feb. 4, 2022) (messages advising recipient about availability of free vaccines did not encourage any purchase); *Schulz v. Infogroup, Inc.*, No. 3:19-CV-1620-N, 2020 WL 4201636 (N.D. Tex. July 21, 2020) (communications arguably offering recipient a free product are not telephone solicitations); *Spiegel v. Reynolds*, No. 15 C 8504, 2017 WL 4535951, at *4 (N.D. Ill. Oct. 11, 2017) (communications soliciting donations are not telephone solicitations even though donations would be used to make purchases); *Morris v. UnitedHealthcare Ins. Co.*, No. 4:15-CV-00638, 2016 WL 7115973, at *8-9 (E.D. Tex. Nov. 9, 2016) (calls advising recipient of availability of free insurance benefit are not telephone solicitations); *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-cv-1459, 2013 WL 6865772, at *10 (M.D. Fla. 2013) (communications in which sender offered to purchase recipient's plasma are not telephone solicitations).

Therefore, the District Court erred when it found the Corporate Defendants' informational telephone calls were subject to the TSR. (A-23-27.)

## III. Whether the Corporate Defendants Had Knowledge That Their Business Model Was Subject to the TSR is a Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC.

In order to be held liable for civil penalties, the FTC must show that the Corporate Defendants had "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). The FTC did not show that the Defendants had actual knowledge that their businesses violated the TSR and, to the extent the District Court inferred that the Defendants had such knowledge, the District Court intruded on the province of the jury.

As the District Court recognized, the Individual Defendants attested that Corporate Defendants did not know or have reason to know that the TSR applied to their businesses:

> More particularly, Ian Fitzgerald, Day Pacer's president beginning in 2016, states that in late April 2016 Day Pacer considered expanding into selling goods and services to consumers, but "learned of the provisions of TSR and decided that Day Pacer would not transition its business from one governed by the TCPA to one governed by the TSR." [Dkt. 219-3, ¶ 23.] Raymond says the same. [Dkt. 219-4, ¶ 18.]

(A-38.) Furthermore, Defendant David Cumming stated that he performed research that confirmed to him that Day Pacer was exempt from the TSR. (Dkt. 230-1, ¶¶ 15-20.)

Day Pacer's belief that the TSR was not applicable to its business was confirmed by the Utah Division of Consumer Protection's ("UDCP") 2017

investigation into Day Pacer's business. The purpose of the UDCP's investigation was to determine whether Day Pacer violated the Utah Telephone Fraud Prevention Act, a statute substantially similar to the TSR. (Dkt. 227-4, ¶ 24; Dkt. 227-6, ¶ 19.) The investigation was thorough and included, among other things, an unannounced onsite visit to Day Pacer by UDCP. (*Id*.) On that day, UDCP observed Day Pacer's day-to-day practices, listened to Day Pacer's conversations with consumers, and reviewed Day Pacer's business records, including recordings of conversations with consumers. (*Id*.) Ultimately, the UDCP did not allege that Day Pacer was in violation of the Telephone Fraud Protection Act and did not require Day Pacer to change its business practice or take any action such as registering as a "telephone solicitor." (*Id*.) The District Court ignored this fact in its Summary Judgment Order.

At a minimum, this testimony provided by all Defendants created a genuine issue of a material fact that should have been determined by the jury. However, in recognizing this triable issue, the District Court instead made credibility determinations adverse to the Individual Defendants and failed to view the facts in the light most favorable to Defendants:

> The individual Defendants provide no details concerning the research that Cumming (or any other attorneys) performed or why it led them to believe that Day Pacer was exempt from the TSR. To the extent that Cumming's research consisted of reading the FTC guidance that Defendants rely on in their summary judgment briefs, no reasonable and prudent person under the circumstances would have concluded that they authorized Defendants' telemarketing activity. Further, Defendants do not explain how they could reasonably have known they were subject to the TCPA, which applies to a "telephone solicitor" that initiates calls "for the purpose of encouraging the purchase . . . of . . . goods, or services," but not to the TSR, which applies to a "telemarketer" that initiates calls "in connection with" "a plan, program, or campaign

which is conducted to induce the purchase of goods or services." *Compare* 47 C.F.R. § 64.1200(f)(15), *with* 16 C.F.R. § 310.2(ff)-(gg).

(A-39.)

The District Court's disregard of the Defendants' evidence and testimony and its conclusion their testimony was not credible and that no "no reasonable and prudent person under the circumstances would have" reached Defendants' conclusions was error. Here, the District Court made several impermissible credibility determinations on summary judgment and failed to view the facts in the light most favorable to Defendants. (A-34-57.) However, the court must not make credibility determinations or weigh conflicting evidence at summary judgment. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) ("In determining if there was an issue of material fact on an element . . . [t]he court may not weigh the evidence or decide which testimony is more credible."); *Haupert*, 481 F.3d at 544 ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are the jobs for a fact finder." (quoting *Payne*, 337 F.3d at 770)); *Runkel v. City of Springfield*, 51 F.4th 736, 742, 747 (7th Cir. 2022) (reversing and remanding the district court's order granting summary judgment because on summary judgment, a court cannot "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." (quoting *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021))); *Craftwood II, Inc. v. Generac Power Sys., Inc.,* 63 F.4th 1121, 1128-29 (7th Cir. 2023) (reversing and remanding the district court's order granting summary judgment where there existed

conflicting evidence of a material fact, i.e., "[t]he testimony by both parties shifted and curved throughout this litigation, and sometimes within the course of a single deposition. But all of these present credibility issues for a jury.").

The District Court erred by making credibility determinations at summary judgment. And at minimum, the Corporate Defendants presented a genuine issue of material fact regarding their knowledge and understanding of the application of the TSR that should not have been decided by the District Court at summary judgment.

**IV.  Whether the Corporate Defendants Limited Their Telemarketing to Consumers Who Solicited and/or Consented to Receive Telephone Calls About For-Profit Educational Opportunities is a Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC.**

Similarly, the District Court made impermissible credibility determinations at summary judgment regarding whether Corporate Defendants spoke with consumers who solicited conversations with them. The Corporate Defendants provided ample evidence of consent that at a minimum creates a genuine issue of a material fact. *First*, there is no dispute that consumers with whom the Corporate Defendants had conversations with had submitted their telephone numbers to the websites operated by the data providers. (Dkt. 211, p. 1 ["Defendants are telemarketers who place outbound telephone calls nationwide to consumers who—in search of job opportunities or public benefits—have submitted their contact information on websites specifically advertising those matters."].) The Federal Communications Commission ("FCC"), which is the co-regulator of the DNCR with the FTC, has always conceded that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given,

absent instructions to the contrary." *In re R. & R. Implementing the Tel. Consumer Prot. Act of 1991, Report and Order,* 7FCC Rced. 8752, at 8769 (Oct. 16, 1992). As the FCC acknowledged, the DNCR is directed against cold calls, not where a consumer has invited the communication by providing their contact information. Contrary to the history and purpose of the DNCR, the District Court has permitted the FTC to overreach its mandate from Congress by interpreting the TSR to prohibit telephone conversations where the consumer provided its telephone number to the other person on the call.

*Second*, the Corporate Defendants provided their "call records, which purport to identify the URLs, or website locations, where the consumers entered their phone numbers. [Dkt. 229, ¶ 107; Dkt. 232, ¶ 106.]" (A-44.) The Corporate Defendants also provided "call transcripts indicating that some customers were interested in the information regarding educational opportunities they marketed [see Dkt. 241, p. 9; Dkts. 241-2 through 241-15]." (*Id*.) The FTC, on the other hand, sampled a mere 750 out of the 11,308,260 records provided by Defendants, by checking the website locations provided in the records to see where they led. The FTC claims that the links in their 750 sample - .007% of the total records - do not provide written consent because they either linked to a website that was blank, not an active web page, or did not contain any language about calls. (Dkt. 229, ¶¶ 108-109; Dkt. 232, ¶¶ 108-109.) The FTC presented no evidence that their miniscule sample could in any way be fairly extrapolated to all the links provided by Defendants. Defendants also identified a significant flaw in the FTC's sampling of the call records—the FTC did not use a

Wayback Machine to view the webpages as of the dates that the consumers viewed them when the consent was gathered. (Dkt. 241, pp. 11-12.) The FTC's summary judgment papers also ignored its admission in the complaint that the websites contained consent language. (*See generally*, Dkt. 211.) The FTC's summary judgment argument ignored these obvious fact issues and simply, and contrary to its complaint, stated that there was no consent language in the websites. (Dkt. 211, pp. 10, 11, 40.) These issues created genuine issues of material fact that should have been determined by a jury.

However, even in light of these triable issues, the District Court held that "Defendants have no evidence that consumers wanted to receive calls from the [Corporate] LLC Defendants and their dialing vendors or consented to receiving such calls." (A-44.) The District Court was wrong. The Day Pacer Defendants submitted to the District Court transcripts of conversations between the Corporate Defendants and consumers that contradicted the FTC's assertion that the consumers did not want, or consent to, calls from the Corporate Defendants.[8] (*See* Dkt. 241-2 -241-15.) For example, the Day Pacer Defendants submitted the following transcript which purports to be a recorded telephone call between a representative and a consumer:

> This is Dan. I'm with the company called school search[9] on a recorded line. How are you today? Alright. Good you you were a transferred because you're we're interested receiving complimentary information on a higher education. … And then what I do here as school search I provide information on different colleges or trade programs in your area. It's a

---

[8] These were among the hundreds of thousands, if not millions, of recordings produced to the FTC during discovery

[9] School Search is a d/b/a used by the Corporate Defendants.

service at no cost to you. … And when you do go back, would you like information on going to school on Campus cycle go to school on line or would you like information on both of those options that you can decide. Both. … I do have a program that became available. It's it's a campus school. It's a Diploma in medical assistant, which is like helping out in the doctor's office or hospital setting. Is that's something you'd like to learn more about? Yes.

(Dkt. 241-2, pp. 2-3.) Day Pacer Defendants submitted numerous other similar transcripts. (*See e.g.*, Dkt. 241-3, p. 2 ["And you would like information for associate . . . degree bachelor certificate or information for all options? . . . Yeah."]; Dkt. 241-4, p. ["And what are you looking for now? . . . I'm really focused on school at the moment. . . . Well, we certainly do understand that your job search (is) your number one priority . . . So you want to look at your options then? (Y)es."]; Dkt. 241-5, p. 2 ["I'm calling today because you indicated that you would like some information on higher educational or career training in one of our partner websites. . . . I'd like to get some information on masters and Phd programs. . . . Now my goal today tiffany would be to find a few schools for you to compare all of your options."]; Dkt. 241-6, p.2 ["And just to confirm, I have your authorization for the college to call you at the number you provided earlier (sic) conversation. Is that a yes? Yeah."]; Dkt. 241-7, p. 2 ["Thank you for calling School Search. . . . How can I help you? I have a qualified candidate on a recorded line. . . . Do you know what you wanna major [in] . . . to be honest I was thinking physics. . . . And then did you want information on associate degree bachelor's degrees, career training? Or did you want (to) learn about all of your options? . . . I want information on Associates. . . . I'm definitely looking to further my education."]; Dkt. 241-8, p. 2 ["And you were transferred over to me today because

you were seeking information in regards to educational programs or career training .

. . Well, currently, I'm just trying to find a job, but it's looking like I need to further my education or to find something decent. . . . My goal today is not to enroll you. I don't have that ability. Is just to help you gather information. . ."); Dkt. 241-9, p. 2 ["(You) were transferred, sir, because you were (interested) in receiving complimentary information on a higher education . . . "]; Dkt. 241-10, p. 2 ["You were transferred over. You indicated some interest in higher education or career training."]; Dkt. 241-11, p. 2 ["(Y)ou were transferred today, sir, because you are online and indicated that you would like some information on higher education or career training. And I'm following up with you to provide you with new (sic) information, programs available to you. What subject programs would you like to learn more about and get some information on? It's medical."]; Dkt. 241-12, p. 2 ["You were transferred today because you indicated that you would like some information on higher education or career training."] Dkt. 241-13, p. 2 ["I was actually just reaching out to you today because you were online. And they indicated that you might like information as far as career training."]; Dkt. 241-14, p. 2 ["[sic] transferred over here to me because online indicated you would like a little more information. On either higher educational training."]; and Dkt. 241-15, p. 2 [". . . we're calling because you were inquiring about furthering your education looking at career training. . . Yes . . ."].)

## V. Whether the Corporate Defendants Had Knowledge Concerning the Validity of Consent to Call Numbers on the DNCR is a Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC.

The District Court further made impermissible credibility determinations on summary judgment regarding whether Corporate Defendants had knowledge that they did not have valid consent to call numbers on the DNCR. As explained in Section III above, the Defendants believed the TSR did not apply to their businesses. *See* Section III, *supra*. Even if they did believe the TSR applied, the District Court reached the conclusion that Day Pacer Defendants had knowledge concerning the validity of consent by relying on disputed facts supported by insufficient evidence. For example, the District Court stated that Defendants "admit that they received complaints from schools and other lead purchasers—including their compliance companies—that the LLC Defendants and their dialing vendors were calling consumers without proper consent." (A-46.) However, the FTC pointed to less than 20 communications from schools or other lead purchasers. The Corporate Defendants, or their transfer entities, made over 11,000,000 calls. (Dkt. 212-8, p. 80 at ¶ 5.) The fact that the FTC was able to point to a handful of complaints is neither surprising nor dispositive of Day Pacer Defendants' knowledge of the validity of overwhelming majority of consents.

The District Court also relies on the Day Pacer Defendants' response to the FTC's statement of disputed material fact (Dkt. 229, ¶ 33), but the Day Pacer Defendants disputed the majority of the statement. (*Id.*)

25

Therefore, at a minimum, the testimony provided by the Corporate Defendants created a genuine issue of a material fact that should have been determined by the jury. *See* Section III, *supra*. Instead, the District Court made credibility determinations and failed to view the facts in the light most favorable to Defendants. (A-46-47.)

## VI. Whether the Individual Defendants Were Liable For Alleged TSR Violations Committed by the Corporate Defendants Is A Genuine Issue of Material Fact That Precludes Summary Judgment in Favor of the FTC.

"To impose individual liability on the basis of a corporate practice, the Commission must prove (1) that the practice violated the TSR; (2) that the individual 'either participated directly in the deceptive acts or practices or had authority to control them'; and (3) that the individual 'knew or should have known about the deceptive practices.'" *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 769 (7th Cir. 2019) (quoting *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005)); *FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974, 980 (N.D. Ill. 2007). The FTC did not show that Raymond Fitzgerald participated in the alleged deceptive acts or practices of EduTrek and Day Pacer. The FTC also did not show that Ian Fitzgerald participated in the alleged deceptive acts or practices, nor had authority to control them, at EduTrek. At a minimum, the issue of whether Raymond Fitzgerald and Ian Fitzgerald had authority to control the Corporate Defendants and whether they knew or should have known about the deceptive practices are genuine issues of material fact that should be determined by a jury and that precludes summary judgment in favor of the FTC.

### A. Raymond Fitzgerald Did Not Participate in the Alleged Deceptive Acts or Practices at Day Pacer or EduTrek L.L.C.

The FTC did not show that it was an undisputed fact that Raymond Fitzgerald had exercised control over the practices of the Corporate Defendants, nor that he knew or should have known about the deceptive practices, to hold him individually liable for the Corporate Defendants' alleged actions. Raymond Fitzgerald was not an officer or employee of either EduTrek or Day Pacer. He was, instead, an investor of the Corporate Defendants. (Dkt. 227-6, ¶¶ 5-8.) He did not have control of the day-to-day operations of the companies. (*Id.*) He checked in with the presidents of the Corporate Defendants "a few times a year" and at times, as a practicing lawyer, provided some legal advice. (*Id.*) The FTC alleged that Raymond Fitzgerald was aware of the alleged deceptive practices in his advisory role due to his knowledge of four consumer lawsuits alleging violations of the TCPA – not the TSR. However, these four TCPA lawsuits were all dismissed. (Dkt. 227-6, ¶¶ 5-13.) Moreover, EduTrek and Day Pacer received only a handful of complaints but made over 11,000,000 telephone calls. (Dkt. 212-8, ¶ 5.) That miniscule number of complaints, fewer than 0.00005%, in a consumer facing business is hardly evidence to put Raymond Fitzgerald on notice that the telephone calls violated the TCPA or the TSR much less that there was no genuine issue of a material fact.

### B. Ian Fitzgerald Did Not Participate in the Alleged Deceptive Acts or Practices Nor Had Authority to Control Them at EduTrek L.L.C.

The timeline of the alleged 4,168,511 violations range between March 2014 and June 2019. (Dkt. 211, p. 36 at n. 20.) However, the FTC attributes about 61% of the

alleged violations (2,548,695 of the 4,168,511 alleged violations) to the time period ranging from March 22, 2014 to July 31, 2016. (*Id*.) This means the allegations in this period are mainly directed against Defendant EduTrek, which was run on a day-to-day basis by non-parties Chad Tatton and Nathan Clegg. (Dkt. 291, p. 30:20-24.) Defendant Ian Fitzgerald, on the other hand, did not have control over EduTrek's day-to-day business nor any knowledge of wrongfulness. Indeed, Mr. Ian Fitzgerald's role at EduTrek was director of human resources (Dkt. 212-10, p. 196) and he was only "employed at EduTrek -- not in a managerial position, not running the place -- for the last two months of its operation." (Dkt. 291, p. 37:8-11. *See also* Dkt. 212-10, p. 199.) Moreover, he only began running operations at Day Pacer in June of 2016. (Dkt. 291, p. 37:12-13 ["(h)e never ran Day Pacer until June of 2016."] *See also* Dkt. 227-4, ¶ 3 ["(He has) been president of Day Pacer from the spring of 2016."].) As such, the evidence is clear that Ian Fitzgerald did not have control over the practices of EduTrek, nor that he knew or should have known about any alleged deceptive practices with respect to EduTrek. The District Court nonetheless found Ian Fitzgerald liable and imposed a civil penalty on him for the alleged conduct of EduTrek. The District Court's finding is factually erroneous and should be reversed. Similarly, while the evidence showed that Ian Fitzgerald was President of Day Pacer, Ian Fitzgerald testified that he did not believe the TSR applied to the Corporate Defendants' telephone calls (Dkt. 219-3, ¶ 23) and the FTC's scant evidence—three consumer complaints—failed to show that he "should have known about the deceptive practices" much less that there was no genuine dispute as to this material fact.

## VII. The Injunction Is Overly Broad.

Circuit courts review injunction orders for an abuse of discretion; and they review questions of law *de novo*. *Fed. Sav. & Loan Ins. Corp. v. PSL Realty Co.*, 630 F. 2d 515, 520 (7th Cir 1980); *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997); *Deimer v. Cincinnati Sub-Zero Prods.*, 58 F.3d 341, 343–44 (7th Cir. 1995); *Computrol v. Newtrend, L.P.*, 203 F.3d 1064, 1070 (8th Cir. 2000) (a district court abuses its discretion when it makes an error of law; the circuit court will review the same *de novo*).

Although a circuit court gives deference to a district court when reviewing for abuse of discretion, that deference is limited. A court charged with making a discretionary ruling may not do so "unfettered by meaningful standards or shielded from thorough appellate review." *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975). "Abuse of discretion is found if the district court's decision rests upon a clearly erroneous finding of fact, upon an errant conclusion of law, or upon improper application of law to the facts." 19 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 206.05 (3d ed.) (citing *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 399–405 (1990); *Spallone v. United States*, 493 U.S. 265, 280 (1990)). And "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable." *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991).

On November 8, 2023, the District Court had held a hearing regarding the injunctive relief and monetary penalties that would follow its Summary Judgment Order. At the hearing, the Day Pacer Defendants argued, among other things, that the permanent injunction enjoining the Day Pacer Defendants from participating in

telemarketing proposed by the FTC should be denied or modified for the following reasons: 1) an injunction against Defendant EduTrek was unnecessary because EduTrek was no longer in business and had been dissolved before the FTC's lawsuit had been brought; 2) an injunction against Day Pacer also was unnecessary because it has not been in the business of making telephone calls to consumers since 2019; 3) an injunction against Raymond Fitzgerald was inappropriate because he did not, and does not, make telephone calls to consumers; and 4) an injunction against Ian Fitzgerald also should not be imposed because he is not involved in business that participates in telephone calls to consumers. (Dkt. 291, p. 30:20-32:14.)

Following the hearing, on November 17, 2023, the Day Pacer Defendants filed an Opposition to FTC['s] [Proposed] Final Order for Permanent Injunction and Other Relief and in Support of Day Pacer LLC, et al.'s, Proposed Injunction Order. (Dkt. 290.) The Day Pacer Defendants opposed the FTC's Proposed Order for Permanent Injunction and Other Relief on the grounds that (1) it exceeded the claims asserted in the complaint and the findings of the District Court in its September 1, 2023, Summary Judgment decision; and (2) the proposed injunction sought to make findings or have its terms apply to David Cumming, deceased, or the personal Representative of David Cumming. (*Id.*) The District Court rejected the arguments raised in the Day Pacer Defendants' Opposition. (A-64.)

The District Court entered an injunction against the Day Pacer Defendants on November 21, 2023. (A-65-74) The District Court found that the "Corporate Defendants violated the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B) (Count I) by initiating or

causing the initiation of outbound telephone calls to consumers whose telephone numbers were on the National Do Not Call Registry ("Registry")," and that the "Corporate Defendants also violated 16 C.F.R § 310.3(b) (Count II) by assisting and facilitating their inbound transfer partners' violations of the TSR." (A-66, ¶ 3.) The District Court further held that because the Individual Defendants participated in these violations or had authority to control them, there is a reasonable likelihood that they will also engage in future violations absent the injunctive relief requested. (*Id.*, ¶¶ 7-8.) The District Court entered an order prohibiting telemarketing as follows:

> "IT IS ORDERED that the Day Pacer Defendants are permanently restrained and enjoined from participating in Telemarketing or assisting others engaged in Telemarketing, whether directly or through an intermediary."

(A-68.) The District Court's order defined Telemarketing as "any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule." (A-68.)

The Day Pacer Defendants then filed a Motion to Stay the Injunction Pending Appeal. (Dkt. 296.) The District Court granted the Motion to Stay the Injunction Pending Appeal in part on January 12, 2024. (A-76-83.) In doing so, the District Court, recognizing that the Injunction was overly broad, held that Day Pacer Defendants' argument that the Injunction is too broad because it prohibits Defendants from calling businesses and that "[Day Pacer] Defendants' calls to businesses are not part of the underlying conduct that led to the TSR violations. ***Nor can they be.***" (A-81.) Therefore, Day Pacer Defendants "may be successful in arguing

on appeal that the Injunction is impermissibly broad to the extent it precludes them from calling businesses." (*Id.*) The District Court thus ruled that "[t]he Injunction is stayed to the extent it precludes Defendants from calling businesses, but otherwise remains in force." (A-83.)

The scope of the Injunction is unreasonably broad because it enjoins conduct unrelated to the conduct held as unlawful by the District Court. The complaint alleges calls by the Corporate Defendants to consumers on the DNCR as part of a program to market for-profit education companies. However, the Injunction is not limited to enjoining the Day Pacer Defendants from making telemarketing calls to persons on the DNCR or from making telemarketing calls related to marketing for-profit education companies. Instead, the Injunction enjoins Day Pacer Defendants from engaging in any type of telephone call made to induce the purchase of any goods or services whether or not covered by the TSR. As set forth below, the Injunction is so broad that it prohibits the Individual Defendants from engaging in almost any employment opportunities that uses a telephone, including their current employment and business. The extremely broad proscriptions in the Injunction prohibit perfectly legal conduct and will irreparably harm the Individual Defendants' livelihood. *Hilton v. Braunskill,* 81 U.S. 770, 776 (1987).

The Injunction bars the Individual Defendants from engaging in their current legitimate and legal businesses. Defendant Raymond Fitzgerald, for example, is a practicing attorney and named partner at the law firm of Butler Fitzgerald & Fiveson PC. Under the current terms of the Injunction, the FTC may argue that if Raymond

Fitzgerald speaks on the telephone to a potential client and offers that client legal services, he has violated the terms of the Injunction because the Injunction prohibits any telephone calls conducted to induce the purchase of goods or services, whether or not covered by the TSR. The Injunction therefore may directly impact Raymond Fitzgerald's practice of law and operation of his law firm, and absent reversal, he will be unable to engage in his legitimate and legal practice of law.

The Injunction similarly impacts Ian Fitzgerald's current business. Ian Fitzgerald is the owner and operator of Allied Contact Management, which is engaged in the business of selling goods and services to other businesses through the use of telephones. Based on the definition of telemarketing in the Injunction, Ian Fitzgerald can no longer operate his business without the risk of the FTC alleging that he is violating the terms of the Injunction. And, as set forth below, his prospects for other employment is severely restricted. Thus, the Injunction directly impacts his livelihood and ability to provide for his family. Indeed, the District Court agreed the restrictions imposed by the Injunction regarding telephone calls to businesses are too broad and thus stayed the Injunction to the extent it precludes Defendants from calling businesses. (A-83.) As the District Court held, "Defendants' calls to business are not part of the underlying conduct that led to the TSR violations. Nor can they be." (A-81.) This is because the TSR exempts calls to business. 16 C.F.R. § 310.6(b)(7) ("Telephone calls between a telemarketer and any business to induce the purchase of goods or services" are "exempt" from the TSR.); *see also Kornea v. J.S.D Mgmt., Inc.*,

366 F.Supp.3d 660, 669 n.32 (E.D. Pa. 2019) ("[C]alls between a telemarketer and a business to induce the purchase of services are exempt from the [TSR].").

Not only does the Injunction directly impact the current livelihood and employment of the Individual Defendants, but it also provides the opportunity for the FTC to argue that the Individual Defendants cannot engage in virtually ***any type of business*** that involves a telephone and the sales of goods or services. Indeed, under the Injunction, the FTC may argue that the Day Pacer Defendants are enjoined from entirely legitimate and legal business activities, such as working as a sales representative, operating a plumbing, landscaping or electrical business, providing professional services such as selling real estate, providing accounting or legal services, or working as a customer service representative in the travel industry, all of which offer the sale of goods and services by telephone.

This broad proscription is not related to the actions in the complaint. *N. Tex. Speciality Physicians v. FTC*, 528 F.3d 346, 371 (5th Cir. 2008) (FTC's cease and desist order was "overly broad and internally inconsistent"); *ITT Cont'l Baking Co. v. FTC*, 532 F.2d 207 (2d Cir. 1976) (courts may narrow FTC orders by deleting those portions for which a reasonable relationship to the offending conduct is lacking); *Beneficial Corp. v. FTC*, 542 F.2d 611, 618-19 (3d Cir. 1976) ("The Commission's order . . . went further than was permitted . . . and was an abuse of the Commission's remedial discretion.").

Furthermore, the Injunction provides the FTC with relief it does not seek. When the District Court held that Defendants are liable for the Inbound Transfers under Count II, the District Court held:

> Based on the undisputed record, the FTC is entitled to summary judgment on its substantial assistance claim. ***The Court finds it unnecessary to determine whether the LLC Defendants substantially assisted each and every one of the IBT Partners, because the FTC does not seek civil penalties based on calls made by the IBT Partners, and its proposed injunction [see Dkt. 211-1] does not contain any provisions concerning the IBT Partners.*** It is enough for purposes of determining liability that the FTC has shown that the LLC Defendants substantially assisted Blue Water's violations of the TSR.

(A-51-52.) The Court notes that the FTC's proposed injunction "does not contain any provisions concerning the IBT Partners." (*Id.*) And yet, the Court provides this exact relief in the Injunction. (*See e.g.* A-68 ["IT IS ORDERED that the Day Pacer Defendants are permanently restrained and enjoined from participating in Telemarketing ***or assisting others engaged in Telemarketing***, whether directly or through an intermediary."].) The Injunction is therefore overbroad and must be reversed.

## VIII.  The January 23, 2024 Order for Civil Penalties is Excessive.

On January 23, 2024, the District Court entered an Order for Civil Penalties, which granted civil penalties against all Defendants jointly and severally. (A-90-94.) The District Court held that: "Judgment in the amount of $28,681,863.88 is entered in favor of the Commission against the Individual Defendants and Corporate Defendants, jointly and severally, as a civil penalty." (A-93.) The District Court further ruled that: "Defendants are ordered to pay to the Commission $28,681,863.88. Such payment must be made within 60 days of entry of this Order." (*Id.*)

The amount of the civil penalties entered in this case is excessive for various reasons as set forth below.

## A. The Amount of Civil Penalties Exceeds the Relief Requested by the FTC.

The amount of the civil penalties is excessive because it exceeds the relief requested by the FTC and granted by the District Court at summary judgment. The FTC's Complaint alleges two counts of violations of the TSR related to telephone calls to numbers on the DNCR in violation of the TSR. Count I alleged that Defendants had "initiated or caused others to initiate an outbound telephone call to a person's telephone number" on the DNCR and Count II alleges that Defendants had "provided substantial assistance and support to one or more Telemarketing Affiliates" to make calls to persons registered on the DNCR. (Dkt. 1, ¶¶ 53, 54.) The violations alleged in the complaint fall into two categories 1) "Outbound" calls, that are calls dialed by the Day Pacer Defendants; and 2) "Inbound Transfer" calls, that are calls transferred to the Day Pacer Defendants by their IBT Partners. Pursuant to the FTC's analysis, the total Outbound calls made were 3,669,914 calls and the total of Inbound Transfers made were 498,597 calls. (Dkt. 211, pp. 15-16.)

However, the FTC set forth two alternative theories for holding Defendants liable for the Inbound Transfers: 1) that IBT partners acted as the Corporate Defendants' agents (under Count I); or 2) that Day Pacer Defendants assisted/facilitated the IBT partners' violations (under Count II). (Dkt. 1, ¶¶ 53, 54.) In the Summary Judgment Order, the District Court held that Defendants are entitled to summary judgment on Count I to the extent that it is based on calls placed

by the IBT partners, or the 498,597 Inbound Transfers. (A-62.) The District Court, instead, found that Defendants are liable for the Inbound Transfers under Count II. The District Court reasoned it was "***unnecessary to determine whether the LLC Defendants substantially assisted each and every one of the IBT Partners, because the FTC does not seek civil penalties based on calls made by the IBT Partners . . .***" (A-51.) In other words, the District Court held that the FTC was entitled to summary judgment on its substantial assistance claim based on one of twenty-six IBT Partners—Bluewater—whose alleged calls to numbers on the DNCR accounted for less than 4% of all the IBT Partners' calls. (Dkt. 212-8, p. 110.)

Nonetheless, in light of the Summary Judgment Order, the District Court should have calculated civil penalties based on the Outbound calls only—the alleged 3,669,914 violations. However, the District Court's Civil Penalty Order calculates a penalty based on a total of 4,168,511 violations. This incorrectly includes both Outbound and Inbound Transfers. At the very least, the calculation should have been based on the alleged Outbound violations only.

Day Pacer Defendants also disagree with the District Court's ruling regarding Day Pacer Defendants' liability for the Inbound Transfers, generally. At the very minimum, the evidence presents triable issues of fact for a jury to decide. The Court reached conclusions by relying on admissions that were not clear. For example, the District Court held that "FTC has demonstrated that the LLC Defendants continued to pay and work with IBT Partners even after receiving complaints from schools, consumers, and compliance monitoring companies that their IBT Partners were

calling DNC Numbers without consent." (A-50-51.) In support of this statement, the District Court relied on Day Pacer Defendants' response to request for admission no. 15. However, the Day Pacer Defendants' response to the request stated that "Responding Defendants admit that EduTrek L.L.C. and Day Pacer LLC **sometimes** continued to work with inbound transfer companies after receiving complaints regarding lead generation by such inbound transfer companies depending on the particular complaint." (Dkt. 212-9, p. 124.) "Sometimes" does not mean always or all IBT Partners. Indeed, sometimes can only be once or twice. The District Court did not even identify which IBT Partners the Corporate Defendants allegedly continued to work with. Request for admission no. 15 is simply not enough for the District Court to reach the conclusion it reached.

Similarly unpersuasive is the allegation that the twenty-six IBT Partners received three complaints during the relevant time period. The IBT Partners made over 489,000 calls. The fact that the FTC was able to point to three complaints is neither surprising nor dispositive of the Corporate Defendants' knowledge of the validity of overwhelming majority of consensual telephone calls.

### B. The District Court Failed to Consider the Applicable Factors When Awarding a Civil Penalty.

*First*, the Civil Penalties are excessive as explained in Section III of the Estate's Opening Brief, which the Day Pacer Defendants respectfully join. The Individual Defendants are unable to pay over $28,000,000 as it exceeds their net worth at the time of Summary Judgment, and even now. In support of its Summary Judgment Motion, the FTC provided a declaration of Rufus L.M. Jenkins

summarizing the Individual Defendants' assets. (Dkt. 212-8, p. 202). Even though the Day Pacer Defendants disagree with the summary of the value of assets, which is now dated as well, the argument remains the same for the purposes of this Appeal. In Jenkins' declaration, the FTC notes that the total value of Ian Fitzgerald's assets is $947,868.11 (Dkt. 212-8, pp. 215-216) and the total value or Raymond Fitzgerald's assets is $12,803,143.92 (Dkt. 212-8, p. 211). Specifically, and similar to the Estate's argument in Section III.F.2(a), on a percentage basis, there is a *radical* disconnect between the 1% of net worth the district court was comfortable awarding in *Dish Network I* and the over 3,003% of Ian Fitzgerald's net worth and over 224% of Raymond Fitzgerald's net worth, that was awarded to the FTC below. Ian Fitzgerald cannot pay about over 30 times the amount his total assets and Raymond Fitzgerald cannot pay over twice the amount of his total assets. The amount of penalties are therefore entirely excessive.

*Second*, the District Court further erred in assessing civil penalties by misapplying the law and not considering all required factors. Day Pacer Defendants adopt and incorporate herein the arguments set forth in Argument Section III of the Estate's Opening Brief. For those reasons, the judgment must be vacated as to all Defendants. More specifically, the Day Pacer Defendants address the applicable factor-test as to themselves below.

1.     **The Harm.** Day Pacer Defendants adopt the Estate's argument as to this factor.

**2.** **Degree of Culpability.** As addressed in Section VI above, the Individual Defendants request that the Court consider the degree of culpability with respect to each of the Day Pacer Defendants—which is similarly limited by their general lack of involvement and control. *See* Section VI, *supra*.

**3.** **History of Misconduct.** Day Pacer Defendants adopt the Estate's argument as to this factor. There is no evidence that Day Pacer Defendants engaged in any prior misconduct.

**4.** **Ability to Pay.** As addressed in Section VIII.A above, Day Pacer Defendants cannot pay the excessive civil penalty awarded by the District Court.

**5.** **Ability to do Business.** Day Pacer Defendants adopt the Estate's argument as to this factor.

**6.** **Other Matters that the District Court Should Have Considered but Did Not.** Day Pacer Defendants adopt two of the three "other matter" arguments made by the Estate to this factor. More specifically, Day Pacer Defendants adopt the two following "other matter" arguments as to themselves: (1) the FTC did not show, and the District Court did not find, that Defendants' assets are tainted by any of the alleged misconduct; and (2) there was no showing that Defendants' derived significant benefit from the alleged violations.

## CONCLUSION

For the foregoing reasons, the District Court committed reversible error in reaching its conclusion in the Summary Judgment Order. The Summary Judgment Order should be reversed.

Respectfully submitted,


/s/  *Terance A. Gonsalves*

Terance A. Gonsalves
ALSTON & BIRD LLP
1201 West Peachtree Street, NW
Atlanta, Georgia 30309
(404) 881-7983
terance.gonsalves@alston.com

Raymond Fitzgerald
BUTLER, FITZGERALD & FIVESON PC
65 East Monroe Street, Suite 4305
Chicago, Illinois 60603

9 East 45th Street, Ninth Floor
New York, New York 10017

(917) 301-9006
(212) 615-2215
rfitzgerald@bffmlaw.com

*Counsel for Day Pacer LLC, EduTrek L.L.C.,*
*Raymond Fitzgerald and Ian Fitzgerald*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 10,967 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook style font.

Dated: May 21, 2024

/s/ *Terance A. Gonsalves*
Terance A. Gonsalves
Attorney for Defendants-Appellants
Day Pacer LLC, EduTrek L.L.C.,
Raymond Fitzgerald and Ian Fitzgerald

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the Appendix.

/s/  *Terance A. Gonsalves*
Terance A. Gonsalves

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2024, the Brief and Appendix of Defendants-Appellants Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald and Ian Fitzgerald was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/  *Terance A. Gonsalves*
Terance A. Gonsalves

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Notification of Docket Entry filed September 1, 2023 (Doc. 279) ........................... A-1

Memorandum Opinion and Order filed September 1, 2023 (Doc. 280) .................. A-2

Notification of Docket Entry filed November 8, 2023 (Doc. 289)......................... A-63

Notification of Docket Entry filed November 21, 2023 (Doc. 292)....................... A-64

Order for Permanent Injunction and Other Relief filed November 21, 2023 (Doc. 293)................................................................................................................ A-65

Notification of Docket Entry filed January 12, 2024 (Doc. 309) ........................... A-75

Order entered on January 12, 2024 (Doc. 310)...................................................... A-76

Order filed on January 16, 2024 (Doc. 311).......................................................... A-84

Order filed on January 16, 2024 (Doc. 312) .......................................................... A-85

Notification of Docket Entry filed January 23, 2024 (Doc. 313) .......................... A-89

Order for Civil Penalties filed January 23, 2024 (Doc. 314) ................................. A-90

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF NextGen 1.7.1.1**
**Eastern Division**

Federal Trade Commission
                                        Plaintiff,

v.                                                      Case No.: 1:19−cv−01984
                                                        Honorable Lindsay C. Jenkins

Day Pacer LLC, et al.
                                        Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Friday, September 1, 2023:

      MINUTE entry before the Honorable Lindsay C. Jenkins: For the reasons explained in the Order issued today, the FTC's motion for substitution [247] is granted. The Estate is substituted as a defendant in this action. The Clerk shall substitute Margaret Cumming, as representative of the Estate of David Cumming for deceased Defendant David Cumming. The FTC's motion for summary judgment [211] and the Defendants' two cross−motions for summary judgment [227], [230], are each granted in part and denied in part. The Court grants summary judgment in favor of the FTC and against Defendants on Count I to the extent that count is based on calls initiated by the LLC Defendants. Summary judgment is granted in favor of Defendants and against the FTC on Count I to the extent that count is based on calls initiated by the IBT Partners. Summary judgment is granted in favor of the FTC and against Defendants on Count II. This matter is set for a status hearing on September 26, 2023 at 9:30 a.m. in Courtroom 2119 to resolve the outstanding matters concerning the appropriate civil penalty. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

A-1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Federal Trade Commission, | |
|     *Plaintiff,* | No. 19 CV 1984 |
| v. | Judge Lindsay C. Jenkins |
| Day Pacer LLC, Edutrek L.L.C., Raymond Fitzgerald, Ian Fitzgerald, and David Cumming, | |
|     *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

In March 2019, the Federal Trade Commission ("FTC") filed this consumer-protection action against Day Pacer LLC ("Day Pacer"), a telemarketing company that makes calls to generate consumer leads to sell to for-profit education companies. [Dkt. 1, ¶ 1.] The FTC also brings suit against Day Pacer's successor in interest, EduTrek L.L.C. ("EduTrek," and together with Day Pacer, the "LLC Defendants"), and its former President Ian Fitzgerald, managing member Raymond Fitzgerald, and partial owner and manager David Cumming. In Count I, the FTC alleges that Defendants initiated or caused others to initiate telephone calls to phone numbers on the federal Do Not Call List in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(iii)(B), which is promulgated under the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Count I is based on both (1) calls initiated by the LLC Defendants and (2) calls initiated by other telemarketers that were allegedly acting as the LLC Defendants' agents (the "IBT Partners"). Count II alleges that Defendants violated 16 C.F.R. § 310.3(b) by providing substantial assistance and support to the IBT Partners even though Defendants knew or

A-2

consciously avoided knowing that those telemarketers were calling numbers on the Do Not Call List in violation of the TSR.

The FTC has moved for summary judgment against all Defendants. [See Dkt. 211.] Day Pacer, EduTrek, and the Fitzgeralds oppose summary judgment and have also cross-moved for summary judgment against the FTC. [See Dkt. 227.] Cumming filed a separate opposition to summary judgment and also cross-moved for summary judgment. [See Dkt. 230.] The two sets of Defendants have also adopted one another's summary judgment arguments. [See Dkt. 227 at 58; Dkt. 230 at 6.] Shortly after summary judgment briefing concluded, Cumming passed away. [See Dkt. 244, Statement Noting Party's Death.] The FTC timely filed a motion to substitute the personal representative of Cumming's estate (the "Estate") as a defendant in this action. [See Dkt. 247.] The Estate opposes the motion. [See Dkt. 263.]

For the reasons discussed below, the FTC's motion for substitution [Dkt. 247] is granted. The Estate is substituted as a defendant in this action. The FTC's motion for summary judgment [Dkt. 211] is granted in part and denied in part. The FTC has demonstrated as a matter of law that Defendants are liable for violating the TSR because the LLC Defendants placed calls to phone numbers on the Do Not Call List (part of Count I). The FTC has not demonstrated as a matter of law that Defendants are liable for calls initiated by the IBT Partners acting as Defendants' agents (the other part of Count I). However, the FTC has also moved for—and is entitled to— summary judgment on its alternative claim in Count II that Defendants have provided substantial assistance and support to at least one other telemarketer while

A-3

knowing that the telemarketer was calling numbers on the Do Not Call List. Since the FTC is entitled to judgment on only one of its two alternative theories (absent any attempt to analyze the IBT Partners individually), Defendants are entitled to summary judgment on Count I to the extent it is based on calls initiated by IBT Partners.

Given the age of the summary judgment motions and the substitution of the Estate for Mr. Cumming, the Court will require further input from the parties before ordering an appropriate remedy.

## I.    Introduction

### A.    Statutory Framework

Section 5 of the FTC Act declares unlawful "[u]nfair methods of competition" and "unfair or deceptive acts or practices" in or affecting commerce. 15 U.S.C. § 45(a)(1). The FTC has authority to prescribe "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce," with certain exceptions that are not applicable here. 15 U.S.C. § 57a(a)(1)(B). Once those rules take effect, "a subsequent violation thereof shall constitute an unfair or deceptive act or practice in violation of section 45(a)(1) …." 15 U.S.C. § 57a(d)(3). The FTC is empowered to bring actions in federal court to enforce violations of Section 5 of the FTC Act and to seek appropriate equitable relief and civil penalties. *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634-35 (7th Cir. 2005). During the time period relevant here, the maximum statutory recovery for each violation of the FTC

Act was between $16,000 and $42,530, depending on exactly when the violation occurred. [See Dkt. 211 at 36, n.20.]

The FTC promulgated the TSR to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act's direction that it "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). The TSR is codified in Title 16, Part 310 of the Code of Federal Regulations. Violations of the TSR constitute unfair or deceptive acts or practices in violation of section 5(a) of the FTC Act. *F.T.C. v. Pacific First Benefit, LLC*, 472 F. Supp. 2d 974, 980 (N.D. Ill. 2007) (citing 15 U.S.C. § 45(a); 15 U.S.C. § 57a(d)(3); 15 U.S.C. §6102(c)). The TSR defines "telemarketing" to mean "a plan, program, or campaign which is conducted to *induce the purchase of goods or services* or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. . . ." 16 C.F.R. § 310.2(gg) (emphasis added). "Telemarketer means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." *Id.* § 310.2(ff). "Customer means any person who is or may be required to pay for goods or services offered through telemarketing." *Id.* § 310.2(n). "Seller means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." *Id.* § 310.2(dd).

Pursuant to the TSR, "[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a

telemarketer to engage in … (iii) *Initiating* any outbound telephone call to a person when: … (B) That person's telephone number is on the 'do-not-call' registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services *unless* the seller or telemarketer" can demonstrate that the seller either (1) "has obtained the express agreement, in writing, of such person to place calls to that person"; or (2) "has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls …." 16 C.F.R. § 310.4(b)(1)(iii)(B) (emphasis added). An "outbound telephone call" means "a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution." 16 C.F.R. § 310.2(x).

In addition, pursuant to § 310.3(b), it is also "a violation of this Rule for a person to provide *substantial assistance or support* to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates … § 310.4 of this Rule." 16 C.F.R. § 310.3(b) (emphasis added).

## B.   Factual Background

The facts set forth in this opinion are drawn from the statements and exhibits that the parties filed pursuant to Local Rule 56.1. [See Dkts. 212, 227, 228, 229, 230, 231, 232, 235, 236, 237, 241, 242.] These facts are undisputed except where a dispute is noted.[1] Day Pacer is a company that sold consumer leads to various educational

---

[1]   Local Rule 56.1 requires a party opposing a summary judgment motion to file, in response to the movant's statement of material facts, a concise response to the movant's

partners. [See Dkt. 229, ¶ 17; Dkt. 227-2, ¶¶ 4-5 (Tatton affidavit).] Day Pacer previously did business under the name EduTrek, among other names. These LLC Defendants purchased data from websites where people entered their contact information, including their phone numbers. [See Dkt. 229, ¶ 15; Dkt. 236, ¶ 4; Dkt. 227-2, ¶ 5 (Tatton affidavit).] Many—but not all—of the websites collecting consumer contact information contained job postings and advertised themselves as job search sites. [Dkt. 229, ¶ 24.]

After purchasing the consumer contact information from the websites, the LLC Defendants gave those phone numbers to what they refer to as "dialer companies" and paid those companies to call the numbers. [Dkt. 236, ¶¶ 20, 22.] If someone answered the call, the dialing vendor then transferred the call to Day Pacer. [*Id.*, ¶ 23.] Day Pacer operated its own 100 to 200 seat call center, which employed agents called College Search Advisers ("CSAs"). [Dkt. 229, ¶ 15.] If a consumer expressed interest in educational opportunities, Day Pacer sold that contact information to one or more educational institutions as a consumer lead. [Dkt. 236, ¶ 35; Dkt. 227-2, ¶¶ 5 & 18 (Tatton declaration).]

---

statement that shall contain: (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed (Local Rule 56.1(e)(1)), (B) a response to each numbered paragraph in the moving party's statement (Local Rule 56.1(e)(2)), and (C) in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon and a concise explanation of "how the cited material controverts the asserted fact" (Local Rule 56.1(e)(3)). Defendants' Local Rule 56.1 responses include multiple numbered paragraphs that purport to dispute the FTC's facts, but do not actually dispute the contents of the paragraph, do not provide citations to the record, and/or do not "concisely explain how the cited material controverts the asserted fact." This does not comply with Local Rules 56.1(b)(2) and 56.1(e). Where Defendants dispute the FTC's facts but fail to cite the record evidence or explain how it controverts the asserted fact, the FTC's facts are deemed admitted.

In addition to placing their own outbound telephone calls, Defendants also contracted with other telemarketing companies, the "IBT Partners," to place outbound telephone calls to consumers, determine potential eligibility for enrollment in post-secondary education, and transfer the calls to the LLC Defendants for further telemarketing. [See Dkt. 229, ¶ 35 (citing model inbound transfer agreement, PX10).] Many of the IBT Partners are located outside of the United States, for instance in India and the Philippines. [*Id.*, ¶ 39.] The LLC Defendants paid the IBT Partners for the leads that they called and then transferred to the LLC Defendants. [*Id.*, ¶ 43.] In some cases, Defendants provided the IBT Partners with the telephone numbers to call. [*Id.*, ¶ 44.] And in some cases, Defendants reviewed their IBT Partners' call scripts or provided them with scripts to use, or provided the IBT Partners with business information and guidance to increase the number of transfers they provided to the LLC Defendants. [*Id.*, ¶¶ 45, 46.]

According to the FTC, Defendants have violated the TSR by initiating millions of calls to numbers on the Do Not Call List and by assisting and facilitating the IBT partners' violations. For the most part, Defendants do not dispute that these calls occurred and that no efforts were made to comply with the TSR. Specifically, it is undisputed that between March 2014 and June 2019, the LLC Defendants made at least 3,669,914 calls to phone numbers on the Do Not Call List, including interstate calls. [Dkt. 229, ¶ 26.] Calls to numbers on the Do Not Call List accounted for approximately 25% of the outbound telephone calls initiated by the LLC Defendants. [*Id.*] Defendants did not subscribe to the Do Not Call registry and did not scrub their

calling lists of DNC numbers. [*Id.*, ¶ 27.] Defendants also admit that they instructed their CSAs to overcome the "objections" of consumers who told the CSAs that they were not interested in speaking about educational opportunities or were displeased about being called. [*Id.*, ¶ 29.] In addition, the FTC has introduced transcribed calling records indicating that numerous consumers were not interested in education or in speaking with Defendants at all. [*Id.*, ¶ 32.]

It is undisputed that between March 22, 2014 and June 12, 2019, the IBT Partners transferred 498,597 calls to Defendants that were the product of outbound telephone calls to numbers on the DNC Registry (20% of the total inbound transfers received from IBT Partners during that period). [Dkt. 229, ¶ 41.] The IBT Partners made an additional approximately 39,847,000 calls to DNC numbers, which did not result in inbound transfers to Defendants. [*Id.*] Defendants operated under the assumption that the IBT Partners did not scrub numbers against the DNC Registry. [*Id.*, ¶ 48; see also Dkt. 232, ¶¶ 26, 27, 41 (Cumming's 56.1 response disputing only that he "personally engaged" in telemarketing calls to numbers on the DNC Registry).]

The LLC Defendants received complaints from consumers, as well as from operators of the websites from which they purchased phone numbers, that they were initiating calls to phone numbers on the DNC registry. [Dkt. 229, ¶ 30; Dkt. 232, ¶ 30.] Defendants also received complaints from schools and other lead purchasers and their compliance companies that they were initiating calls to consumers without collecting proper express written authorization to be contacted. [Dkt. 229, ¶ 33; Dkt.

232, ¶ 33.] At least one major lead purchaser, EducationDynamics, refused to work with the LLC Defendants because it was concerned that their consumer data sources, such as websites, did not properly collect consumers' consent to be contacted. [*Id.*] Defendants admit that the LLC Defendants "continued to purchase consumer data generated from websites after receiving complaints regarding those websites depending on the particular complaint." [Dkt. 212-9 at 124 (response to request to admit no. 16).]

Defendants also received complaints and threatened lawsuits from consumers on the DNC Registry who were called by IBT Partners; Defendants acknowledge this but assert that the claims were false. [Dkt. 229, ¶¶ 49, 93; Dkt. 232, ¶¶ 49, 92; *see also* Dkt. 212-9 at 124 (response to request to admit no. 17).] Defendants admit that they sometimes continued to work with IBT Partners even after receiving complaints that they were calling DNC Numbers without consent. [*See* Dkt. 229, ¶ 42; Dkt. 212-9 at 124 (PX521, response to request to admit no. 15).] In one example, Defendants continued working with IBT Partner Bluewater despite repeated complaints and compliance notices. [Dkt. 229, ¶ 42; Dkt. 232, ¶ 42.] The FTC has also introduced call records showing that numerous consumers called by the IBT Partners were not interested in education or in speaking with the LLC Defendants at all. [Dkt. 229, ¶ 50; Dkt. 232, ¶ 50.]

Nonetheless, Defendants maintain that they did not violate the TSR, for three primary reasons: 1) the TSR is unconstitutional or otherwise invalid; 2) Defendants did not offer to sell the called parties anything and therefore are not subject to the

9

A-10

TSR; and 3) the called parties all consented to have their data sent to educational institutions. Defendants argue further that even if their conduct did violate the TSR, they did not have the requisite level of knowledge to be held liable for civil penalties.

The FTC issued a Civil Investigative Demand to EduTrek in 2016. At that time, Cumming told the FTC that EduTrek was dissolved, but did not mention that Day Pacer was operating the same business out of the same location with most of the same employees. [Dkt. 229, ¶ 60; Dkt. 232, ¶ 60.] The FTC filed the present lawsuit in 2019. Raymond and Day Pacer employees subsequently created two new companies, Allied Contract Management LLC and Entropy Leads LLC, to conduct telemarketing operating using Day Pacer employees. [Dkt. 229, ¶ 103.]

## II. Motion to Substitute

Following David Cumming's death, the FTC timely moved to substitute as defendant his daughter, Margaret Cumming, in her capacity as the personal representative of David's Estate. Federal Rule of Civil Procedure 25 governs the substitution of a party who has died. See *Russell v. City of Milwaukee*, 338 F.3d 662, 663 (7th Cir. 2003). Under Rule 25(a), "if the claim on which the suit is based survives the death (some claims, such as claims of defamation, die with the claimant), the court may order the substitution of the proper party, ordinarily the personal representative of the party who has died." *Atkins v. City of Chicago*, 547 F.3d 869, 870–71 (7th Cir. 2008).

Rule 25(a) is written in permissive terms ("the court may"), but the parties nonetheless debate how much discretion the Court has to deny a timely motion for

substitution following the death of a party. [See Dkt. 267 at 2 (FTC citing *Saylor v. Bastedo*, 623 F.2d 230, 237 (2d Cir. 1980), for the proposition that "it is difficult to imagine a case where discretion might properly be exercised to deny a motion to substitute for a deceased plaintiff made within the rule's time limits"); Dkt. 263 at 2-3 (the Estate citing *In re Baycol Prod. Litig.*, 616 F.3d 778, 783 (8th Cir. 2010), and *Beaudry v. TeleCheck Services, Inc.*, 2016 WL 11398115, at *11 (M.D. Tenn. Sept. 29, 2016), to show that the Court has discretion to deny a Rule 25(a) motion)]. The Court's own limited research indicates that it may be a proper exercise of discretion to deny a Rule 25(a) motion to substitute "where 'circumstances have arisen rendering it unfair to allow substitution." *Symons Int'l Group, Inc v. Continental Cas. Co.*, 2015 WL 1279839, at *9 (S.D. Ind. Mar. 20, 2015) (quoting *S & W X–Ray, Inc. v. Film Recovery Sys., Inc.,* No. 84 C 10479, 1987 WL 6626, at *3 (N.D. Ill. Feb. 9, 1987)); see also Fed. R. Civ. P. 25, advisory committee note to 1963 amendment. Regardless of the exact standard that applies, the Estate has not shown that it would be unfair to allow substitution.

The parties in this case agree that Margaret Cumming would be the proper party for substitution if the FTC's claims survived David's death. But the Estate opposes substitution on the basis that the FTC's claims are penal in nature and, therefore, did not survive David's death. As noted above, the FTC brought this suit to enforce Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the TSR promulgated under the Telemarketing Act, l5 U.S.C. §§ 6101–6108. Neither of these statutes specifies whether a claim brought to enforce it survives the death of the defendant.

11

A-12

Therefore, resolution of the survival issue is governed by federal common law. See *Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 413 (7th Cir. 1980), *overruled on other grounds by Pridegon v. Gates Credit Union*, 683 F.2d 182 (7th Cir. 1982); see also *Hoffman v. Sumner*, 478 F. Supp. 2d 1024, 1030 (N.D. Ill. 2007); *McKinney v. Panico*, 2022 WL 2356476, at *2 (N.D. Ill. June 30, 2022). Under federal common law, remedial claims survive the defendant's death, *Smith*, 615 F.2d at 415; actions for penalties do not, *Schreiber v. Sharpless*, 110 U.S. 76 (1884). But it is not always easy to tell if a statutory claim is remedial or penal.

The FTC Act has long been characterized as a remedial statute. *Sears, Roebuck & Co. v. F.T.C.*, 258 F. 307, 311 (7th Cir. 1919); see also *F.T.C. v. AT&T Mobility*, 883 F.3d 848, 854 (9th Cir. 2018) ("Because the FTC Act is a remedial statute, we are 'guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). But it also creates a cause of action for what the statute labels as "a civil penalty." 15 U.S.C. § 45(m)(1)(A). Under this provision, "[t]he Commission may commence a civil action to recover a civil penalty … against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices …. with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." *Id*. The FTC Act "requires that '[i]n determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on

A-13

ability to continue to do business, and such other matters as justice may require.'" *United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020) (quoting 15 U.S.C. § 45(m)(1)(C)).

Although the FTC Act labels an action under § 45(m)(1)(C) as one for "penalties," this does not necessarily mean that such an action is penal. The designations "penal" and "penalty" often appear in civil actions where the remedy is not in fact strictly penal. See *Huntington v. Attrill*, 146 U.S. 657, 667 (1892). The Seventh Circuit has not addressed whether an action for civil penalties under the FTC Act should be considered penal or remedial for purposes of allowing substitution of a defendant under Rule 25(a). Since the term penal "is used in different contexts to mean different things," the Seventh Circuit has identified three factors that should be considered in determining whether a statutory action is penal for survival purposes: "(1) whether the purpose of the action is to redress individual wrongs or wrongs to the public; (2) whether recovery runs to the individual or to the public; [and] (3) whether the authorized recovery is wholly disproportionate to the harm suffered." *Smith*, 615 F.2d at 414 (citing *Murphy v. Household Finance Corp.*, 560 F.2d 206, 209 (6th Cir. 1977)). The FTC and the Estate agree that this is the proper framework for assessing survivability. [See Dkt. 247 at 3; Dkt. 263 at 3.]

The FTC argues that the first factor weighs in favor of substitution because the purpose of the TSR is to protect individual consumers from specific telemarketing behavior identified as abusive and coercive. The Estate responds that the civil penalties in this case are intended as a deterrent, so therefore the remedy is meant

to address wrongs to the public, not individuals. *Smith* is instructive on how the Court should treat a statute that arguably addresses both general harm to the public and harm to specific consumers. The question in *Smith* was whether a claim for violation of the Truth In Lending Act ("TILA") survived the death of one of the defendants. On the first factor, the Seventh Circuit determined that the purpose of a TILA action is "to remedy abuses resulting from consumer ignorance of the nature of credit arrangements by requiring disclosures in the hope of enable consumers to shop for credit by comparing uniform terms." *Smith*, 615 F.2d at 414. The court acknowledge that "[w]ithout doubt, the statutory scheme ha[d] the effect of redressing a perceived social ill." *Id*. However, "the entire focus of the legislation [w]as on the options open to the individual consumer": it did not mandate terms and conditions of credit but rather "madate[d] only disclosure, leaving the consumer to choose among the available terms and conditions." *Id*; see also *James v. Home Const. Co. of Mobile, Inc.*, 621 F.2d 727, 729–30 (5th Cir. 1980) (agreeing with *Smith* that a TILA action under 15 U.S.C. § 1635 survives the death of the plaintiff). The statutes at issue here also focus on the individual consumer, even though they also have "the effect of redressing a perceived social ill." *Id*. The Congressional findings of the Telemarketing Act recognize that "[c]onsumers and others are estimated to lose $40 billion a year in telemarketing fraud," that "[c]onsumers are victimized by other forms of telemarketing deception and abuse," and that, "[c]onsequently, Congress should enact legislation that will offer consumers necessary protection from telemarketing

14

A-15

deception and abuse." 15 U.S.C. § 6101. The TSR leaves it to consumers to choose if they want telemarketing calls.

The Court is also guided by the Sixth Circuit's decision in *Parchman v. SLM Corp.*, 896 F.3d 728 (6th Cir. 2018), which involved whether a plaintiff's claims for violation of the Telephone Consumer Protection Act ("TCPA") survived the plaintiff's death. The TCPA prohibits much of the same conduct as the TSR, including calling numbers on the DNC List. *Compare* 16 C.F.R. § 310.4(b)(1)(iii)(B) (TSR DNC Registry provision), *with* 47 C.F.R. § 64.1200(c)(2) (TCPA rule DNC Registry provision); *compare* 16 C.F.R. § 310.2(ff)-(gg) (TSR definitions of "telemarketer" and "telemarketing") *with* 47 C.F.R. § 64.1200(f)(15) (TCPA rule definition of "telephone solicitation"); *see also* 15 U.S.C. § 6153 (directing FCC to "consult and coordinate" with the FTC "to maximize consistency with" rules promulgated by the FTC). The Sixth Circuit found that the claim survived and that the first factor weighed in favor of the plaintiff because "[t]he primary purpose of the TCPA was to protect individuals from the harassment, invasion of privacy, inconvenience, nuisance, and other harms associated with unsolicited, automated calls." *Parchman*, 896 F.3d at 738. The court rejected the notion that because "[t]he harm is widely shared does not mean it is a general public wrong," reasoning that "[t]hese are harms felt by identifiable individuals, as individuals." *Id.* at 739.

Likewise, when a consumer receives a telemarketing call after placing her name on the DNC List, but a telemarketer calls her anyway, the harm is felt by the individual consumer, not the public generally. If consumers do not mind receiving

such calls, and do not place their names on the DNC List, then the FTC will not sue to vindicate their interests. The first *Smith* factor therefore weighs in favor of substitutability. See also *F.T.C. v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16, 22–23 (D.D.C. 2004) ("While other courts have also acknowledged the dual remedial and penal nature of penalties assessed under consumer protection statutes, those courts have often found those penalties to be remedial, not penal, in nature." (citing *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 376 (1973)); see also *Citronelle–Mobile Gathering, Inc. v. O'Leary*, 499 F. Supp. 871, 887 (S.D. Al. 1980) (explaining that "most modern consumer remedies . . . [have] a dual purpose" that includes "remedying harm to the individual who could not practically protect himself from violations by allowing the government to enforce the law for the individual's benefit" and "deter[ring] prohibited business practices for the good of the general public," and that such a dual purpose does not vitiate the overall remedial nature of the claim); cf. *McKinney v. Panico*, 2022 WL 2356476, at *3 (N.D. Ill. June 30, 2022) (following "[m]ore recent decisions from courts in this District" that have found RICO claims to be remedial; while RICO had "both remedial and punitive aspects," "overall, the statute served to address individual wrongs").

Next, the Court considers *Smith*'s second factor: whether the recovery sought runs to the individual or to the public. The FTC concedes that the recovery it seeks would be paid to the U.S. Treasury, not the allegedly harmed consumers. According to the Estate, this factor is "critical" and requires the Court to deny substitution. [Dkt. 263 at 6.] But according to the FTC, the payment mechanism to the U.S. Treasury

16

A-17

does not by itself transform an otherwise remedial statutory scheme into one that is penal.

Cumming cites *United States v. Edwards*, 667 F. Supp. 1204 (W.D. Tenn. 1987), for the proposition that the second factor is "critical." That case involved the survivability of claims brought to enforce the civil penalty provision of the Clean Water Act. The first factor weighed against survivability because the complaint and "most of the testimony concerning harm dealt with harm to the general public from the destruction of habitats for the wetlands animal and plant life." 667 F. Supp. at 1213. The third factor—whether the civil penalty is disproportionate to the harm suffered—was "not … critical" because it depended on the "value of a fish, a tree, or an active beaver colony," which was subjective. See *id*. at 1213-14. On the second factor, the court contrasted the Clean Water Act with "antitrust, patent/copyright infringement, securities fraud, and truth in lending actions, where the penalty survives the wrongdoer's death'" and "any recovery of the so called 'penal' damages is paid to the injured party and not the government." *Id*. at 1213.

The FTC relies instead on *F.T.C. v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16 (D.D.C. 2004), which involved claims that City Mortgage Corporation violated the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691(f), and the FTC Act, 15 U.S.C. §§ 41–48. The ECOA authorizes the FTC to use its enforcement powers to implement the ECOA. See *Capital City*, 321 F. Supp. 2d at 20-21; 15 U.S.C. § 1691c(c). The court in *Capital City Mortgage* concluded that under factor two, the penalties sought by the FTC were not penal because the FTC's collection mechanism (to the

17

A-18

public at large rather than individuals) itself came from the FTC Act, a "remedial, consumer protection statute." 321 F. Supp. 2d at 22.

The Court finds *Capital City Mortgage* more relevant and helpful than *Edwards* because it analyzed the FTC Act and consumer protection statutes. See also *F.T.C. v. AMG Services, Inc.*, 2014 WL 2742872, at *2 (D. Nev. June 17, 2014) (granting unopposed motion to substitute trustee for deceased individual defendant in FTC action and noting that "[n]umerous courts have determined that consumer protection statutes, like TILA and the FTC Act, are remedial in nature"). Therefore, the fact that payments go to the public is not determinative of whether the relief is penal or remedial. See *Jim 72 Properties, LLC v. Montgomery Cleaners*, 151 F. Supp. 3d 1092, 1099 (C.D. Cal. 2015) (private right of action provided for under Resource Conservation and Recovery Act, which authorized citizen suit against a polluter, was primarily "remedial" in nature and therefore survivable; the Act was meant to address individual harms, since its focus was not just environmental waste clean-up, but also the health of those who had been harmed by toxic waste, and monetary penalties in the statute were intended to reimburse government for the actual costs of rectifying environmental degradation, not to punish polluter).

Finally, the Court examines whether the authorized recovery is wholly disproportionate to the harm suffered. In its summary judgment papers, the FTC maintains that Defendants are responsible for at least 4,168,511 violations of the TSR. [See Dkt. 211 at 36 & n.20.] If the FTC sought the maximum statutory recovery for each violation (between $16,000 and $42,530, depending on exactly when the

violation occurred), the total maximum allowable civil penalty would be in excess of $100 billion. *Id*. Its motion for summary judgment, the FTC proposes a civil penalty of $28,681,863.88—or about $6.88 per call.[2] The Estate argues that, in assessing proportionality, the Court should focus on the maximum recovery authorized by the statute, rather than the amount sought by the FTC. The Estate urges the Court to focus on "the sheer magnitude of the civil penalties [the FTC] has reserved the right to seek," which could reach into the billions of dollars. [Dkt. 263 at 7.]

The Court finds *Parchman* instructive on the third factor, too. The TSR and FTC Act, like the TCPA, allow "the court discretion to decide in each case whether and how much to increase damages, unlike the provisions in the other statutes which automatically provide multiple recovery." *Parchman*, 896 F.3d at 740.[3] Indeed, in *Dish Network*, the Seventh Circuit indicated that the Court should consider the "harm" caused by Defendants as the starting point for determining appropriate penalties, rather than the "wealth" of Defendants. 954 F.3d at 980. Since the statutory framework allows the Court "to evaluate the facts of a particular case and,

---

[2]     The FTC also calculates the per-call penalty using an additional 39,847,000 calls allegedly made "by Defendants' IBT partners," which "works out to approximately $0.65 per call." [Dkt. 247, at 5-6 & n.4.] However, the Court finds it inappropriate to use the larger number of allegedly illegal calls in assessing proportionality because the FTC represents in its summary judgment motion that it is not seeking civil penalties for the additional 39,847,000 calls. [Dkt. 211 at 17, n.6.]

[3]     And even statutes that automatically provide multiple recovery, like RICO, have been found to be remedial. See *Shearson/American Express v. McMahon*, 482 U.S. 220, 240-241 (1987) (the policing or penal function of RICO's treble damages provision is a "secondary concern" to its remedial one); *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406 (2003); *Saleh v. Merchant*, 2017 WL 1478000, at *6 (N.D. Ill. Apr. 25, 2017) (concluding that RICO treble damages are not "wholly disproportionate" and that a RICO claim survives a plaintiff's death).

19

A-20

perhaps, the harm caused to the plaintiff by the defendant's violations in determining the appropriate level of damages," this suggests that the TSR is remedial. *Parchman*, 896 F.3d at 740. Therefore, the Court finds it appropriate to focus on the amount actually sought by the FTC, rather than maximum statutory penalty in the billions.

The Estate further argues that even if the third factor is evaluated using the lower amount of $28.7 million, this is "wholly disproportionate" to the "intangible harm of allegedly unwanted phone calls." [Dkt. 263 at 7.] Plaintiff cites *Hannabury v. Hilton Grand Vacations Company, LLC*, 174 F. Supp. 3d 768 (W.D.N.Y. 2016), in support. In that case, the Western District of New York concluded in a TCPA case that "a $500 award for a phone call, which could be trebled up to $1,500, is wholly disproportionate to the harm suffered" by a plaintiff who received two phone calls from the defendant even though the plaintiff's phone number was on the DNC registry. *Id.* at 776. *Hannabury*, however, appears to be an outlier. The next court in the Western District of New York to consider the same issue declined to follow it, see *Sharp v. Ally Financial, Inc.*, 328 F. Supp. 3d 81, 97 (W.D.N.Y. 2018), and the Sixth Circuit in *Parchman* criticized it. See 896 F.3d at 738; see also *Precise v. Credit One Bank, N.A.*, 2018 WL 11491440, at *2 (N.D. Fla. July 26, 2018) (the TCPA's available remedies are not wholly disproportionate to the contemplated harms, even if they are non-monetary). Moreover, to the extent that *Hannabury* is instructive, it involved a per-call penalty—$500, or $1,500 when trebled—that was many times higher than the $6.88 per call that the FTC seeks here. For this reason, it provides weak support for the Estate's claim that $6.88 per call is wholly disproportionate.

A-21

The Estate emphasizes the sheer size of the award sought by the FTC, but that amount is large in great part because Defendants were responsible for placing millions of calls to consumers whose numbers are on the Do Not Call List. As the Seventh Circuit has recognized in the context of TSR violations, "[s]omeone whose maximum penalty reaches the mesosphere only because the number of violations can't complain about the consequences of its own extensive misconduct." *Dish Network L.L.C.*, 954 F.3d at 980. The high volume of allegedly violative calls—which represent individual consumer injuries—translates to a large dollar amount in civil penalties. But it does not follow that the magnitude of the alleged misconduct in this case—which results in the pursuit of high penalties—makes the statutory scheme penal rather than remedial. In light of how many consumers were allegedly harmed, the Court is not convinced that the amount sought by the FTC is grossly disproportionate to the harm caused by Defendants' telemarketing in violation of the TSR. To the extent that the Court has reservations about the size of the penalty sought by the FTC, the Court will explore them with the parties before ordering Defendants—and particularly the Estate—to pay civil penalties.

Outside of the *Smith* factors, the Estate argues that the Court should deny the motion for substitution based on the equities. [Dkt. 263 at 10.] From the Estate's perspective, substituting Margaret Cumming would be unfair because Day Pacer was "not a profitable business" and, as a partial owner, David Cumming invested more than he earned, so the money in the Estate was not the result of ill-gotten gains. [*Id.*] Further, the Estate points to the fact that David Cumming's heirs would be the

21

A-22

individuals to bear the financial impact of substitution, despite being unfamiliar with the underlying allegedly violative conduct. *Id.* By the same token, however, it would be inequitable to allow the Estate to avoid any liability while leaving Ian and Raymond responsible for the full penalty amount. The motion for substitution is granted.

## III.    Motions for Summary Judgment

### A.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). Where, as here, the parties have cross-moved for summary judgment, the Court is required to "'construe all inferences in favor of the party against whom the motion under consideration [was] made.'" *Ten Pas v. Lincoln Nat'l Life Ins. Co.*, 31 F.4th 541, 545 (7th Cir. 2022) (quoting *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005)). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'"

*Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

### B. Analysis

#### 1. Challenges to the TSR

Defendants raise a number of legal challenges to the TSR itself, which the Court will address before turning to the substance of the FTC's claims.

*First*, Defendants challenge the FTC's authority to bring an action to enforce the TSR on the basis that the FTC does "not maintain the requisite person specific registry" required by § 310.4(b)(1)(iii)(B). [Dkt. 219 at 32.] Instead, the FTC only "maintains a list of telephone numbers that are not identified by, or correlated to, the names of any person" and thus the "Registry does not show, and the FTC does not know, whether the account holder for the telephone number placed the telephone number on the Registry." [*Id.* at 33.] The Court is not convinced that the FTC lacks enforcement authority due to a purported failure to maintain a sufficiently detailed registry. Section 310.4(b)(1)(iii)(B) "does not say the call must be initiated to the person who registered the number on the Registry" in order to violate the TSR. *U.S. v. Network*, 75 F. Supp. 3d 942, 1007 (C.D. Ill. 2014), *vacated in part on reconsideration*, 80 F. Supp. 3d 917 (C.D. Ill. 2015). Rather, "[i]t is an abusive telemarketing act or practice and a violation of [the TSR] for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in … initiating any outbound telephone call to a person when … [t]hat person's telephone number is on the 'do-no-call' registry[.]" 16 C.F.R. § 310.4(b)(1)(iii)(B). A defendant violates the TSR by dialing a person whose number is on the registry, regardless of whether that person is the one who originally registered the number. The only relevant precedent cited by either side is *Dish Network*, with which this Court agrees. See 75 F. Supp. 3d at 1007 ("The TSR states that a violation occurs if the telemarketing call is initiated to a person when the person's telephone number is on the Registry.").

24

A-25

*Second*, Defendants raise a related First Amendment "overbreadth" challenge, arguing that enforcement of the TSR is unconstitutional because the registry applies to all calls to a telephone number and is not limited to calls by the person who initially placed the number on the registry. [See Dkt. 230 at 7.] Defendants suggest that the TSR was required to be narrowly tailored, citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015). But they do not explain the relevance of *Reed*, which involved a town sign code that subjected ideological, political, and temporary event signs to different restrictions. "Perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

In any event, telemarketing calls that interrupt a registrant's privacy at home are not somehow less of an invasion if the registrant's family member picks up the call than if the registrant does so. Indeed, the FTC explicitly considered the issue of households with multiple phone users and determined registering phone numbers is necessary to "accomplish its privacy protection objectives," noting that members of one household with differing interests in receiving calls could obtain more than one phone line or provide express authorization to specific telemarketers. 68 Fed. Reg. 4580, 4639 n.708; see also *id*. at 4640 & n.710 (explaining that collecting consumer telephone numbers rather than names was all that was needed to protect privacy, ensure accuracy of the Registry, and efficiently operate the Registry); 15 U.S.C. § 6155(a),(b) (numbers remain indefinitely on the Registry absent the individual to whom the number is assigned requesting removal or the number being disconnected

25

A-26

and reassigned). Congress expressly agreed with this approach in ratifying the Registry. 15 U.S.C. § 6151.

*Third*, Defendants also make a First Amendment "underinclusiveness" argument, which is slightly better developed but not supported by the cases on which Defendants rely. [See Dkt. 230 at 8-9.] According to Defendants, the TSR is content-based and therefore subject to strict scrutiny. Defendants cite the Tenth Circuit's decision in *Mainstream Marketing Services, Inc. v. F.T.C.*, 358 F.3d 1228 (10th Cir. 2004). [See Dkt. 230 at 8.] But that case does not support their argument. In *Mainstream Media*, the Tenth Circuit rejected telemarketers' First Amendment challenge to the FTC's and the FCC's do-not-call regulations, which exempted charitable and political callers. The Tenth Circuit applied intermediate scrutiny using *Central Hudson*'s "three-part test governing First Amendment challenges to regulations restricting non-misleading commercial speech that relates to lawful activity": "First, the government must assert a substantial interest to be achieved by the regulation. Second, the regulation must directly advance that governmental interest, meaning that it must do more than provide 'only ineffective or remote support for the government's purpose.' Third, although the regulation need not be the least restrictive measure available, it must be narrowly tailored not to restrict more speech than necessary." *Mainstream Marketing*, 358 F.3d at 1237 (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 564 (1980)). "Together, these final two factors require that there be a reasonable fit between the government's objectives and the means it chooses to accomplish those ends." *Id.* The

26

A-27

Tenth Circuit concluded that the DNC regulations satisfied this test because they were enacted to protect the privacy of individuals in their homes and to protect consumers against risk of fraudulent and abusive solicitation; the registry's opt-in character ensured that it did not inhibit any speech directed at the home of a willing listener; the registry blocked a substantial number and significant percentage of unwanted telemarketing calls; and Congress, the FTC and the FCC all determined that commercial calls affected by the registry were most to blame for problems that the regulations sought to redress. *Id.*

To the extent that Defendants urge the Court to apply *Mainstream Marketing Services*, it supports the FTC's position, not Defendants'. The TSR is intended to protect the privacy of individuals in their homes; its opt-in character ensures that it does not inhibit speech directed at willing listeners; and it is aimed at the same type of commercial speech examined by the Tenth Circuit. Although the Seventh Circuit has not expressly adopted this approach, it has cited it approvingly in at least one case. See *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305–06 (7th Cir. 2017) ("No one can deny the legitimacy of the state's goal: Preventing the phone (at home or in one's pocket) from frequently ringing with unwanted calls. … Federal law severely limits unsolicited calls to cell phones, and the FTC maintains a do-not-call registry for landline phones, just as the Postal Service maintains a no-junk-mail list. These devices have been sustained against constitutional challenge." (citing *Rowan v. Post Office*, 397 U.S. 728 (1970); *Mainstream Marketing Services*, 358 F.3d 1228))).

Defendants also rely [Dkt. 230 at 9] on the Supreme Court's decision in *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, -- U.S. -- (2020). In that case, the Supreme Court considered a First Amendment challenge to an exception to the TCPA's restriction on automated calls or "robocalls" to cell phones, for the collection of debts owed to or guaranteed by the federal government. The Court treated the statute as a content-based law, applied strict scrutiny, and concluded that the statute impermissibly favored debt-collection speech over political and other speech, in violation of the First Amendment. See *id.* at 2346-47. The dissent criticized the majority for applying strict scrutiny and called for the application of intermediate scrutiny evaluating the "restriction's speech-related harms in light of its justifications." *Id.* at 2362 (Breyer, J., dissenting in part). But the majority explained that its holding was limited: "The issue before us concerns only robocalls to cell phones … [and] [o]ur decision is not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity." *Id.* at 2347 (majority opinion). Given *American Association of Political Consultants*' limited holding, the Court finds it inappropriate to apply strict scrutiny to the TSR. And whether the Court applies intermediate scrutiny as in *Mainstream Marketing Services* (as Cumming urges) or the balancing approach used by the Seventh Circuit in *National Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783, 787 (7th Cir. 2006) (as advanced by the FTC), Cumming cannot establish a First Amendment violation.

A-29

In *National Coalition of Prayer*, the Seventh Circuit considered a challenge to a provision of Indiana's Telephone Privacy Act, which precluded tax-exempt charities from using professional telemarketers to place fundraising calls to state residents who placed their names on the state's do-not-call list. *Id.* at 784. The Court found that the law was not content-based, and thus, the plaintiff charities' free speech challenge to the provision would be analyzed under the legitimate interest test, rather than the strict scrutiny standard. *Id.* at 789. The court reasoned that since the Do Not Call List allowed residents to opt-in to the Act, the provision did not have to be narrowly tailored to protect residential privacy. *Id.* at 791-92. In addition, the court found that the Act was not underbroad even though it exempted political and charitable speech. The court reasoned that "[b]ecause the Act sharply curtails telemarketing—the speech that was most injurious to residential privacy—while excluding speech that historically enjoys greater First Amendment protection, we are satisfied that the Act is not underbroad." *Id.* at 792.

The TSR's Registry provisions are analogous to the Indiana do-not-call registry in National Coalition, involving an "opt-in" registry of consumer phone numbers. Its exemptions for political and charitable speech reflect the historically greater protection that such speech has enjoyed. And its other exemptions simply reflect that certain industries are not regulated by the FTC, such as banks, securities, insurance companies, and common carriers. Whether the TSR is analyzed using *National Coalition of Prayer*'s balancing approach or intermediate scrutiny as in *Mainstream Marketing*, Cumming is unable to establish a First Amendment violation.

29

A-30

*Fourth*, Defendants argue that consumers have a First Amendment right to solicit speech from them. [Dkt. 230 at 6-7 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (acknowledging a First Amendment right to "receive information and ideas" but upholding Attorney General's decision to deny visa to Belgium journalist whom American plaintiffs had invited to participate in academic conferences in the U.S.); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (due process right of inmates to seek and receive assistance of attorneys to challenge unlawful convictions and seek redress for violations of constitutional rights).] The Court does not find this argument compelling because the TSR does not prevent individuals who want to receive information from doing so. Consumers register their telephone numbers on the Registry precisely because they *do not* wish to receive telemarketing calls, and the Telemarketing Act and TSR set forth the compelling governmental purpose of protecting consumers' privacy. If Defendants could establish that the dialed parties did, in fact, provide express prior written consent that complies with the rule, then Defendants would not be liable under the TSR. But, as explained below, Defendants have failed to develop a factual record supporting their theory that they obtained consent from consumers to contact them about educational opportunities.

*Fifth*, Defendants argue that their commercial speech cannot be curtailed without violating the First Amendment because consumers could avoid the objectionable speech—the LLC Defendants' calls—by "not provid[ing] a name and phone number on a website." [Dkt. 230 at 18.] This argument also fails due to

A-31

Defendants' inability to demonstrate that all customers did, in fact, provide valid consent to be called about educational services that Defendants marketed.[4]

## 2.   Statute of Limitations

Defendants argue that the FTC's claims are subject to the three-year statute of limitations set out in 15 U.S.C. § 57b(d) and that, as a result, the FTC is barred from bringing suit based on any act or practice occurring prior to March 22, 2016. According to Defendants, this means that judgment should be entered in favor of EduTrek on all claims against it because EduTrek ceased doing business on October 31, 2015. [Dkt. 219 at 36.]

Defendants are not entitled to summary judgment based on the statute of limitations. Section 57b authorizes the FTC to seek compensatory remedies to redress injuries to consumers and others caused by a violation of an FTC rule. 15 U.S.C. § 57b(b). Claims brought under this provision are subject to a three-year statute of limitations. 15 U.S.C. § 57b(d). But the remedies provided in § 57b are "in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law." *Id*. § 57b(e).

The FTC seeks civil penalties under 15 U.S.C. § 45(m) and injunctive relief under 15 U.S.C. § 53(b). These sections of the FTC Act "contain no express statutes of limitations." *Dish Network*, 75 F. Supp. 3d at 1004. The FTC's claim for civil penalties is governed by the FTC's general five-year statute of limitations for actions

---

[4]   Defendants also raise an Eighth Amendment challenge, arguing that the FTC seeks an excessive fine and the suit is therefore penal in nature. The Court will address this argument when determining the appropriate penalty.

31

for "any civil fine, penalty, or forfeiture." 28 U.S.C. § 2462; see also *Gabelli v. S.E.C.*, 568 U.S. 442, 444 (recognizing § 2462 as the general federal statute of limitations for actions for civil penalties); *United States v. Ancorp Nat'l Servs., Inc.*, 516 F.2d 198, 200 n.5 (2d Cir. 1975) (applying § 2462 to actions for civil penalties under FTC Act for violations of cease and desist order); *Dish Network*, 75 F. Supp. 3d at 1004. And the FTC's claim for equitable relief is not subject to any statute of limitations. See *id.* (citing *F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1012 (N.D. Cal. 2010); *F.T.C. v. Instant Response Systems, LLC*, 2014 WL 558688, at *3 (E.D.N.Y. Feb. 11, 2014); *F.T.C. v. Minuteman Press*, 53 F. Supp. 2d 248, 263 (E.D.N.Y. 1998)).

### 3. Liability for Calls Made by the LLC Defendants

The FTC seeks to hold Defendants responsible for calls placed by the LLC Defendants and their dialing vendors. As noted above, it is undisputed that the LLC Defendants made at least 3,669,914 calls to phone numbers on the Do Not Call List. [Dkt. 229, ¶ 26.] Defendants also do not dispute that at least some of those calls were interstate phone calls. [*Id.*, ¶ 40.][5]

Instead, Defendants take the position that their business is not subject to the TSR because: 1) the TSR does not apply to their calls, which did include sales pitches and were purely informational; and 2) the LLC Defendants only called consumers who solicited and consented to receiving their calls. Further, Defendants contend that even if their understanding of the TSR was wrong, the FTC cannot establish that

---

[5]      In its opening brief, the FTC establishes that Day Payer and EduTrek were operated as a common enterprise such that they their liability should be joint and several. [See Dkt. 211 at 24-25.] The FTC also establishes that Day Pacer is liable for EduTrek's TSR violations as a successor to EduTrek. [See *id.* at 25-26.] Defendants do not dispute either point.

Defendants had actual knowledge or knowledge fairly implied on the basis of objective circumstances that they were violating the TSR.

### a. Are the LLC Defendants' Activities Subject to the TSR?

Defendants argue that they are entitled to summary judgment because the LLC Defendants are not "telemarketers" and have not engaged in "telemarketing" as those terms are defined in the TSR. In support of this argument, Defendants *do not* rely on the TSR's definition of "telemarketer," which includes "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor," 16 C.F.R. § 310.2(ff), or "telemarketing," which means "a plan, program, or campaign which is conducted to induce the purchase of goods or services. . . ." 16 C.F.R. § 310.2(gg). Instead, Defendants rely on a Revised Notice of Proposed Rulemaking and a Statement of Basis and Purpose of the Final Rule, which the FTC issued while promulgating the TSR. [See Dkt.219 at 26-27.] Both of these sources explain: "The Commission intended that the definition of the term 'telemarketer' apply to persons making a telephone call to, or receiving a telephone call from, a customer in connection with or about the purchase of goods or services. It does not include persons making or receiving customer service calls or similar tangential telephone contacts *unless a sales offer is made and accepted during such calls.*" [*Id.* at 26 (quoting 60 Fed. Reg. 30,406, at 30,411 (June 8, 1995), and 60 Fed. Reg. 43,842, at 43,844 (Aug. 23, 1995); emphases by Defendants).] Based on this guidance, Defendants argue that they are not subject to the TSR because they "never engaged in a conversation in which a sales pitch or sales offer was made or accepted during

the conversation, or any sales call of any kind." [*Id.* at 27.] Rather, their conversations were "purely informational." [*Id.*]

Defendants are misreading the FTC's guidance. The language they emphasize—"unless a sales offer is made and accepted during such calls"—is modifying the sentence concerning "customer service calls"; such calls are not considered telemarketing "unless a sales offer is made and accepted during such calls." The FTC has advised in its "FAQs" that "purely informational calls" are limited to incidental contacts "like your cable company confirming a service appointment." [Dkt. 227-7 at 3-4.] Its guidance has no application here, because none of the challenged calls were to existing customers or concerned customer service issues. The FTC's guidance does not modify the plain language of the TSR, which defines "telemarketing" broadly to including any "plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution …." 16 C.F.R. § 310.2(gg). Neither the definition of telemarketer nor telemarketing requires a direct sale or sales offer between the person placing the call and the consumer.

Moreover, Defendants do not dispute that the LLC Defendants' business model was designed to generate consumer leads in order to sell them to educational programs. [See Dkt. 219-2, ¶¶ 4-5 (Tatton affidavit).] For instance, Cumming acknowledges that "[t]he goal of the two call center companies was to sell leads." [Dkt. 230-1, ¶ 10(h).] For-profit educational programs then used those leads in an effort to enroll people in their programs. [Dkt. 229, ¶ 17; Dkt. 212-7 at 33 (deposition

transcript of Brett Larson, who worked for EduTrek and Day Pacer).] Defendants referred to this sales goal as "conversion." [Dkt. 229, ¶ 18; Dkt. 212-3 at 166 *et seq.* (PX64, Day Pacer email concerning conversion).] The FTC has also presented multiple pieces of evidence that Day Pacer self-identified as being part of educational marketing services. [Dkt. 229, ¶¶ 16-19; Dkt. 232, ¶¶ 16-19; Dkt. 212-3 at 227 *et seq.* (PX87, EduTrek Articles of Incorporation); Dkt. 212-5 (PX126, Day Pacer's IRS Form 1065).] In sum, the undisputed facts show that the LLC Defendants engaged in telemarketing as defined by the TSR. Their entire business model depended on being a marketing partner as part of a plan between multiple businesses to connect consumers to various for-profit programs.

In a separate argument, Defendants claim that they did not engage in "telemarketing" because they did not use telephones in any of their conversations with consumers; rather, they used headsets and computers and the calls were all voice over Internet protocol ("VoIP"). Defendants do not cite any authority or offer any explanation for the proposition that VoIP calls should be excluded from the coverage of the TSR. Perfunctory and undeveloped arguments such as this one are waived. See *Britney S. v. Berryhill*, 366 F. Supp. 3d 1022, 1028 (N.D. Ill. 2019) (citing *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016); *Thomas v. Colvin*, 745 F.3d 802, 807-808 (7th Cir. 2014)). In addition, as the FTC noted, the limited case law on this question strongly suggests that calls made using VoIP technology are subject to the TSR. See *Dish Network*, 75 F. Supp. 3d at 936 ("Nothing in the TSR limits the TSR's coverage to residential landlines or excludes wireless or VoIP lines from coverage.");

cf. *FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1019 (W.D. Tex. 2020) (VoIP provider that allegedly participated in deceptive telemarketing scheme could be held liable under the TSR's "substantial assistance" provision; VoIP provider was not covered by exemption from liability for "common carriers").

### b. Did the LLC Defendants have actual knowledge or knowledge fairly implied under the circumstances that their business model was subject to the TSR?

In order to be held liable for civil penalties, it is not enough that the LLC Defendants were responsible for initiating calls to numbers on the Do Not Call List. Instead, the FTC must show that the LLC Defendants had "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). This language provides a "mistake-of-law defense to civil liability." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583-84 (2010); see also *Dish Network*, 954 F.3d at 978 ("§ 45(m)(1)(A) includes a variation on an ignorance-of-the-law defense"). "Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors. A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *United States v. National Financial Services, Inc.*, 98 F.3d 131, 139 (4th Cir. 1996) (applying 15 U.S.C. § 45(m)(1)(A)) (citing S.Rep. No. 1408, 93rd Cong., 2nd Sess. 4, 1974 U.S.C.C.A.N. 1772); see also 1974 U.S.C.C.A.N. 7755, 7772 ("In determining whether knowledge of a Commission rule may be fairly implied, it is intended that the courts hold a defendant responsible where a reasonable and prudent man under the circumstances

would have known of the existence of the rule and that the act or practice was in violation of its provisions."); *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 929–30 (C.D. Ill. 2017), *rev'd in part on other grounds*, 954 F.3d 970 (7th Cir. 2020); *United States v. Commercial Recovery Systems, Inc.*, 179 F. Supp. 3d 728, 737 (E.D. Tex. 2016).

Defendants claim they did not know, nor did they have any reason to know, that the TSR applied to their businesses. All three of the Individual Defendants, as well as EduTrek's former president Chad Tatton, attested in their affidavits that they knew about the TCPA but did not know or have reason to know that the TSR applied to their businesses, which they characterize as purely informational calls made to consumers who have consented to receiving such calls. More particularly, Ian Fitzgerald, Day Pacer's president beginning in 2016, states that in late April 2016 Day Pacer considered expanding into selling goods and services to consumers, but "learned of the provisions of TSR and decided that Day Pacer would not transition its business from one governed by the TCPA to one governed by the TSR." [Dkt. 219-3, ¶ 23.] Raymond says the same. [Dkt. 219-4, ¶ 18.]

Cumming states in his affidavit that when "new managers" of Day Pacer suggested in 2016 that "the company take on new clients and make calls intended to induce the purchase of those clients' goods or services," he "did some research" (which he does not specifically identify) and "determined that making sales calls would require registration of the company as a telephone solicitor with the State of Utah and would subject the company to regulation under the TSR." [Dkt. 230-1, ¶ 15.] He

"suggested that management review those regulations" and "opposed changing the company's business model to include telemarketing because of the additional regulation and risk that would be involved." [*Id.*] Cumming believed that "the TSR applies only to telephone calls intended to induce the purchase of goods or services." [*Id.*, ¶ 18.] He also emphasized that the LLC Defendants never established goals for sales or the conversion of leads by the schools with which the LLC Defendants contracted. [*Id.*, ¶¶ 19-20.]

The individual Defendants provide no details concerning the research that Cumming (or any other attorneys) performed or why it led them to believe that Day Pacer was exempt from the TSR. To the extent that Cumming's research consisted of reading the FTC guidance that Defendants rely on in their summary judgment briefs, no reasonable and prudent person under the circumstances would have concluded that they authorized Defendants' telemarketing activity. Further, Defendants do not explain how they could reasonably have known they were subject to the TCPA, which applies to a "telephone solicitor" that initiates calls "for the purpose of encouraging the purchase . . . of . . . goods, or services," but not to the TSR, which applies to a "telemarketer" that initiates calls "in connection with" "a plan, program, or campaign which is conducted to induce the purchase of goods or services." *Compare* 47 C.F.R. § 64.1200(f)(15), *with* 16 C.F.R. § 310.2(ff)-(gg).

The LLC Defendants received complaints from consumers, as well as from operators of the websites from which they purchased phone numbers, that they were initiating calls to phone numbers on the DNC registry. [Dkt. 229, ¶ 30; Dkt. 232, ¶

30.] Defendants also received complaints from schools and other lead purchasers and their compliance companies that they were initiating calls to consumers without collecting proper express written authorization to be contacted. [Dkt. 229, ¶ 33; Dkt. 232, ¶ 33.] At least one major lead purchaser, EducationDynamics, refused to work with the LLC Defendants because it was concerned that their consumer data sources, such as websites, did not properly collect consumers' consent to be contacted. [*Id.*] Defendants admit that the LLC Defendants "continued to purchase consumer data generated from websites after receiving complaints regarding those websites depending on the particular complaint." [Dkt. 212-9 at 124 (response to request to admit no. 16).]

Defendants' argument that they did not understand the TSR's definition of "telemarketing" is comparable to a "mistake of law" argument that the Seventh Circuit considered and rejected in *Dish*. Dish argued that it lacked the knowledge necessary to be liable for civil penalties for calls made to its former customers, because "it did not know that it lacked an 'established business relationship' with customers who had stopped paying their bills before DISH disconnected their service (a mistake of law)." *Dish Network*, 954 F.3d at 978. Dish maintained that it did not know the legal definition of "established business relationship" under the FTC's rules, because an FTC comment that accompanied the rule purportedly suggested that Dish could start the 18-month time limit for calling former customers on the date it disconnected a customer's service, even if that date came after the customer's subscription expired for lack of payment. *Id.* at 979. The Seventh Circuit agreed with

39

the district court that the text of the rule required the 18-month clock to start from the date of the customer's last payment. The Seventh Circuit found that the rule was not ambiguous and that to the extent the FTC's comments were inconsistent with the TSR's text, "the text prevails," rejecting Dish's "mistake of law" defense. *Id.* Likewise, in this case, Defendants misread the FCC's commentary on "purely informational calls," the TSR is not ambiguous, and Defendants are not entitled to take the mistake of law defense to a jury.

<blockquote>

**c.    Did the LLC Defendants limit their telemarketing to consumers who solicited and consented to receiving calls about for-profit educational opportunities?**
</blockquote>

Defendants argue that they are not subject to the TSR or any requirements to scrub calling lists against the Do Not Call List because the LLC Defendants only called consumers who solicited a conversation with them. Defendants begin with the statute that authorized the FTC to promulgate the TSR, 15 U.S.C. § 6102(a)(3)(A). This provision requires the FTC to include in its rules "a requirement that telemarketers may not undertake a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy." *Id.* Defendants contend that this provision limits the FTC's regulatory authority to "unsolicited" telephone calls. [Dkt. 227 at 18.] Defendants also rely on the TSR's use of the term "initiate." Under the TSR, "[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in ... (iii) *Initiating* any outbound telephone call to a person when: ... (B) That person's telephone number is on the 'do-not-call'

40

registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services *unless* the seller or telemarketer" can demonstrate that the seller either (1) "has obtained the express agreement, in writing, of such person to place calls to that person"; or (2) "has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section." 16 C.F.R. § 310.4(b)(1)(iii)(B) (emphasis added). Defendants claim that the FTC used the word "initiate" to "distinguish[] between the Congressionally intended prohibited unsolicited calls to consumers and the consumer solicited calls that were not to be prohibited." [Dkt. 227 at 20.] According to Defendants, all of their calls fall into the first bucket.

The Court is not persuaded by Defendants' reading of the statute to impose a burden on the FTC to show that calls to numbers on the DNC Registry were "unsolicited." The language of the TSR, as part of the larger regulatory scheme, makes it clear that a telemarketer initiates a call when it places an outbound call. And a telemarketer violates the TSR when, as here, the telemarketer initiates, that is, places, an outbound call to a phone number on the Do Not Call List. To construe the word "initiate," undefined in the federal rule here, the Court looks to the canons of statutory interpretation. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2419 (2019) ("[A] court must apply all traditional methods of interpretation to any rule, and must enforce the plain meaning those methods uncover."); see also, e.g., *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 668–69 (2007) (invoking the canon

against surplusage in interpretation of regulation); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007) (invoking the canon that the specific governs the general). The Court starts with the plain meaning of the statute's text. See *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). The "first step ... is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "Where Congress's intent is clear from that language, it must be given effect." *Arobelidze v. Holder*, 653 F.3d 513, 518 (7th Cir. 2011) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). The plain language of the TSR makes it clear that to "initiate" a call means to place such a call. It's as simple as that. It is a violation of the TSR to make an outbound call to someone on the do not call registry unless the telemarketer or seller "[c]an demonstrate" that "the seller has obtained the express agreement, in writing, of such person to place calls to that person." 16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

Defendants cannot demonstrate that they have obtained such consent. It is undisputed that neither Defendants nor their dialing vendors owned the websites from which the LLC Defendants purchased phone numbers. Defendants acknowledge that the websites collecting consumer information sold those phone numbers to the company willing to pay the highest price—here, the LLC Defendants. The record does not contain screenshots or other contemporaneous evidence to establish the contents of the websites on which the customers supposedly provided express written consent. In short, the record simply does not support Defendants' position that customers

invited and solicited calls from the yet unknown highest bidder purchasing their contact information.

Defendants' primary evidence of "consent" is their call records, which purport to identify the URLs, or website locations, where the consumers entered their phone numbers. [Dkt. 229, ¶ 107; Dkt. 232, ¶ 106.] However, Defendants have not demonstrated that the URLs lead to pages collecting valid written consents. By contrast, the FTC reviewed a random sample of 750 of the LLC Defendants' call records to see if the URLs were complete and linked to websites that indicated evidence of consent. [Dkt. 229, ¶ 108; Dkt. 232, ¶ 107.] This review indicated that in nearly all cases, the URL records were blank, contained text that was not a web page, or did not point to an active web page. Even when they did point to an active web page, they did not contain any language about telephone calls. [Dkt. 229, ¶ 109; Dkt. 232, ¶ 108.] Defendants criticize how this analysis was performed, primarily because it looked at the webpages as they currently exist rather than using the Wayback Machine to view the webpages as of the dates that the consumers viewed them when the consent was gathered. [See Dkt. 241 at 11-12.] But *Defendants* have the burden to show consent. Here, besides a handful of call transcripts indicating that some customers were interested in the educational opportunities they marketed [see Dkt. 241 at 9; Dkts. 241-2 through 241-15], Defendants have no evidence that consumers wanted to receive calls from the LLC Defendants and their dialing vendors or consented to receiving such calls.

43

A-44

By contrast, records identified by the FTC support its position that the LLC Defendants did not have valid consent. Consumers entered their contact information on websites primarily focused on job opportunities, not education. Defendants dispute this based on generic hearsay and authentication grounds, but fail to discuss the particular evidence offered by the FTC or other evidence establishing the websites' contents. [See 229, ¶ 24.] Several of the statements come from the LLC Defendants' own employees in the course of their employment, which do not constitute hearsay. See Fed. R. Evid.801(d)(2)(D) (hearsay does not include a statement offered against an opposing party that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed"); *Stepp v. Covance Central Laboratory Services, Inc.*, 931 F.3d 632 (7th Cir. 2019). For instance, EduTrek's director of lead generation, Nathan Clegg, testified that job search websites were "the most common type of website where [EduTrek] would receive a lead." [Dkt. 212-7 at 214 (Tr. 28:12-21) (PX309)]. Similarly, Lon Kennard, who was vice president of operations for EduTrek, wrote in a November 2014 email to employees that "[m]any of our leads come from job boards (or similar sites)" and that "these people may not have read/understood the statement asking if they would like a phone call from us regarding their education." [Dkt. 212-3 at 111 (PX37).]

Finally, in further support of their consent argument Defendants point to the fact that consumers consented to their calls being transferred between the dialing vendors and Day Pacer and therefore they could have avoided the call. But by that point, the train had left the station. The dialing vendors had already initiated a call

44

A-45

to a number on the Do Not Call List. Whether the consumers then agreed to be transferred does not show that the dialing vendors somehow had consent to call the consumers in the first place. Viewing the record as a whole and in the light most favorable to Defendants, Defendants fail to show that they only called consumers who solicited and consented to receiving calls about for-profit educational opportunities.

> **d.   Did the LLC Defendants have actual knowledge or knowledge fairly implied under the circumstances that they did not have valid consent to call numbers that appear on the Do Not Call Registry?**

The undisputed record, viewed in the light most favorable to Defendants, shows at a minimum that Defendants had knowledge fairly implied under the circumstances that there were not valid written consents for at least a portion of the numbers they purchased and dialed, yet did not take any steps to safeguard against this problem or comply with the TSR.

Defendants admit that they received complaints from schools and other lead purchasers—including their compliance companies—that the LLC Defendants and their dialing vendors were calling consumers without proper consent. Dkt. 229, ¶ 33; Dkt. 232, ¶ 33. For example, one of the educational institutions that bought leads from Day Pacer submitted an incident report to them noting that the registration path to enter consumer information on the job search site lacked a necessary disclaimer that it was a separate educational offer, and that there was no opt out option. [Dkt. 212-6 at 219 *et seq.* (PX222, Corinthian Colleges email).] Another lead purchaser, Education Dynamics, emailed Day Pacer indicating they had reviewed the contact information forms included on various websites. [Dkt. 212-6 at 136 *et seq.*

(PX180).] According to the email from Education Dynamics, the forms did not comply with consent requirements that would allow for phone calls. [*Id*.]

In sum, the summary judgment record shows no material factual dispute that the LLC Defendants initiated at least 3,669,914 calls to phone numbers on the Do Not Call List; that at least some of these calls were interstate [PSOF ¶ 40; DSOF at 27, ¶ 40]; and that Defendants did not maintain records sufficient to demonstrate that it obtained valid consent for all or any portion of its calls to numbers on the Do Not Call List. The summary judgment record belies any claim that Defendants did not know—or that a reasonably prudent person would not know—that they were not getting valid consents. The FTC is entitled to summary judgment on Count 1 to the extent it is based on calls made by the LLC Defendants and their dialers.

### 4. Liability for Calls Made by the IBT Partners

The FTC also seeks to impose liability on Defendants for calls placed by their IBT Partners. It is undisputed that between March 22, 2014 and June 12, 2019, the IBT Partners transferred 498,597 calls to the LLC Defendants that were the product of outbound telephone calls to numbers on the DNC Registry (20% of the total inbound transfers received from IBT Partners during that period). [Dkt. 229, ¶ 41; Dkt. 232, ¶ 41.] It is also undisputed that the IBT Partners made an additional approximately 39,847,000 calls to DNC numbers, which did not result in inbound transfers to the LLC Defendants. [*Id*.]

The FTC advances two alternative theories for holding the LLC Defendants liable for these calls: First, that the IBT Partners were acting as Day Pacer's agents

when they called numbers on the DNC Registry, making Day Pacer liable as principal; and second, that Day Pacer assisted and facilitated the IBT Partners' violations. The FTC moves for summary judgment on both theories of liability, in the alternative. [See Dkt. 211 at 18-19.]

The FTC asserts three theories of agency liability: actual, implied, and by ratification. Whether an agency relationship exists is normally a question of fact, *Clarendon Nat. Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011), which requires the Court to examine (1) whether the IBT Partners "act on [the LLC Defendants'] behalf and (2) whether they are subject to its control." *F.T.C. v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 773 (N.D. Ill. 2016). The FTC has not provided enough details about the various IBT Partners, or the specific complaints that the LLC Defendants received about them, to allow the Court to conclude as a matter of law that any or all of the IBT Partners were the LLC Defendant's agents.

For instance, the FTC cites to a model inbound transfer agreement (PX10), but does not explain whether any, all, or some subset of the IBT Partners are subject to that agreement. Nor does the FTC elaborate on the level of control that the model agreement—or the parties' actual practice—gives the LLC Defendants over the IBT Partners' operations. Although it is undisputed that the LLC Defendants provided *some* of the IBT Partners with telephone numbers, scripts, and other support, it is not apparent from the record if this was the typical arrangement or less common. To the extent that the FTC's theories of agency liability depend on the LLC Defendants

47

knowing about and ratifying particular misconduct by their IBT Partners, the record generally lacks the granular detail necessary to make such a determination.

The FTC has traced a clearer path to liability on its alternative "assisting and facilitating" claim. As explained in the next paragraph, the Court agrees with the FTC that it has satisfied its burden to show that the LLC Defendants assisted and facilitated at least one IBT Partners' violations of the TSR. The FTC is therefore entitled to summary judgment on Count II. Pursuant to the Seventh Circuit's decision in *Dish*, the FTC is entitled to judgment on only one theory of liability, at least absent any attempt by the FTC to distinguish between the various IBT Partners. See *Dish Network*, 954 F.3d at 978 ("When an entity is vicariously responsible for another's acts (as a corporation is vicariously for the acts of its employees, and DISH is vicariously responsible for the acts of the order-entry retailers), it makes little sense to treat the entity as assisting itself. It would take clearer language than § 310.3(b) to support such a conclusion. The district court therefore should not have held DISH liable for 'substantially assisting' its own agents."). Therefore, Defendants are entitled to summary judgment on Count I to the extent that it is based on calls placed by the IBT Partners.

Turning to Count II, liability for assisting and facilitating telemarketers' calls to DNC Numbers requires: 1) providing substantial assistance or support to the telemarketer; and 2) knowing or consciously avoiding knowing that the telemarketer is engaged in any act or practice that violates Section 310.4 of the TSR, including initiating calls to DNC Numbers. 16 C.F.R. § 310.3(b). The first element "does not

48

impose a demanding standard, as it requires only that the assistance be 'more than mere casual or incidental dealing with a seller or telemarketer that is unrelated to the violation of the Rule.'" *F.T.C. v. Consumer Health Benefit Ass'n*, 2011 WL 3652248, at \*5 (E.D.N.Y. Aug. 18, 2011) (quoting TSR, 60 Fed. Reg. 43842–01, 43852 (FTC, Aug. 23, 1995) (statement of basis and purpose)); see also *United States v. Dish Network*, 667 F. Supp. 3d 952, 961 (C.D. Ill. 2009); *F.T.C. v. Consumer Health Benefits Ass'n*, 2012 WL 1890242, at \*6 (E.D.N.Y. May 23, 2012); *F.T.C. v. HES Merchant Services Co., Inc.*, 2014 WL 6863506, at \*7–8 (M.D. Fla. Nov. 18, 2014). Put slightly differently, the FTC simply must show "a connection between the assistance provided and the resulting violations of the core provisions of the TSR." *Dish Network*, 667 F. Supp. 3d at 961.

In this case, the undisputed evidence shows that the LLC Defendants paid the IBT Partners to make calls and transfer leads to them. [Dkt. 229, ¶ 43; Dkt. 232, ¶ 43.] "[N]o assistance could be more substantial or more directly connected to the core violations of the TSR than paying someone to commit the acts that violated the TSR." *Dish Network*, 667 F. Supp. 3d at 961. The undisputed evidence also shows that Defendants knew or consciously avoided knowing that at least one of its IBT Partners was violating the TSR. "Knowledge or conscious avoidance of knowledge may be inferred when the person providing assistance receives complaints about violations." *Consumer Health Benefits Ass'n*, 2011 WL 3652248, at \*5 (citing *Dish Network*, 667 F. Supp. 2d at 961). The FTC has demonstrated that the LLC Defendants continued to pay and work with IBT Partners even after receiving complaints from schools,

49

A-50

consumers, and compliance monitoring companies that their IBT Partners were calling DNC Numbers without consent. [See Dkt. 229, ¶ 42; Dkt. 232, ¶ 42; Dkt. 212-9 at 124 (PX521, response to request to admit no. 15).] The FTC also provides at least one specific example: Defendants continued working with IBT Partner Bluewater despite repeated complaints and compliance notices. [Dkt. 229, ¶ 42 (citing Dkt. 212-6 at 118 (PX175), 124 (PX177), 129 (PX178), 133 (PX179); Dkt. 212-7 at 168 (PX307); Dkt. 212-9 at 25 (PX508), 118 (PX521); Dkt. 212-10 at 315 (PX593)).] Defendants do not substantively dispute anything about the Bluewater example. [See Dkt. 229, ¶ 42; Dkt. 232, ¶ 42.] The emails and other records cited by the FTC show that Defendants continued working with Bluewater despite repeated complaints and compliance notices. Day Pacer did not terminate the relationship; rather, Bluewater "just kind of disappeared one day." [*Id.*] A few months later, Day Pacer started a new relationship with XactCall Inc., which like Bluewater was operated by Paul Flannery. [*Id.*] The FTC has also introduced call records showing that numerous consumers called by the IBT Partners were not interested in education or in speaking with the LLC Defendants at all. [Dkt. 229, ¶ 50; Dkt. 232, ¶ 50.]

Based on the undisputed record, the FTC is entitled to summary judgment on its substantial assistance claim. The Court finds it unnecessary to determine whether the LLC Defendants substantially assisted each and every one of the IBT Partners, because the FTC does not seek civil penalties based on calls made by the IBT Partners, and its proposed injunction [see Dkt. 211-1] does not contain any provisions concerning the IBT Partners. It is enough for purposes of determining liability that

A-51

the FTC has shown that the LLC Defendants substantially assisted Blue Water's violations of the TSR.

### 5. Liability of the Individual Defendants

The FTC seeks to hold the Individual Defendants liable for TSR violations committed by the LLC Defendants. "To impose individual liability on the basis of a corporate practice, the Commission must prove (1) that the practice violated the FTCA; (2) that the individual 'either participated directly in the deceptive acts or practices or had authority to control them'; and (3) that the individual 'knew or should have known about the deceptive practices.'" *FTC v. Credit Bureau Center, LLC*, 937 F.3d 764, 769 (7th Cir. 2019) (quoting *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005)); see also *FTC v. Pacific First Benefit, LLC*, 472 F. Supp. 2d 974, 980 (N.D. Ill. 2007). The FTC is "not required to prove subjective intent to defraud." *World Media Brokers*, 415 F.3d at 764.

The FTC has satisfied the first element by showing that the LLC Defendants initiated millions of calls to numbers on the Do Not Call Registry. It has satisfied the second element, too, because the undisputed facts in the record also show that each of the Individual Defendants either participated directly in the deceptive acts or practices or had authority to control them—Ian by running Day Pacer, and Raymond and Cumming by advising when the LLC Defendants were faced with strategic business decisions and legal complaints.

More particularly, Ian served as President of Day Pacer beginning June 1, 2015. In that role, he was responsible for the day-to-day operation of the company,

including hiring and firing employees, signing contracts, and responding to compliance issues. He was responsible for the company's profitability and had access to its bank accounts and accounting records. [Dkt. 229, ¶ 70.] Ian understood the laws and regulations applicable to his businesses. As evidence of this, on October 13, 2015, he wrote an email to Brett Larsen and Nate Clegg about a lawsuit filed by a consumer against EduTrek and opined: "We should sit down with Blake this Friday and talk about how this could have happened if it did. We need to make sure our system is not calling DNC numbers ever." [Dkt. 229, ¶ 81.]

Raymond was a managing member of both EduTrek and Day Pacer. [Dkt. 227-6, ¶ 5.] As a managing member, he was required to "devote the time and effort as is reasonably required in the business of the company" and to "do and perform all … acts as may be necessary to or appropriate to the conduct of the Company's business." [Dkt. 229, ¶ 75.] He invested money, reviewed monthly and quarterly financial statements, met or refused to meet capital calls, and occasionally received distributions. [*Id.*] He also reviewed contracts entered into by the LLC Defendants. Raymond claims that he did not have the expertise or the time to be more involved. [Dkt. 227-6, ¶ 6.] He admits, though, that he "was consulted with respect to claims that threatened lawsuits," including ones involving violations of the TCPA, but claims they were all "false" and "stick-ups." [*Id.* ¶¶ 9-13; see also Dkt. 229, ¶ 90.] Clegg testified that he would go to Raymond if a consumer complained that either company had violated the TCPA. [*Id.* ¶ 92.]

Cumming was a corporate manager of EduTrek and Day Pacer, along with Raymond. [Dkt. 230-1, ¶ 10(c).] Cumming discussed Day Pacer's business model, sales tactics, strategic direction, as well as industry statistics, with Ian and Raymond. [Dkt. 232, ¶ 71.] Cumming understood the laws and regulations applicable to his businesses, including the TSRA and the TRS, and provided legal guidance to the LLC Defendants concerning how those laws applied. [See *id.*, ¶ 80; Dkt. 230-1, ¶¶ 12, 14-18.]

The undisputed evidence in the record also shows that each of the Individual Defendants knew or should have known their businesses were subject to the TSR but that they were not making any attempt to comply. Since 2012, the contracts that Raymond has reviewed represented and warranted to schools and lead purchasers that the LLC Defendants (or their IBT partners) would comply with applicable federal laws including the TSR and the TCPA. [Dkt. 229, ¶¶ 36, 65, 90.] Despite this representation, the Individual Defendants knew that the LLC Defendants did not subscribe to or access the national DNC registry. [*Id.*, ¶ 86; Dkt. 232, ¶ 85.] All three Individual Defendants admit to knowing about the TCPA, which is substantially similar to the TSR. Cumming was involved in "roughly half a dozen claims and class actions against the companies based on the TCPA," including ones that asserted that the LLC Defendants had called numbers on the DNC Registry. [Dkt. 230-1, ¶ 12.].

All three Individual Defendants admit that they learned about the TSR as early as 2016, when "new managers" suggested that Day Pacer take on new clients and "make calls intended to induce the purchase of those clients' goods or services."

A-54

[Dkt. 230-1, ¶ 15 (Cumming); Dkt. 219-3, ¶ 23 (Ian); Dkt. 219-4,¶ 18 (Raymond).] Cumming "did some research" and determined that a change in business model would "subject the company to regulation under the TSR." [Dkt. 230-1, ¶ 15.] Defendants should have known by that time, at the latest, that they were failing to comply with the TSR.

Even if Cumming's purported research had not put them on notice, complaining consumers, compliance reports, and the FTC's investigative activities should have. See *United States v. Lasseter*, 2005 WL 1638735, at *5 (M.D. Tenn. June 30, 2005) (defendants' knowledge fairly inferred because FTC had been in contact about potential rule violations three years prior). For instance, in 2014, Cumming and Raymond both learned of an article by David Halperin claiming that EduTrek called individuals who had given their name and telephone number in response to deceptive websites. [Dkt. 230-1, ¶ 13; Dkt. 229, ¶ 89; Dkt. 212-3 at 88-96.] Ian Fitzgerald regularly received reports from the compliance company Omniangle indicating that the websites Day Pacer received consumer information from did not obtain consumers' consent. The FTC also points to a variety of emails in which the Individual Defendants discussed their concerns about the validity of customer consent. For instance, in a March 2016 email Cumming raised with Raymond and Ian what he called "conditional consent," writing: "By opting in on a site advertising at home business opportunities, is the opter consenting to a call about further education. It is unfortunate that we have the potential conditional consent issue but oh, well." [Dkt. 229, ¶ 82; Dkt. 232, ¶ 81; see also Dkt. 212-6 at 100.] And in a

54

A-55

November 2016 email, Cumming expressly recognized the risk that the TSR may apply to calls made by IBT Partners. Responding to Raymond's email regarding a consumer who complained that he was called by a Day Pacer IBT Partner (Bluewater) and transferred to Day Pacer, Cumming advised that he was "not certain any FTC or FCC or TCP provision applies but, if Blue Water was determined to be an agent, it might" and "the only colorable regulation would be the FTC TSR." [Dkt. 212-6 at 97.] He continued that "[l]ess likely but more scary is the FTC telemarketing sales rule," under which the FTC "can assess a penalty of $40,000 per violation." [*Id.*] Cumming also acknowledges in his affidavit that he knew since 2014 that some of the calls in which the LLC Defendants engaged were "transferred from call centers in the Philippines" and "had some concern about whether those call centers might be obtaining names and numbers using deceptive websites and thought the names and numbers so obtained could not be considered consensual." [Dkt. 230-1, ¶ 14.]

By April 2016, the Individual Defendants became aware that the FTC was investigating them for illegal practices. The FTC issued Civil Investigative Demands to EduTrek L.L.C. in April 2016 and to both Day Pacer LLC and EduTrek L.L.C. in April 2017, expressly seeking TSR compliance information. [Dkt. 229, ¶ 84.] All of this evidence undermines Defendants' position that they only called individuals (or thought they only called individuals) who provided valid, express consent in compliance with the TSR.

In sum, the summary judgment record shows that that the Individual Defendants knew or should have known about the LLC Defendants' deceptive

practices. All three of the Individual Defendants: knew of the TSR and the penalties it imposed; knew that consumers were complaining about receiving calls from the LLC Defendants and IBT Partners despite having their numbers registered on the DNC List; and knew or should have known that the "consents" that they and the IBT Partners obtained from customers were not valid. The FTC has therefore established that the Individual Defendants should be held liable for the LLC Defendants' TSR violations.

### 6. Remedies

The FTC seeks both civil penalties and injunctive relief against the LLC Defendants and the Individual Defendants.

### a. Injunctive Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." See *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) (entering permanent injunction under Section 13(b)). The FTC "need only show that there is a reasonable likelihood of future violations" to obtain an injunction under Section 13(b). *FTC v. Credit Bureau Ctr. LLC*, 325 F. Supp. 3d 852, 867 (N.D. Ill. 2018), *aff'd in part, vacated in part*, 937 F.3d 764, 770 (7th Cir. 2019). In deciding whether to issue an injunction, the Court considers: (1) the gravity of the harm, (2) the extent of [Defendants'] participation, (3) the nature of the infraction and the likelihood that they may become involved in similar conduct in the future; (4) any recognition of culpability; and (5) the sincerity of assurances against further violations. *SEC v.*

*Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). Further, individuals can be held liable for injunctive relief under the FTC Act if they either participated in the acts or practices or had authority to control them. *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002).

The Court is inclined to issue injunctive relief against the LLC Defendants and Ian and Raymond Fitzgerald, for the same essential reasons that the Fitzgeralds are properly held responsible for the acts of the LLC Defendants. But given the age of the case, and Defendants' suggestion that the industry has changed significantly due to major players in the for-profit education industry going out of business, the Court will require updated information from the parties before determining the proper scope of any injunctive relief. Additionally, since Mr. Cumming is deceased, and the Estate has no role in the affairs of the LLC Defendants, the Court intends to deny injunctive relief as to the Estate.

### b. Civil penalties

Section 5(m)(1)(A) authorizes the imposition of civil penalties against parties that violate FTC trade regulation rules, including the TSR, "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A); *Commercial Recovery Systems*, 179 F. Supp. 3d at 737 (awarding civil penalties against owner and president on summary judgment). As discussed above, the FTC has demonstrated that both the LLC Defendants and the Individual Defendants

violated the TSR with actual knowledge or implied knowledge based on objective factors. Therefore, the FTC is entitled to seek civil penalties against them.

In determining the amount of the civil penalty, the Court is required to "take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C); see also *Dish Network*, 954 F.3d at 980. Further, in *Dish*, the Seventh Circuit advised that even where a statute, like the FTC Act, "permit[s] consideration of wealth," "the best way" to ensure that the penalty is "within a constitutionally allowable range" is to "start from the harm rather than [the] wealth" of the Defendant, "then add an appropriate multiplier, after the fashion of the antitrust laws (treble damages) or admiralty (double damages), to reflect the fact that many violations are not caught and penalized." *Id*.

Here, the FTC seeks an award of civil penalties in the amount of $28,681,863.88—"substantially less than the maximum allowable civil penalty that is in excess of $100 billion." [Dkt. 211 at 36.] This works out to $6.88 per call for 4,168,511 violations. The FTC explains that the $28.6 million figure is "equal to Defendants' gross revenue during the applicable period" of March 22, 2014 to June 12, 2019. [*Id.* at 40.] The FTC seeks to hold the LLC Defendants and the Individual Defendants jointly liable for this amount and has submitted a brief discussing each of the factors that the FTC Act requires the Court to consider before imposing a penalty. [See Dkt. 211 at 36-40.]

The LLC Defendants and the Fitzgeralds respond, in sum, that (1) because they did not violate the TSR they are not liable for civil penalties; (2) the amount is arbitrary, capricious, and premature; (3) the FTC did not provide its calculation for the requested penalty; (4) the amount is intended to destitute the Defendants; and (5) the FTC must prove every conversation that violated the TSR and the fine that applied during that time period. [See Dkt. 241 at 24—25.] Cumming argues that the amount proposed by the FTC is so excessive it would reduce the Defendants to extreme poverty. [Dkt. 239 at 10–11.] He also asserts that his "good faith belief" that the TSR did not apply to Day Pacer's activities precludes civil penalties. [*Id.* at 10–11.] All of these assertions are incorrect and unsupported.

Defendants provide no authority for the bald assertion that in order to attach civil penalties the FTC must prove every individual conversation that violated the TSR. [Dkt. 241.] Nonetheless, the summary judgment record in fact includes admissions that Defendants violated the TSR millions of times—directly contradicting their arguments against civil penalties and showing a high degree of culpability. As noted, many of the FTC's Rule 56.1 facts have been admitted because Defendants failed to properly dispute the statement and, in many cases, failed to point to any evidence or citations in the record. As the FTC points out, it is undisputed that the LLC Defendants violated the TSR at least 4,168,511 times. [Dkt. 211 at n. 20; Dkt. 229 at ¶ 26; (deemed admitted); Dkt. 232 at ¶ 26 (deemed admitted)].

Nor is it true that the FTC has failed to provide a calculation for its proposed penalties. The FTC explained that the proposed penalties correspond to the proceeds

from the misconduct. [Dkt. 211 at 36–40.] The amount, $28,681,863.88, corresponds to the Defendants' gross revenue during the relevant period (EduTrek's revenue from March 2014 to October 2015 at $10,709,181.11 and Day Pacer's revenue from November 2015 to June 2019 at $17,972,682.77). [*Id.* at 40; Dkt. 229, ¶ 64 (deemed admitted); Dkt. 232, ¶ 64 (admitted).] And for further context on the calculation, the FTC provided a detailed calculation of the maximum allowable penalties based on the specific years of the violations and the corresponding civil penalty amount for those ranges of time—2,548,695 violations from 2014 to 2016 at $16,000 per violation, 366,626 violations from 2016 to 2017 at $40,000 per violation, 592,650 violations from January 24, 2017 to January 21, 2018 at $40,654 per violation, 507,894 violations from January 22, 2018 to February 13, 2019 at a rate of $41,484, and 152,646 violations from February 2019 forward at $42,530 per violation. [Dkt. 211 at 36–40.] The FTC has established that both the LLC Defendants and the individual Defendants had knowledge fairly implied that their conduct violated the TSR, such that the FTC is entitled to a substantial civil penalty.

The Court is inclined to impose the requested penalty for the reasons given above. Before reaching a final determination on the amount, however, the Court will require some additional information. Substantial time has passed since the parties briefed the issue and this ruling, and the Court does not have current information on some important matters. For example, the Court is uninformed about whether Day Pacer (or any successor) is still doing business in any capacity, and the Court requires more information about Defendants' ability to pay and the effect any penalty would

have on an ability to continue to do business. For this reason, the Court stays a final judgment on the issue of civil penalties subject to a hearing.

## IV.     Conclusion

For these reasons, the FTC's motion for substitution [Dkt. 247] is granted. The Estate is substituted as a defendant in this action. The FTC's motion for summary judgment [Dkt. 211] and the Defendants' two cross-motions for summary judgment [Dkts. 227, 230], are each granted in part and denied in part. The Court grants summary judgment in favor of the FTC and against Defendants on Count I to the extent that count is based on calls initiated by the LLC Defendants. Summary judgment is granted in favor of Defendants and against the FTC on Count I to the extent that count is based on calls initiated by the IBT Partners. Summary judgment is granted in favor of the FTC and against Defendants on Count II.

Enter: 19-cv-1984
Date:  September 1, 2023

_____
Lindsay C. Jenkins
United States District Judge

61

A-62

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1**
**Eastern Division**

Federal Trade Commission
                                        Plaintiff,

v.                                                      Case No.: 1:19−cv−01984
                                                        Honorable Lindsay C. Jenkins

Day Pacer LLC, et al.
                                        Defendant.

_____

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, November 8, 2023:

      MINUTE entry before the Honorable Lindsay C. Jenkins: Oral arguments on the issue of injunctive relief and civil monetary penalties held. Defendant Margaret Cummings as representative of the Estate of David Cummings oral motion to extend time for its response to the issue of civil monetary penalties is granted. Defendant Estate's response shall be filed on or before December 8, 2023; Plaintiff shall file reply brief by December 19, 2023. Briefs are limited to 15 pages. By November 17, 2023, Plaintiff shall submit a proposed preliminary injunction order to the Judge's proposed order email account as it pertains to the remaining Defendants. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

A-63

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1
### Eastern Division

Federal Trade Commission

Plaintiff,

v.

Day Pacer LLC, et al.

Defendant.

Case No.: 1:19–cv–01984

Honorable Lindsay C. Jenkins

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, November 21, 2023:

      MINUTE entry before the Honorable Lindsay C. Jenkins: The Court has reviewed the materials and arguments submitted electronically to the court's proposed order box regarding the proposed preliminary injunction order. It has also reviewed the arguments submitted in opposition filed at [290]. None of the modifications proposed by Day Pacer LLC, Edutrek L.L.C, Ian Fitzgerald, Raymond Fitzgerald is well taken; indeed, the proposed modifications suggest qualifying language not warranted by the facts; improperly narrow the scope of relief; and improperly weaken recordkeeping and compliance monitoring and reporting provisions. The Court also notes that it provided these Defendants with an opportunity to raise objections at the November 8, 2023 hearing, and none of their proposed modifications were raised at that time. The Court has modified the proposed order to reflect some of the changes proposed by the Estate of David Cumming, even though the order does not impose any obligations on the Estate, and even though the Estate has not identified any provision of the agreement imposing any specific obligation on it. Nonetheless, paragraph 7 is modified to better align with the language in the Court's summary judgment ruling. Separate preliminary injunction order to issue. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

A-64

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 1:19-cv-01984 |
| Plaintiff, | Judge: Lindsay C. Jenkins |
| v. | |
| DAY PACER LLC, et al. | |
| Defendants. | |

**ORDER FOR PERMANENT INJUNCTION AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("Commission"), filed its Complaint for civil penalties, a permanent injunction, and other relief in this matter, pursuant to Sections 5(a), 5(m)(1)(A), 13(b), and 16(a) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a)(1), and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105. Plaintiff has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 against Defendants Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald, David Cumming, and Ian Fitzgerald. Defendant David Cumming died after the parties had fully briefed summary judgment and his estate has been substituted as a defendant. The Court, having considered the memoranda and exhibits filed in support of Plaintiff's Motion for Summary Judgment, and all other pleadings and filings in this action, granted Plaintiff's motion in part for the reasons set forth in its Memorandum Opinion and Order [Dkt. 280]. The Court held a hearing on remedies on November 8, 2023, and now enters this Order granting injunctive relief. This Order does not impose any injunctive or other relief (including, without limitation,

Page 1 of 10

A-65

the relief or other requirements under Section II-V hereof) against David Cumming or his estate. Nor does it make any findings with respect to David Cumming or his Estate. The Court will separately enter an Order on civil monetary penalties with respect to all Defendants.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint states a claim upon which relief may be granted, charging that Defendants violated Section 5 of the FTC Act, 15 U.S.C. § 45, and the FTC's Telemarketing Sales Rule ("TSR" or "Rule"), as amended, 16 C.F.R. Part 310, in the Telemarketing of vocational training and post-secondary education programs.

3. The Corporate Defendants violated the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B) (**Count I**) by initiating or causing the initiation of outbound telephone calls to consumers whose telephone numbers were on the National Do Not Call Registry ("Registry"). The Corporate Defendants also violated 16 C.F.R § 310.3(b) (**Count II**) by assisting and facilitating their inbound transfer partners' violations of the TSR.

4. The Corporate Defendants' TSR violations are deemed to constitute unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

5. There is no genuine issue of material fact as to any of the Defendants' affirmative defenses, and summary judgment for the FTC is granted as to each of those defenses.

6. Corporate Defendants Day Pacer LLC ("Day Pacer") and EduTrek L.L.C. ("EduTrek") formed a common enterprise. Day Pacer is also a corporate successor to EduTrek. The Corporate Defendants had knowledge that their acts and practices were prohibited by the TSR.

7. The Individual Defendants either participated in the violative acts or practices and/or had authority to control them. The Individual Defendants knew or should have known of the Corporate Defendants' violative acts and practices and knowledge that those acts and practices were prohibited by the TSR.

8. There is a reasonable likelihood that Defendants Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald, and Ian Fitzgerald ("Day Pacer Defendants") will engage in future violations absent the injunctive relief requested. Accordingly, it is proper in this case to issue a permanent injunction under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) that: a) bans the Day Pacer Defendants from engaging in, or assisting others engage in, telemarketing activities; and b) orders other relief including recordkeeping and compliance monitoring provisions to ensure compliance with this Order.

10. Entry of this Order is in the public interest.

**DEFINITIONS**

For the purpose of this Order, the following definitions apply:

A. "**Defendants**" for purposes of this Order means all of the Individual Defendants (as defined herein) and the Corporate Defendants, individually, collectively, or in any combination.

B. "**Corporate Defendants**" means Day Pacer LLC (also d/b/a Edutrek, EdSoup, Our School Search, College Info, Degree Spots, and Insurance Info), Edutrek LLC (also d/b/a EdSoup), and their successors and assigns.

C. "**Day Pacer Defendants**" means the Corporate Defendants, Raymond Fitzgerald, and Ian Fitzgerald.

Page 3 of 10

A-67

D.     "**Individual Defendants**" for purposes of this Order means Raymond Fitzgerald, Ian Fitzgerald, and David Cumming.

E.     "**Telemarketing**" means any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule.

## ORDER

### I.   BAN ON TELEMARKETING

IT IS ORDERED that the Day Pacer Defendants are permanently restrained and enjoined from participating in Telemarketing or assisting others engaged in Telemarketing, whether directly or through an intermediary.

### II.   ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that the Day Pacer Defendants obtain acknowledgments of receipt of this Order:

A.     Each Day Pacer Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 20 years after entry of this Order, Defendants Raymond Fitzgerald and Ian Fitzgerald for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, and each Corporate Defendant, must deliver a copy of this Order to:   (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents and representatives having managerial responsibilities for conduct related to Lead Generation; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.   Delivery must occur within 7 days of entry

of this Order for current personnel.   For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

### III.   COMPLIANCE REPORTING

IT IS FURTHER ORDERED that the Day Pacer Defendants make timely submissions to the Commission:

A.     One year after entry of this Order, each Day Pacer Defendant must submit a compliance report, sworn under penalty of perjury:

 1.     Each Day Pacer Defendant must:  (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Defendants Raymond Fitzgerald and Ian Fitzgerald must describe if they know or should know due to their own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

Page 5 of 10

A-69

2.      Additionally, Defendants Raymond Fitzgerald and Ian Fitzgerald must:  (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.      For 20 years after entry of this Order, each Day Pacer Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following: 1.  Each Day Pacer Defendant must report any change in:  (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.      Additionally, Defendants Raymond Fitzgerald and Ian Fitzgerald must report any change in:  (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C.     Each Day Pacer Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:   "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed on:   _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:   Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC   20580. The subject line must begin:   FTC v. DAY PACER, X190022.

## IV.   RECORDKEEPING

IT IS FURTHER ORDERED that the Day Pacer Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years.   Specifically, each Corporate Defendant, in connection with Lead Generation, and Defendants Raymond Fitzgerald and Ian Fitzgerald for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.     accounting records showing the revenues from all goods or services sold;

Page 7 of 10

A-71

B.    personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.    records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D.    all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.    a copy of each unique advertisement or other marketing material.

## V.   COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Day Pacer Defendants' compliance with this Order:

A.    Within 14 days of receipt of a written request from a representative of the Commission, each Day Pacer Defendant must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.   The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.    For matters concerning this Order, the Commission is authorized to communicate directly with each Day Pacer Defendant.   The Day Pacer Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview.   The person interviewed may have counsel present.

Page 8 of 10

A-72

C.     The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.   Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.     Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Defendants Raymond Fitzgerald and Ian Fitzgerald pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## VI.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes

of construction, modification, and enforcement of this Order.

Enter: 19-cv-1984
Date: November 21, 2023

_____
Lindsay C. Jenkins
UNITED STATES DISTRICT JUDGE

Page  10 of 10

A-74

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1
### Eastern Division

Federal Trade Commission

Plaintiff,

v.

Day Pacer LLC, et al.

Defendant.

Case No.: 1:19−cv−01984

Honorable Lindsay C. Jenkins

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, January 12, 2024:

      MINUTE entry before the Honorable Lindsay C. Jenkins:On November 29, 2023, the Court entered a Preliminary Injunction Order [293] following a hearing on the matter. Pending now is a motion by Defendants to stay the PI Order pending appeal. The motion [296] is granted in part and denied in part. The Court modifies the Injunction to the extent it bars the Defendants from calling businesses. Defendants will continue to be precluded from calling consumers, regardless of their status on the Do Not Call Registry. See attached Order for further detail. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Federal Trade Commission, | |
| *Plaintiff,* | No. 19 CV 1984 |
| v. | Judge Lindsay C. Jenkins |
| Day Pacer LLC, et al. | |
| *Defendants.* | |

**ORDER**

In March 2019, the Federal Trade Commission ("FTC") sued Defendants Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald, and Ian Fitzgerald (collectively, "Defendants")[1], seeking injunctive relief and civil penalties for two alleged violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(iii)(B), which is promulgated under the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Both counts relate to millions of calls Defendants made on behalf of the for-profit education industry to consumers on the federal Do Not Call Registry ("Registry").

In September 2023, this Court granted summary judgment in favor of the FTC finding that Defendants both directly called individuals on the Registry and provided assistance and support for others to do the same. [Dkt. 280.] After holding a hearing on remedies, the Court issued a permanent injunction ("Injunction") on November 21, 2023, against Defendants prohibiting them from engaging in certain telemarketing activities. [Dkt. 293.] Defendants have appealed both the Court's summary judgment order and the Injunction. Currently before the Court is Defendants' motion to stay the Injunction pending the outcome of its appeal. [Dkts. 295-296.]

For the reasons that follow, the Court grants the motion in part and denies it in part. The Court will stay the Injunction to the extent it bars the Defendants from calling businesses. Defendants will continue to be precluded from calling consumers, regardless of their status on the Registry.

## I.    Background

The FTC included a proposed preliminary injunction order in its motion for summary judgment that made clear it sought to prohibit Defendants from engaging in conduct broader than making telemarketing calls for the for-profit education

---

[1]    The FTC also sued David Cumming, who passed away during the pendency of this case and has been substituted with the personal representative of his estate. Neither Mr. Cumming nor his estate are relevant for purposes of this opinion.

1

A-76

industry. [Dkt. 211 at 33-36; Dkt. 211-1.][2] The FTC argued that this "fencing-in" relief was necessary "given Defendants' unrepentant conduct in calling millions of consumers on the Registry and attempting to hide their violations from the FTC." [Dkt 211 at 36.] The FTC further argued the individual defendants could merely create new businesses and use the same TSR-violating tactics in new industries if the injunction were limited just to the named corporations and industry at issue in the Complaint. [*Id.*]

In granting the motion for summary judgment, the Court noted that it was inclined to impose this injunctive relief against the Defendants but, given the passage of time since the motion had been briefed, opted to hold a hearing first. The explicit purpose of the hearing was to "determine[e] the proper scope of any injunctive relief", [Dkt. 280 at 57], as well as fashion an appropriate civil penalty.

The in-person hearing took place on November 8, 2023. The FTC argued that "fencing-in" relief enjoining Defendants from telemarketing broadly (not just in the for-profit education industry) was still required because of evidence that new businesses operated by the Fitzgeralds continued to market their telemarketing "cold call" capabilities, and that none of the businesses had subscribed to the Registry. [Dkt. 291 at 27-29.] In response, Defendants' counsel argued that the defendant entities no longer existed or no longer engaged in calling consumers, and that any new entities created by the Fitzgerald defendants could not be subject to an injunction because they were not defendants. [*Id.* at 30-32.] Defense counsel added that even if the new entities could be subject to the injunction, the businesses are engaged in business-to-business calls, so an injunction was unnecessary because there was no risk of calling consumers on the Registry. [*Id.*]

The Court found on the record that broad injunctive relief against the Defendants was necessary in part because of Defendants' unwillingness to take basic steps to ensure future compliance with the TSR and the likelihood that future violations would occur. [*Id.* at 33-35.] The Court ordered the FTC to submit a proposed injunctive order for the Court to review. [*Id.* at 54-56.] The Court entered the FTC's proposed injunction—which largely mirrored the initial proposed injunction—on November 21, 2023.[3] On November 29, 2023, Defendants filed a notice of appeal to the Seventh Circuit as well as a motion with this Court to stay the Injunction pending appeal. [Dkts. 295-296.]

---

[2]     Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.
[3]     Defendants submitted redline edits to the FTC's proposed injunction order, which the Court reviewed and rejected. [Dkts. 290, 292.]

A-77

## II.     Legal Standard

Federal Rule of Civil Procedure 62(d) allows the Court to stay or modify an injunction pending appeal. In determining whether this relief is warranted, Courts look to the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir. 2019). When the Government is a party at issue, the harm and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts employ a "sliding scale" when evaluating the factors; if there is a strong showing of irreparable harm, then the need to show a likelihood of success on the merit lessens. *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). The burden to show that a stay is warranted lies with the moving party. *Nken*, 556 U.S. at 433-434.

## III.     Analysis

### A.     Likelihood of success on merits

A strong showing of success on the merits "requires something less than a fifty percent chance of success." *Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 846, 849 (N.D. Ill. 2007). While Defendants appealed the Court's underlying summary judgment ruling, the sole basis in its motion for why the Injunction should be stayed—why the appeal will succeed on the merits—is that Defendants are likely to be able to show the scope of the Injunction is overbroad. Defendants do not argue, for example, a stay is warranted because they did not violate the TSR. The Court will similarly limit its analysis, but first addresses the FTC's argument that Defendants waived their ability to challenge the scope of the Injunction.

### 1.     Waiver

In its response opposing the stay, the FTC contends Defendants are barred from arguing now the Injunction is too broad because Defendants failed to raise this argument both during summary judgment briefing and at the Court's November 8 hearing. [Dkt. 303 at 6-8.] According to the FTC, Defendants had ample opportunity to argue the injunctive relief the FTC sought (which had not substantively changed since the FTC moved for summary judgment in August 2021) was too broad, but waited until after the Court ruled on injunctive relief to try to limit the scope by redlining the FTC's proposed order. *Id.* Defendants respond by noting the summary judgment briefing focused on liability, not future potential injunctive relief, that Defendants did argue at the hearing that the proposed relief was overbroad, and that its redlined edits to the proposed injunction precludes waiver. [Dkt. 304 at 4-6.]

"A party who fails to adequately present an issue to the district court has waived the issue for purposes of appeal." *Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013). This occurs when an argument is "underdeveloped, conclusory, or unsupported by law." *Id.* (internal citations omitted). Still, courts prefer to resolve cases on the merits where possible. *Malas v. Hinsdale Twp. District #86*, 2019 WL 2743590, at *4 (N.D. Ill. July 1, 2019). Here, while the Court agrees with the FTC that Defendants failed to take full advantage of their opportunity at the hearing to argue the proposed relief was too broad, the Court cannot conclude Defendants waived the argument as a matter of law.

At the hearing, Defendants' counsel argued that an injunction against Day Pacer was not necessary because the entity "has been out of the business of making calls to consumers" for years. [Dkt. 291 at 30:25-31:1.] He made similar arguments that injunctive relief prohibiting business-to-business calls were improper for a new entity controlled by the Fitzgeralds, as well as Ian Fitzgerald and Raymond Fitzgerald in their individual capacities. [*Id.* at 31-32.] Counsel's argument was not particularly compelling—he did not cite to any authority or propose revisions to the proposed injunction—but it was made and it relates to the scope of the injunction. And the FTC responded, arguing that the new entity did indeed make business-to-consumer calls. [*Id.* at 32-33.]

The Defendants' redlines to the FTC's proposed injunction order also support their position. It is true that the Court already ruled injunctive relief was proper by this time, but the Court did at least give Defendants the opportunity to suggest revisions to the FTC's order, and those revisions primarily attempted to limit the scope of the injunction. [*Id.* at 55:13-56:17; *see also* Dkt. 290.] Undoubtedly, Defendants could have done much more to develop their arguments, but they were not so conclusory as to constitute waiver. With that, the Court turns to Defendants' argument that the scope of the Injunctions is overbroad.

### 2.    Scope of the Injunction

The Injunction states in relevant part that "Defendants are permanently restrained and enjoined from participating in Telemarketing or assisting others engaged in Telemarketing, whether directly or through an intermediary." [Dkt. 293 at 4.] Telemarketing is defined as "any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule." [*Id.*]

According to Defendants, the scope of this prohibition precludes them "from engaging in almost any employment opportunities that uses a telephone, including their current employment and business." [Dkt. 296 at 11.] Defendants contend that their unlawful conduct was limited to calling consumers on the Registry for the for-profit education industry, so the Injunction cannot exceed that boundary. *Id.*

4

A-79

Defendants point to several other injunctions with more narrowly tailored relief, including cases involving the FTC and the Registry, to show that the Injunction here is overbroad. In response, the FTC contends that the Injunction's relief reflects the scope of Defendants' misconduct, which included over 4 million violations of the TSR. [Dkt. 303 at 8-11.] The FTC also points to several injunctions from other cases like the one imposed here in support of its view that Defendants will not be able to show on appeal that this Court abused its discretion in entering the Injunction.

The scope of conduct barred in an injunction must be related to the unlawful conduct in the underlying litigation. *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) ("injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation"); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969) ("A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.") This is a fact-intensive inquiry, *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384 (7th Cir. 2018), which is why determining the proper scope of an injunction is within the discretion of the district court, and why the appellate court will reverse only where the district court abuses that discretion. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010); *S.E.C. v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015). "An abuse of discretion occurs only when no reasonable person could take the view adopted by the trial court." *Rivera v. City of Chicago*, 469 F.3d 631, 636 (7th Cir. 2006) (internal quotations omitted).

The Injunction prohibits Defendants from "participating in … or assisting others engaged in … any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule." [Dkt. 293 at 4.] The parties agree this is broader than merely prohibiting Defendants from calling consumers on the Registry on behalf of the for-profit education industry. The question, then, is whether Defendants have a reasonable likelihood of success in arguing on appeal that this Court abused its discretion in concluding the additional prohibitions ordered in the Injunction are "reasonably related" to this conduct. *AutoZone*, 707 F.3d at 841. These prohibitions can be broken down into three categories: (i) consumers on the Registry; (ii) consumers not on the Registry; and (iii) businesses. The Court concludes that Defendants' scope argument has little merit with respect to calls to consumers, regardless of their status on the Registry, but there is potential merit for calls to businesses.

The distinguishing factor for the Court is the TSR itself, which states in relevant part: "It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in … (iii) Initiating any outbound telephone call to a person when: (B) That person's telephone number is on the "do-

not-call" registry." 16 C.F.R. § 310.4(b)(1)(iii)(B). Simply put, the TSR prohibits calling consumers on the Registry. The Court found that Defendants knowingly violated this regulation (and supported others in violating this regulation) millions of times. The fact that these violations were tied to a specific industry is of no import. Defendants do not argue that there is anything unique about for-profit education that contributed to the TSR violations. Rather, Defendants were merely engaged in that industry at the time the Complaint was filed, but could just as easily pivot to new industries where the same TSR-violating tactics could be applied (as Defendants have apparently done). *See FTC v. Life Mgmt. Servs. of Orange County, LLC*, 350 F.Supp.3d 1246, 1273 (M.D. Fla. 2018) (permanent injunctions barring all telemarketing can be appropriate because "the barriers to entry in … telemarketing industries are low.") The Court concludes the Defendants' argument to the extent it seeks to limit the Injunction for consumers on the Registry has little merit because the prohibition is reasonably related to Defendants' misconduct.

The Injunction's requirement that Defendants abstain from calling consumers that are not on the Registry is likewise reasonably related to their past violations. This is so even though calling consumers that are not on the Registry does not necessarily violate the TSR. At the hearing, Defendants did not rebut the FTC's representation that no business associated with the Defendants has subscribed to the Registry, meaning Defendants do not know which consumers cannot be contacted. [Dkt. 291 at 33:24-34:13.] This is particularly concerning not only given the lengthy litigation, but also because entities associated with Defendants continue to advertise that they are engaged in "high volume cold calling." [*Id.* at 26:18-25; *see also* Dkt. 303-1 at 8.] Without knowing which consumers are on the Registry, any consumer call made by Defendants could be a violation. Given Defendants' history and seeming unwillingness to take even basic steps to ensure compliance with the TSR, the Injunction's prohibition of calls to any consumers is reasonably related to the underlying violation. *F.T.C. v. Think Achievement Corp. I*, 144 F. Supp. 2d 993, 1017 (N.D. Ind. 2000), *aff'd*, 312 F.3d 259 (7th Cir. 2002) ("Courts in equitable actions may enjoin otherwise lawful conduct to ensure that the final relief ordered is effective.")

Defendants' argument that the Injunction is too broad because it prohibits Defendants from calling businesses, [Dkt. 296 at 13], has a higher likelihood of success because the TSR exempts calls to businesses. 16 C.F.R. § 310.6(b)(7) ("Telephone calls between a telemarketer and any business to induce the purchase of goods or services" are "exempt" from the TSR); *see also Kornea v. J.S.D Mgmt., Inc.*, 366 F.Supp.3d 660, 669 n.32 (E.D. Pa. 2019) ("calls between a telemarketer and a business to induce the purchase of services are exempt from the" TSR). Here, Defendants' calls to businesses are not part of the underlying conduct that led to the TSR violations. Nor can they be. This is a potentially salient difference that distinguishes the prohibition from calls to consumers that are not on the Registry. As a result, Defendants may be successful in arguing on appeal that the Injunction is impermissibly broad to the extent it precludes them from calling businesses.

A-81

### B.    Irreparable Harm to Defendants, Public Interest

The parties' arguments on irreparable harm and the public interest are predictable and straightforward. Defendants argue that they will be irreparably harmed by the Injunction because it impacts their livelihood by precluding them from "engaging in any type of business involving the purchasing of goods or services that uses a telephone." [Dkt. 296 at 13.] As one of many examples, Defendants argue the Injunction as written precludes Raymond Fitzgerald from practicing law (or at least soliciting new clients) because it involves selling services over the telephone. [*Id.*] While the Court is satisfied that the Injunction will not be interpreted to produce absurd results such as this, *Vendetti v. Compass Envtl., Inc.*, 559 F.3d 731, 733 (7th Cir. 2009), Defendants make a valid point that Ian Fitzgerald's business, which they have represented makes only business-to-business calls, cannot operate under the Injunction. [*Id.*] While the FTC does not respond to the more "absurd" applications of the Injunction, it argues that Ian Fitzgerald has the skillset to switch professions. [Dkt. 303 at 12.]

In the FTC's view, the public interest heavily weighs in favor of the Injunction because otherwise, consumers will be subject to future TSR violations by the Defendants. [*Id.* at 13.] The FTC notes that Defendants contributed to roughly 44 million violations already, and Defendants' conduct since this lawsuit (*e.g.*, not subscribing to the Registry despite forming new companies) shows that the public remains at risk. [*Id.*] The Defendants counter by representing that the corporate defendants "will not violate the Injunction because it is not currently engaged in the business of making calls to consumers", and the individual defendants will not violate the Injunction because "they are not engaged in businesses that make telephone calls to consumers on the DNC Registry."[4] [Dkt. 296 at 15.] Instead, the public will be harmed by the Injunction because the Defendants will not be able to assist their clients in legal business activity covered by the Injunction. [*Id.*]

The Court concludes that the Defendants have the better argument on irreparable harm, but the FTC wins on public interest. But each side's main concern—Defendants' ability to pursue a livelihood, and the FTC's desire to protect the public from future telemarketing calls—can be satisfied by staying the Injunction to the extent it prohibits Defendants from calling businesses. Of course, this is also the portion of Defendants' argument that has the most merit, as discussed above. By

---

[4]    The Court notes some tension between the apparent admission here that the individual defendants are engaged with businesses that call consumers with what was stated at the hearing and in other portions of the briefing. [*See* Dkt. 291 at 31: 14-19 ("Allied is in a B2B business. That's business to business. It's not consumers. Allied does not make or encourage the making of any calls to consumers…"; Dkt. 296 at 13 ("Mr. Ian Fitzgerald is the owner and operator of Allied Contact Management, which is engaged in the business of selling goods and services to other businesses through the use of telephones.")]

A-82

prohibiting Defendants from calling any consumers, regardless of their status on the Registry, the FTC can protect the public from TSR-violating conduct. Conversely, by allowing Defendants to call businesses, which Defendants warrant is all their businesses currently do, they can continue to earn a livelihood while the Seventh Circuit decides the appeal.

The Court also denies the FTC's request for Defendants to post a $28,681,863.88 bond pending appeal because the argument is underdeveloped (it is relegated to a single footnote) and because the Court does not see how the Injunction, which covers forward-looking conduct, impacts Defendants' ability to pay any civil penalty.

## IV.    Conclusion

For the reasons stated herein, Defendants motion to stay is granted in part and denied in part. The Injunction is stayed to the extent it precludes Defendants from calling businesses, but otherwise remains in force.

Enter: 19-cv-1984
Date: January 12, 2024

_____
Lindsay C. Jenkins
United States District Judge

8

A-83

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1
### Eastern Division

Federal Trade Commission

Plaintiff,

v.

Day Pacer LLC, et al.

Defendant.

Case No.: 1:19–cv–01984

Honorable Lindsay C. Jenkins

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, January 16, 2024:

      MINUTE entry before the Honorable Lindsay C. Jenkins: Having considered the arguments by Margaret Cumming as representative for David Cumming [301], the Court concludes $28,681,863.88 is the appropriate civil penalty, which applies jointly and severally to all Defendants as decided in the summary judgment order. See order for further detail. By January 24, 2024, the FTC shall submit a proposed final judgment order to the Court's proposed order box so that the Court can enter a final judgment pursuant to FRCP 58. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

A-84

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Federal Trade Commission, | |
| *Plaintiff,* | No. 19 CV 1984 |
| v. | Judge Lindsay C. Jenkins |
| Day Pacer LLC, et al. | |
| *Defendant.* | |

ORDER

Before the Court is Defendant Margaret Cumming's memorandum, [Dkt. 301], regarding the amount of civil penalties the Court should award after granting summary judgment in favor of the FTC for Defendants' violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(iii)(B), which is promulgated under the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Ms. Cumming brings this memorandum in her capacity as the personal representative of the estate (the "Estate") of David Cumming ("Cumming"), a Defendant who passed away while summary judgment was pending.[1]

In its summary judgment order, the Court held the individual defendants, including Cumming, could be held personally liable for the TSR violations, [Dkt. 280 at 51-56][2], and noted that it was inclined to adopt the FTC's proposal for $28,681,863.88 in penalties over Defendants' arguments. [*Id.* at 60.] The Court came to this conclusion after making several findings regarding Defendants', including Cumming's, knowledge of and culpability in the wrongdoing, as well as the scope of the misconduct, which included millions of calls in violation of the TSR. Before entering judgment, however, the Court decided to hold a hearing to gather "more information about Defendants' ability to pay and the effect any penalty would have on an ability to continue to do business." [*Id.* at 60-61.]

At the hearing, the Estate requested additional time to file a written brief setting out its position on the appropriate civil penalty. The Estate argued it had distinct interests and arguments on remedies separate from Cumming. The Court hesitantly granted the request after receiving assurances that the Estate was not

---

[1] Despite having no authorization to do so, the remaining Defendants in the action (Day Pacer LLC, Edutrek L.L.C., Ian Fitzgerald and Raymond Fitzgerald) filed a notice joining in the motion. [Dkt. 302.] Because the Court denies the Estate's requested relief, the joinder issue is moot.

[2] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

A-85

attempting to reopen issues decided in the summary judgment order [*See* Dkt. 291 at 6-24.] Having considered the Estate's brief, [Dkt. 301], and the FTC's response, [Dkt. 305], the Court concludes a civil penalty in the amount of $28,681,863.88 is appropriate and will enter judgment to that effect.

The Estate's brief makes arguments on several issues—including Cumming's knowledge of the wrongdoing and overall culpability—that were already decided in the Court's summary judgment order. [*See* Dkt. 301 at 5-8.] As the Court made clear at the hearing, this brief was not an invitation for reconsideration, and the Court declines to revisit those findings. The Estate's arguments regarding its relation to Cumming, as well as its penalty calculation methodologies, however, warrant analysis as they both impact the imposition of civil penalties.

When determining what civil penalty is appropriate for violations of the FTC Act, courts "shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C). Moreover, courts should "start from harm rather than wealth, then add an appropriate multiplier" to ensure the penalty awarded is constitutionally sound. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020).

 As noted above, the Court's summary judgment order already applied these factors to Cumming. Permeating throughout the Estate's brief, however, is the notion the Court should apply these factors to the Estate, as opposed to Cumming. [*See e.g.,* Dkt. 301 at 5 ("The Estate (and its constituents) are innocent, and no one says otherwise. This should end the analysis with respect to this [culpability] factor"); *id.* at 7 ("There is no evidence that either the Estate or David engaged in prior misconduct").] The Estate does not cite to any authority for why its conduct should be scrutinized as opposed to Cumming's.

This is perhaps because the Estate's argument does not pass legal scrutiny. The Court substituted the Estate as a party under Rule 25(a)(1), finding that Cumming's TSR violations survive his death and should pass to his estate. [Dkt. 280 at 10-22.] A substituted party "tracks the positions of the original litigants", including the "substantive claims" raised or defended by the initial party. *Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc.*, 53 F.3d 851, 852 (7th Cir. 1995); *see also Abellan v. HRDS Le Roy IL, LLC*, 2020 WL 10355049, at *2 (C.D. Ill. June 19, 2020) (under "Rule 25(a)(1), the substituted party steps into the same position as the original party to the action.") In no way does the conduct of a substituted party become relevant or impact the liability of the initial party. If it did, it is hard to imagine how a substituted

party could ever be found liable of the underlying claims. This is particularly true for an estate, which does not have the capacity to act.[3]

Having determined the Estate's conduct is not applicable to assessing the appropriate civil penalty, the Court turns to the Estate's argument that the FTC's methodology for calculating the penalty is flawed, and should be replaced by one of two options supplied by the Estate. [Dkt. 301 at 12-16.] The FTC's proposed penalty of $28,681,863.88 is derived from the gross revenue the defendant companies earned from the TSR violations, which comes out to $6.88 per call. [Dkt. 280 at 58.] According to the Estate, this is incorrect because a court should "start from harm" and then add a multiplier when fashioning a civil penalty. *Dish Network*, 954 F.3d at 980. Relying on a law review article, the Estate posits that the harm caused by telemarketing calls is only $.113 per call. [Dkt. 301 at 4.] Rounding that figure up to $.12 per call, the Estate argues the harm is $500,221 (4,168,511 calls x .12) and with a multiplier of 3 equals $1,500,663. However, because Cumming was not as culpable as other defendants, his (and therefore the Estate's) portion of the penalty should only be $150,066. [*Id.* at 15.]

In the alternative, the Estate asks the Court to apply a penalty of $2.54 per call, which was the rate used by the district court in *Dish Network*. This math, after taking into consideration the multiplier and Cumming's purported reduced culpability, would equate to $1,058,802 in penalties for the Estate. [*Id.* at 15-16.]

While the Court appreciates the Estate's proposals, it disagrees with its interpretation of *Dish Network* to mean that harm should replace the factors proscribed in 15 U.S.C. § 45(m)(1)(C) for fashioning a civil penalty. Rather, the Court reads *Dish Network* to say that the harm with multiplier process is a mechanism to ensure that the given penalty is within constitutionally acceptable limits. *See Dish Network*, 954 F.3d at 980 ("We appreciate that the district judge tried to ensure that the penalty was within a constitutionally allowable range, but the best way to do this is to start from harm rather than wealth, then add an appropriate multiplier.") Here, the Court declines to adopt a blanket per call harm of $.12 based on a single law review article completely divorced from the facts of this case. Likewise, the Court is unpersuaded that the $2.54 per call harm applied in *Dish Network* has any applicability here.

Conversely, the methodology supplied by the FTC has a reasonable connection to the Section 45 factors—basically, given the scope of Defendants' TSR violations, their knowledge of those violations, and the high culpability in trying to mask those violations, all revenue from those calls should be forfeited as a civil penalty. This comes out to $6.88 per call, which is well within range for the difficult-to-quantify

---

[3]    The Estate claims that its business is to "fulfill the decedent's wishes and to ensure the decedent's heirs and legatees are provided for." [Dkt. 301 at 8-9.] But as the FTC notes, an estate is required first to pay "all claims entitled to be paid therefrom." [Dkt. 305 at 13.]

harms caused by TSR violations. *Parchman v. SLM Corp.*, 896 F.3d 728, 740 (6th Cir. 2018) (holding $500 per call is not "wholly disproportionate to the harm suffered as a result of receiving these irritating and invasive calls, especially where the harm is hard to quantify and may vary significantly from person to person.")

The Court concludes $28,681,863.88 is the appropriate civil penalty, which applies jointly and severally to all Defendants as decided in the summary judgment order.

Enter: 19-cv-1984
Date: January 16, 2024

_____
Lindsay C. Jenkins
United States District Judge

4

A-88

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1
### Eastern Division

Federal Trade Commission

                              Plaintiff,

v.                                          Case No.: 1:19−cv−01984

                                          Honorable Lindsay C. Jenkins

Day Pacer LLC, et al.

                              Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, January 23, 2024:

      MINUTE entry before the Honorable Lindsay C. Jenkins: The Court enters a Civil Penalties Order. Separate Order to issue. Judgment in the amount of $28,681,863.88 is entered in favor of Plaintiff and against the Individual Defendants and Corporate Defendants, jointly and severally, as a civil penalty. The Court enters final judgment in favor of Plaintiff and against Defendants pursuant to FCRP 58. Civil case terminated. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

A-89

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Federal Trade Commission, | |
| *Plaintiff*, | No. 19 CV 1984 |
| v. | Judge Lindsay C. Jenkins |
| Day Pacer LLC, Edutrek L.L.C., Raymond Fitzgerald, Ian Fitzgerald, and David Cumming, | |
| *Defendants*. | |

**ORDER FOR CIVIL PENALTIES**

Plaintiff, the Federal Trade Commission ("Commission"), filed its Complaint for civil penalties, a permanent injunction, and other relief in this matter, pursuant to Sections 5(a), 5(m)(1)(A), 13(b), and 16(a) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a)(1), and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105.  Plaintiff has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 against Defendants Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald, David Cumming, and Ian Fitzgerald.  Defendant David Cumming died after the parties had fully briefed summary judgment and his Estate has been substituted as a defendant.  The Court, having considered the memoranda and exhibits filed in support of Plaintiff's Motion for Summary Judgment, and all other pleadings and filings in this action, granted Plaintiff's motion in part for the reasons set forth in its Memorandum Opinion and Order [Dkt. 280].  The Court held a hearing on remedies on November 8, 2023, and entered an Order for Permanent Injunction and Other Relief against Defendants Day Pacer LLC, EduTrek L.L.C., Raymond Fitzgerald, and Ian Fitzgerald on November 21, 2023, [Dkt. 293] ("Injunctive Order").  The Injunctive Order did not apply to deceased defendant Cumming or his substituted

Page 1 of 5

A-90

Estate. Rather, the Court considered additional briefing by the Estate and Commission regarding appropriate relief as to that defendant. The Court entered an Order determining the appropriate civil penalty amount on January 16, 2024, [Dkt. 312] and now enters this Order granting civil penalties against all defendants jointly and severally and attendant order provisions. The relief imposed by this Order is in addition to, and not in lieu of, the relief imposed by the Injunctive Order.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint states a claim upon which relief may be granted, charging that Defendants violated Section 5 of the FTC Act, 15 U.S.C. § 45, and the FTC's Telemarketing Sales Rule ("TSR" or "Rule"), as amended, 16 C.F.R. Part 310, in the Telemarketing of vocational training and post-secondary education programs.

3. The Corporate Defendants violated the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B) (**Count I**) by initiating or causing the initiation of outbound telephone calls to consumers whose telephone numbers were on the National Do Not Call Registry ("Registry"). The Corporate Defendants also violated 16 C.F.R § 310.3(b) (**Count II**) by assisting and facilitating their inbound transfer partners' violations of the TSR.

4. The Corporate Defendants' TSR violations are deemed to constitute unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

5. There is no genuine issue of material fact as to any of the Defendants' affirmative defenses, and summary judgment for the FTC is granted as to each of those defenses.

6. Corporate Defendants Day Pacer LLC ("Day Pacer") and EduTrek L.L.C. ("EduTrek")

A-91

formed a common enterprise. Day Pacer is also a corporate successor to EduTrek. The Corporate Defendants had knowledge that their acts and practices were prohibited by the TSR.

7.     Defendants Raymond Fitzgerald, Ian Fitzgerald, and David Cumming either participated in the violative acts or practices and/or had authority to control them. They knew or should have known of the Corporate Defendants' violative acts and practices and that those acts and practices were prohibited by the TSR.

8.     The imposition of a civil penalty under Section 5(m)(1)(A), 15 U.S.C. § 45(m)(1)(A), is appropriate in this case. Defendants are jointly and severally liable for a civil penalty in the amount of $28,681,863.88.

9.     Entry of this Order is in the public interest.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.     "**Defendants**" for purposes of this Order means all of the Individual Defendants (as defined herein) and the Corporate Defendants, individually, collectively, or in any combination.

B.     "**Corporate Defendants**" means Day Pacer LLC (also d/b/a Edutrek, EdSoup, Our School Search, College Info, Degree Spots, and Insurance Info), Edutrek LLC (also d/b/a EdSoup), and their successors and assigns.

C.     "**Individual Defendants**" for purposes of this Order means Raymond Fitzgerald, Ian Fitzgerald, and the estate of David Cumming ("Estate"), for which, as of the date of this Order, Margaret E. Cumming is the personal representative.

**ORDER**

## I.   MONETARY JUDGMENT FOR CIVIL PENALTY

IT IS ORDERED that:

A.     Judgment in the amount of $28,681,863.88 is entered in favor of the Commission against the Individual Defendants and Corporate Defendants, jointly and severally, as a civil penalty.

B.     Defendants are ordered to pay to the Commission $28,681,863.88.  Such payment must be made within 60 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

C.     Defendants' Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Defendants previously provided to the Commission, may be used for collecting and reporting, including on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. §7701.

## II.   SUBMISSIONS TO THE FTC

IT IS FURTHER ORDERED that unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580. The subject line must begin:  FTC v. DAY PACER, X190022.

A-93

### III.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes

of construction, modification, and enforcement of this Order.

Enter: 19-cv-1984
Date: January 23, 2024

_____
Lindsay C. Jenkins
UNITED STATES DISTRICT JUDGE

Page 5 of 5

A-94