# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellee,*

v.

DAY PACER LLC, *et al.*,
*Defendant-Appellant,*

and

MARGARET E. CUMMING, in her
capacity as personal representative of
the Estate of David T. Cumming,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 1:19-cv-01984
Hon. Lindsay C. Jenkins, Judge

## BRIEF OF THE FEDERAL TRADE COMMISSION

<div style="margin-left:50%">

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Deputy General
Counsel for Litigation*

</div>

Of Counsel:
MARK GLASSMAN
PATRICK ROY
   *Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

MARK S. HEGEDUS
MATTHEW M. HOFFMAN
   *Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2115
mhegedus@ftc.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iv

GLOSSARY ...................................................................................x

INTRODUCTION ..............................................................................1

JURISDICTION ..............................................................................2

QUESTIONS PRESENTED ...............................................................3

STATEMENT OF THE CASE ............................................................4

A. Statutory and Regulatory Background ............................................4

B. Factual Background ...................................................................7

    1. Day Pacer's Unlawful Calls to Consumers on the Do-Not-Call Registry ....................................................................8

    2. Individual Defendants' Role in Day Pacer ................................10

    3. Defendants' Knowledge of TSR Violations................................12

C. Proceedings Below ..................................................................15

    1. Summary Judgment on Liability ............................................16

    2. Substitution .....................................................................19

    3. Permanent Injunction.........................................................20

    4. Civil Penalties.................................................................21

SUMMARY OF ARGUMENT ...........................................................23

ARGUMENT .................................................................................26

I. The District Court Properly Granted Summary Judgment Holding All Defendants Liable for the TSR Violations and for Civil Penalties...................................................26

    A.   Standard of Review .................................................... 27

    B.   Undisputed Evidence Shows That Day Pacer Is a
        Telemarketer That Violated the TSR By Calling
        Numbers on the Do-Not Call-Registry. .................................... 28

    C.   Defendants Failed to Meet Their Burden To
        Establish Express Written Agreement. ................................... 32

    D.   Undisputed Evidence Shows That Day Pacer Had
        the Requisite Knowledge Necessary To Support
        Penalties. ................................................................ 37

    E.   Undisputed Evidence Shows That the Individual
        Defendants Are Liable for Day Pacer's Violations .................... 42

II.  The Scope of the Permanent Injunction Is Within the
    Scope of the District Court's Discretion. ................................ 48

    A.   Standard of Review .................................................... 48

    B.   The Injunction Is Not Overbroad. ...................................... 49

III. The District Court Properly Awarded Civil Penalties. .................... 54

    A.   Standard of Review .................................................... 56

    B.   The Court Did Not Abuse Its Discretion By
        Awarding a Civil Penalty Equal to Gross Revenue. ................... 56

    C.   The District Court Properly Held All Defendants
        Jointly and Severally Liable ............................................. 61

    D.   Defendants Have Not Shown Any Abuse of
        Discretion With Respect to the Statutory Factors. .................... 64

        1.   Defendants were highly culpable. .................................... 65
        2.   Defendants have a long history of misconduct .................... 69
        3.   Defendants have not shown the penalty exceeds
            their collective ability to pay. ...................................... 70
        4.   Day Pacer is no longer in business. ................................ 71

5. The need for general and specific deterrence supports the penalty. ......................................... 72

E. The Award Does Not Exceed the Relief the FTC Requested. ..................................................... 73

F. If the Court Finds an Abuse of Discretion, the Proper Course Is To Remand ...................................... 73

IV. The District Court Properly Substituted the Estate for Cumming. ........................................................... 75

A. Standard of Review. .................................................. 76

B. The District Court Properly Applied the Three-Part Test For Determining Whether an Action is Penal or Remedial for Substitution Purposes. ........................ 76

1. FTC actions to enforce the TSR protect individual consumers from harm. ..................... 77
2. Recovery by the government is not determinative. ................................................ 84
3. The civil penalty here is not wholly disproportionate to the harm caused by millions of unwanted calls. ........................................... 86

C. Equity, If Relevant, Supports Substitution. ............. 88

CONCLUSION ................................................................ 90

# TABLE OF AUTHORITIES

## CASES

*AMG Capital Mgmt., LLC v. FTC,*
  593 U.S. 67 (2021)...................................................................61

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)...........................................................27, 28

*Beaudry v. Telecheck Servs., Inc.,*
  2016 WL 11398115 (M.D. Tenn. Sept. 29, 2016).................82

*Brook, Weiner, Sered, Kreger & Weinberg v.
  Coreq, Inc.,*
  53 F.3d 851 (7th Cir. 1995)..............................................67

*Brown v. Plata,*
  563 U.S. 493 (2011).........................................................48

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986).........................................................27

*Citronelle-Mobile Gathering, Inc. v. O'Leary,*
  499 F. Supp. 871 (D. Ala. 1980).......................................85

*Cooper-Shut v. Visteon Auto. Sys.,*
  361 F.3d 421 (7th Cir. 2004)..........................28, 40, 44, 68

*E. Natural Gas Corp. v. ALCOA,*
  126 F.3d 996 (7th Cir. 1994)............................................64

*Edward E. Gillen Co. v. City of Lake Forest,*
  3 F.3d 192 (7th Cir. 1993)................................................68

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs.
  (TOC), Inc.,* 528 U.S. 167 (2000)..................................78, 84

*FTC v. Amy Travel Serv., Inc.,*
  875 F.2d 564 (7th Cir. 1989)............................................44

*FTC v. Capital City Mortg. Corp.,*
  321 F. Supp. 2d 16 (D.D.C. 2004) .............. 75, 81, 84, 85, 86

*FTC v. Colgate-Palmolive Co.,*
  380 U.S. 374 (1965).................................................49, 52, 53

*FTC v. Credit Bureau Ctr., LLC,*
  937 F.3d 764 (7th Cir. 2019) ........................................ 27, 43

*FTC v. Grant Connect, LLC,*
  763 F.3d 1094 (9th Cir. 2014) ........................................ 27

*FTC v. INC21.com Corp.,*
  745 F. Supp. 2d 975 (N.D. Cal. 2010) ................................ 52

*FTC v. John Beck Amazing Profits LLC,*
  888 F. Supp. 2d 1006 (C.D. Cal. 2012) .......................... 50, 53

*FTC v. Life Mgmt. Servs. of Orange Cty., LLC,*
  350 F. Supp.v 3d 1246 (M.D. Fla. 2018) ............................ 50

*FTC v. Pointbreak Media, LLC,*
  376 F. Supp. 3d 1257 (S.D. Fla. 2019) .............................. 51

*FTC v. Pukke,*
  53 F.4th 80 (4th Cir. 2022) ........................................ 50

*FTC v. QT, Inc.,*
  512 F.3d 858 (7th Cir. 2008) ........................................ 62

*FTC v. Think Achievement Corp,*
  144 F. Supp. 2d (N.D. Ind. 2000) .................................. 50

*Golan v. Veritas Ent., LLC,*
  788 F.3d 814 (8th Cir. 2015) ...................................... 30, 32

*Hannabury v. Hilton Grand Vacations Co.,*
  174 F. Supp. 3d 768 (W.D.N.Y. 2016) .............................. 84

*Hulce v. Zipongo, Inc.,*
  2024 WL 1251108 (E.D. Wis. Mar. 18, 2024) ...................... 31

*In re Sanctuary Belize Litig.,*
  482 F. Supp. 3d 373 (D. Md. 2020) ................................ 50

*Irvin-Jones v. Equifax Info. Servs. LLC,*
  2019 WL 4394684 (S.D. Tex. Sept. 13, 2019) ...................... 82

*Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.,*
  428 F.3d 706 (7th Cir. 2005) ...................................... 76

*Krueger v. Cuomo,*
  115 F.3d 487 (7th Cir. 1997) ...................................... 72

*Malvino v. Delluniversita,*
    840 F.3d 223 (5th Cir. 2016) ............................................................. 83

*McKinnon v. City of Berwyn,*
    750 F.2d 1383 (7th Cir. 1984) ........................................................... 62

*Michas v. Health Cost Controls of Ill., Inc.,*
    209 F.3d 687 (7th Cir. 2000) ............................................................. 68

*Murphy v. Household Fin. Corp.,*
    560 F.2d 206 (6th Cir. 1977) ....................................................... 81, 83

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) ........................................................................... 69

*Parchman v. SLM Corp.,*
    896 F.3d 728 (6th Cir. 2018) ..................... 59, 75, 78, 79, 83, 84, 87, 88

*Patriotic Veterans, Inc. v. Zoeller,*
    845 F.3d 303 (7th Cir. 2017) ............................................................. 58

*R&W Tech. Servs. Ltd. v. CFTC,*
    205 F.3d 165 (5th Cir. 2000) ............................................................. 60

*Russell v. City of Milwaukee,*
    338 F.3d 662 (2003) ........................................................................... 76

*Schreiber v. Sharpless,*
    110 U.S. 76 (1884) ............................................................................. 19

*SEC v. Jarkesy,*
    No. 22-859 (S. Ct. June 27, 2024), .................................................... 81

*SEC v. Williky,*
    942 F.3d 389 (7th Cir. 2019) ............................................................. 56

*SEC v. Yang,*
    795 F.3d 675 (7th Cir. 2015) ............................................................. 49

*Smith v. Lamz,*
    321 F.3d 680 (7th Cir. 2003) ............................................................. 68

*Smith v. No. 2 Galesburg Crown Fin. Corp.,*
    615 F.2d 407 (7th Cir. 1980) ................................. 19, 75, 76, 80, 82, 83

*Toney v. Quality Res., Inc.,*
    75 F. Supp. 3d 727 (N.D. Ill. 2014) .................................................. 35

*Trujillo v. Free Energy Savings Co.*,
  2020 WL 7768722 (C.D. Cal. Dec. 21, 2020) ..................................... 32

*United States v. Cornerstone Wealth Corp.*,
  549 F. Supp. 2d 811 (N.D. Tex. 2008)........................................... 70, 71

*United States v. Daniel Chapter One*,
  89 F. Supp. 3d 132 (D.D.C. 2015) ..................................................... 70

*United States v. Danube Carpet Mills, Inc.*,
  737 F.2d 988 (11th Cir. 1984)....................................................... 70, 84

*United States v. Dish Network LLC*,
  2015 WL 9164539 (C.D. Ill. 2015) ..................................................... 62

*United States v. Dish Network LLC*,
  256 F. Supp. 3d 810 (C.D. Ill. 2017) ................................. 67, 71, 81, 82

*United States v. Dish Network LLC*,
  954 F.3d 970 (7th Cir. 2020)............................................. 37, 39, 40, 57

*United States v. Edwards*,
  667 F. Supp. 1204 (W.D. Tenn. 1987)................................................ 85

*United States v. Nat. Fin. Servs., Inc.*,
  98 F.3d 131 (4th Cir. 1996)............................................................... 37

*United States v. NEC Corp.*,
  11 F.3d 136 (11th Cir. 1993)............................................................. 83

*United States v. Z Inv. Props., LLC*,
  921 F.3d 696 (7th Cir. 2019)............................................................. 56

*Vargas-Harrison v. Racine Unified School Dist.*,
  272 F.3d 964 (7th Cir. 2001)............................................................. 27

**STATUTES**

7 U.S.C. § 9 ........................................................................................ 60

15 U.S.C. § 45 ........... 2, 4, 16, 17, 21, 26, 37, 54, 57, 60, 61, 77, 78, 86, 87

15 U.S.C. § 53 ............................................................... 2, 4, 16, 61, 77

15 U.S.C. § 57b ................................................................................. 78

15 U.S.C. § 6101 ........................................................................ 58, 79

15 U.S.C. § 6102 ................................................................................. 4

15 U.S.C. § 6105 ....................................................................................... 4

15 U.S.C. § 6151 ....................................................................................... 5

15 U.S.C. § 6153 ....................................................................................... 6

15 U.S.C. § 77t ....................................................................................... 63

28 U.S.C. § 1291 ....................................................................................... 3

28 U.S.C. § 1292 ....................................................................................... 3

28 U.S.C. § 1331 ....................................................................................... 2

28 U.S.C. § 1337 ....................................................................................... 2

28 U.S.C. § 1345 ....................................................................................... 2

28 U.S.C. § 1355 ....................................................................................... 2

47 U.S.C. § 227 ................................................................................... 6, 78

755 Ill. Comp. Stat. § 5/18 .................................................................... 71

## RULES AND REGULATIONS

16 C.F.R. § 310.2 ........................................................ 4, 29, 30, 38

16 C.F.R. § 310.3 ........................................................................ 5, 16

16 C.F.R. § 310.4 ........................................................ 5, 15, 17, 29, 32

16 C.F.R. § 310.8 ....................................................................................... 9

16 C.F.R. Pt. 310 ....................................................................................... 2

47 C.F.R. § 64.1200 ............................................................................ 6, 38

60 Fed. Reg. 43,842 ......................................................................... 31

Fed. R. Civ. P. 25 ....................................................................................... 75

Fed. R. Civ. P. 56 ......................................................................... 27, 28

N.D. Ill. R. 56.1 ....................................................................................... 7

## OTHER AUTHORITIES

149 Cong. Rec. S11957-01,
    2003 WL 22217295 ......................................................................... 80

*In re R&R Implementing the Tel. Consumer
   Protect Act of 1991, Report and Order,*
   7 F.C.C. Rcd. 8752 (1992) ....................................................................35

# GLOSSARY

| | |
|---|---|
| CSA | College Search Advisor |
| Day Pacer | EduTrek, LLC and Day Pacer, LLC |
| Day Pacer Defendants | EduTrek, LLC, Day Pacer, LLC, Ian Fitzgerald, Raymond Fitzgerald |
| Defendants | EduTrek, LLC, Day Pacer, LLC, David Cumming, Ian Fitzgerald, Raymond Fitzgerald |
| DNC | Do Not Call |
| Estate | Estate of David Cumming |
| ECOA | Equal Credit Opportunity Act |
| Fitzgeralds | Ian Fitzgerald, Raymond Fitzgerald |
| FTC | Federal Trade Commission |
| Individual Defendants | David Cumming, Ian Fitzgerald, Raymond Fitzgerald |
| Registry | Do-Not-Call Registry |
| TCPA | Telephone Consumer Protection Act |
| Telemarketing Act | Telemarketing Consumer Fraud and Abuse Prevention Act |
| TILA | Truth in Lending Act |

## INTRODUCTION

The defendants in this case engaged in illegal telemarketing practices for over a decade by calling or facilitating calls to telephone numbers on the National Do-Not-Call Registry as part of a campaign to generate leads that they sold to for-profit schools. More than 40 million consumers received these harassing and unwanted calls. The Federal Trade Commission sued, seeking an injunction to halt unlawful telemarketing practices going forward and civil penalties for past violations. The district court granted summary judgment for the FTC as to all defendants, entered a permanent injunction, and held all defendants jointly and severally liable for $28.7 million in penalties ($6.88 per illegal call placed by or transferred to the defendant companies). Because Defendant David Cumming died during the litigation, the district court substituted his estate as a defendant; the estate is subject to the penalties but not the injunction.

Defendants Raymond Fitzgerald, Ian Fitzgerald, EduTrek LLC and Day Pacer LLC (the "Day Pacer Defendants") appeal the grant of summary judgment, the scope of the injunction, and the amount of civil penalties. The Cumming estate ("Estate") appeals the substitution

order and the penalties. None of Appellants' arguments has merit. The district court properly found no genuine dispute of fact that Defendants were engaged in "telemarketing" under the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Pt. 310, and that they violated the rule by placing or facilitating the placement of calls to numbers on the Do-Not-Call Registry. Defendants' legal arguments misread the TSR, and their conclusory affidavits, supported by little to no record evidence, do not create a genuine issue of material fact sufficient to overcome the FTC's overwhelming evidentiary showing that all Defendants are liable for TSR violations. Nor did the district court abuse its discretion either in issuing the permanent injunction or assessing penalties, or err in substituting the Estate for Cumming following his death. This Court should affirm.

## JURISDICTION

Appellants' jurisdictional statements are not complete. The FTC asserted claims for relief under 15 U.S.C. §§ 45(m)(1)(a) and 53(b) based on Defendants' TSR violations. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355(a). The district court entered

a permanent injunction on November 21, 2023, A65,[1] which the Day Pacer Defendants timely appealed on November 29, 2023. The district court's final judgment was entered on January 23, 2024. A89. The Day Pacer Defendants timely appealed on February 20, 2024, and the Estate timely appealed on the same date. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## QUESTIONS PRESENTED

1.    Whether the district court correctly granted summary judgment of liability in favor of the FTC as to each of the Defendants.

2.    Whether the district court properly enjoined the Day Pacer Defendants from telemarketing.

3.    Whether the district court properly imposed and calculated civil penalties.

4.    Whether the district court correctly substituted the Estate for Cumming as a defendant following Cumming's death.

---

[1] Because all of the district court's opinions and orders included in the Estate's appendix are also in the Day Pacer appendix, "A#" citations are to the Day Pacer appendix.

## STATEMENT OF THE CASE

### A.  Statutory and Regulatory Background

The FTC issued the TSR pursuant to the Telemarketing

Consumer Fraud and Abuse Prevention Act of 1994 ("Telemarketing

Act"), which directed the FTC to prescribe rules prohibiting deceptive or

abusive telemarketing acts and practices. 15 U.S.C. § 6102(a)(1). Under

the TSR, "telemarketing" includes any "plan, program, or campaign

which is conducted to induce the purchase of goods or services … by use

of one or more telephones and which involves more than one interstate

telephone call." 16 C.F.R. § 310.2(hh). Congress directed the FTC to

enforce the TSR under the FTC Act, which generally prohibits unfair or

deceptive acts or practices and provides several different means of

enforcement, including injunctions and civil penalties. 15 U.S.C.

§ 6105(b); *see also id*. §§ 45(a)(1), (m), 53(b). In particular, any person

who violates the TSR "shall be subject to the penalties … provided in

the [FTC] Act." *Id*. § 6105(b).

In 2003, in response to widespread concerns about the

proliferation of unwanted telemarketing calls and the attendant

invasion of personal privacy, the FTC amended the TSR to establish a

National Do-Not-Call Registry, and Congress expressly ratified that

decision. *See* 15 U.S.C. § 6151. The Registry contains phone numbers belonging to individuals who do not want to receive telemarketing calls. As amended, the TSR provides in relevant part that "[i]t is an abusive telemarketing act or practice and a violation of this part for a telemarketer to engage in … [i]nitiating any outbound call to a person when … [t]hat person's telephone number is on the 'do-not-call' registry maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services.…" 16 C.F.R. § 310.4(b)(1)(iii)(B). There are only two exceptions: if the telemarketer can demonstrate either that (1) the seller on whose behalf the telemarketer calls received express agreement for such call, in writing and signed, from the call recipient, or (2) the seller has an established business relationship with the call recipient. *Id.* The TSR also makes it unlawful for any person to "provide substantial assistance or support" to a telemarketer if the person knows or consciously avoided knowing that the telemarketer is engaged in certain misconduct, including do-not-call violations. *Id.* § 310.3(b).

In addition to the TSR, telemarketing calls to numbers on the Do-Not-Call Registry are prohibited by regulations issued by the Federal

Communication Commission under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Congress directed the FCC to "consult and coordinate with the [FTC]" when promulgating the do-not-call provisions of TCPA rules to "maximize consistency" with the do-not-call provisions of the TSR. 15 U.S.C. § 6153. While the TCPA rule uses slightly different language than the TSR, the substantive prohibitions are essentially the same. The TCPA rule generally prohibits "initiat[ing] any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2).[2] A "telephone solicitation" means "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *Id.* § 64.1200(f)(15). Accordingly, a "telephone solicitation" under the TCPA rule is generally "telemarketing" under the TSR.

---

[2] As in the TSR, there are affirmative defenses if the caller can establish either express written agreement by or a personal relationship with the call recipient. 47 C.F.R. § 64.1200(c)(2)(ii), (iii).

## B. Factual Background

The facts of this case are largely uncontroverted. As required by the district court's local rules, N.D. Ill. R. 56.1(a)(2), (d), the FTC submitted a statement of material facts in support of its motion for summary judgment with citations to supporting record evidence that identified millions of calls to the Registry, demonstrated lack of consent, and comprised Defendants' contemporaneous statements and sworn admissions. D.212. The district court held that the Defendant's responses (D.229; D.232) did not comply with the local rule because they "include multiple numbered paragraphs that purport to dispute the FTC's facts, but do not actually dispute the contents of the paragraph, do not provide citations to the record, and/or do not 'concisely explain how the cited material controverts the asserted fact.'" A7 n.1 (quoting N.D. Ill. R. 56.1(e)(3)). The court thus held that "[w]here Defendants dispute the FTC's facts but fail to cite the record evidence or explain how it controverts the asserted fact, the FTC's facts are deemed admitted." *Id.* The following summary is based on the undisputed facts.

### 1. Day Pacer's Unlawful Calls to Consumers on the Do-Not-Call Registry

Defendants EduTrek and Day Pacer were both in the business of generating "leads" that they sold to for-profit schools marketing their services to prospective students. D.212 at 6-7. Defendants Raymond Fitzgerald and David Cumming formed EduTrek in 2010, and they involved Ian Fitzgerald in various capacities. D.212 at 3-4. Following negative publicity and scrutiny of EduTrek's practices, D.212 at 36-38, they formed Day Pacer and transitioned EduTrek's business to the new company in late 2015, operating out of the same office with many of the same employees. D.212 at 40-44. For convenience, we refer to both companies collectively as "Day Pacer" and the Fitzgeralds and Cumming as the "Individual Defendants."

Day Pacer purchased consumer phone numbers from the operators of websites offering information about job opportunities and public benefits. D. 212 at 5-9. Consumers who entered their names on these websites did not consent to receiving telemarketing calls from Day Pacer or its partners, but were called anyway. D.212 at 11-13. Day Pacer operated a 100-200 seat call center where "college search advisors" ("CSAs") cold called consumers to market for-profit schools.

D.212 at 5-6. If a consumer expressed an interest, Day Pacer passed along their name and number to for-profit schools as potential "leads." D.212 at 4-6.

Day Pacer also contracted with various telemarketing companies, known as "in-bound transfer partners" or "IBT Partners," to make additional phone calls and transfer the calls to Day Pacer where the IBT Partner determined that the consumer was potentially eligible for enrollment in post-secondary education. D.212 at 14. Day Pacer paid the IBT Partners, gave them phone numbers to call, reviewed their telemarketing scripts, and provided other guidance and direction to increase the number of transfers. D.212 at 14-15, 18-19.

Telemarketers may subscribe to the Do-Not-Call Registry to determine whether numbers they intend to call are listed on the Registry. *See* 16 C.F.R. § 310.8. Day Pacer, however, never subscribed to the Registry, never "scrubbed" its call lists to remove numbers listed on the Registry, and understood that its IBT Partners also did not scrub call lists for numbers on the Registry. D.212 at 10, 20.

Not surprisingly, a huge number of these calls were placed to numbers on the Do-Not-Call Registry. From March 2014 to June 2019,

25% of the calls initiated by Day Pacer, or 3,669,914 calls, were made to numbers on the Registry. D.229 at 17-18; D.232 at 11-12. Another 498,597 calls to numbers on the Registry were made by IBT Partners and transferred to Day Pacer, D.229 at 27-28; D.232 at 20-21. Some 39,847,000 such calls were made by IBT Partners and never transferred, D.212 at 17. There is no evidence that either Day Pacer or the IBT Partners obtained express written agreement for these calls. D.212 at 46-47.

### 2. Individual Defendants' Role in Day Pacer

All three Individual Defendants have had substantial ownership and financial interests and/or significant managerial responsibilities in Day Pacer over the years. D.212 at 29-33. All three actively participated in the companies' operations, including discussing their business model, marketing tactics, and business opportunities. D.212 at 27-28, 31. They also collaborated in responding to complaints, lawsuits, and threatened lawsuits for Do-Not-Call violations. D.212 at 22-23, 36.

Briefly, Raymond Fitzgerald owns (or owned) a primary interest in Day Pacer through his company, The Dalsnan Family LLC ("Dalsnan"). D.212 at 3. He also is (or was) a managing member,

manager, and registered agent of Day Pacer. *Id.* Prior to his death,

Cumming also owned a substantial interest in Day Pacer and was also

a corporate manager. D.212 at 4. As corporate managers, Raymond and

Cumming had authority, and were required, to oversee Day Pacer.

D.212 at 31-32; D.212-3 at 8-10 [SA007-09]; D.212-4 at 10-12 [SA062-

64]. They also regularly loaned money to the companies (and at one

point "foreclosed" on a loan to EduTrek), D.212 at 33, and owned

(through another LLC) the building where Day Pacer rented office

space, D.212 at 29, 40.

In 2010, Raymond made Ian Fitzgerald president of Dalsnan, and

in that capacity Ian was responsible for watching over Raymond's and

Cumming's investment interests in EduTrek and Day Pacer. D.212 at

30. Ian told vendors he had been involved with the companies since

2009. D.212 at 4. Ian eventually became director of human resources for

EduTrek and later for Day Pacer before becoming Day's Pacer's

president starting June 1, 2016. D.212 at 30. As president, he oversaw

Day Pacer's day-to-day operations, including hiring and firing

employees, signing contracts, responding to compliance issues, and

engaging in business development. *Id.* Further, he was responsible for

the company's profitability and had access to its bank accounts and accounting records. *Id.* Ian also had an ownership interest in Day Pacer after the business was transitioned from EduTrek. D.212 at 4.

### 3. Defendants' Knowledge of TSR Violations

All Defendants had knowledge of TSR requirements. As early as 2011, Day Pacer's contracts required compliance with the TSR. D.212 at 14, 38-39. In 2014, the company revised its existing agreement with IBT Partners to "comply with … the [FTC's] Telemarketing Sales Rule" and prohibited IBT Partners from "call[ing] any individuals whose numbers appear on a federal or state Do Not Call ('DNC') list, unless it meets a valid exemption." D.212 at 38-89; D.212-3 at 42 [SA039]. Day Pacer also required that its IBT Partners "maintain written policies for complying with DNC requirements and training call center personnel on use of those policies." D.212-3 at 42-43 [SA039-40].

Day Pacer maintained a "Do-Not-Call Policy" that purported to comply with federal and state regulations governing the national and Day Pacer's internal Do-Not-Call registries. D.212-4 at 91 [SA093]. The Policy directed CSAs to place a consumer's telephone number on Day Pacer's internal Do-Not-List upon request. D.212 at 10-11; D.212-4 at

91 [SA093]. Nevertheless, Day Pacer also instructed CSAs to overcome the "objections" of consumers who told Defendants they were not interested in speaking about educational opportunities and were displeased about being called. D.212 at 11.

All three Individual Defendants were familiar with the TCPA, the TSR and the Do-Not-Call Registry. D.212 at 14, 29, 34, 38-39; D.235 at 4. Raymond boasted about his expertise with telecommunications and telemarketing law due to his representation of Day Pacer in cases involving the Do-Not-Call Registry and the TCPA. D.212 at 38. In early 2016, Cumming sent Raymond and Ian an email that included a link to the TSR itself, and he advised them to review it. D.212 at 34; D.212-6 at 95 [SA100]. Later that year, he sent Raymond and Ian an email analyzing the TSR and TCPA after Raymond emailed Cumming about a consumer complaining about having been contacted by the one of the IBT Partners. D.212 at 35. In his correspondence, Cumming repeatedly referred to TSR requirements, including the potential for civil penalties if those requirements were violated. *Id.*; D.212-6 at 97 [SA102]. In 2015, Ian admonished: "We need to make sure our system is not calling DNC numbers ever." D.212-6 at 108 [SA109]. He also communicated with

Raymond and Cumming, as well as other company employees, about whether Day Pacer should "invest" in a telemarketing permit. D.212 at 34-35.

Defendants were also aware of the need for consent to call a number on the Do-Not-Call Registry. For example, Cumming explicitly raised with the Fitzgeralds what he called the issue of "conditional consent," in which he asked, "[b]y opting in on a site advertising at home business opportunities, is the opter consenting to a call about further education?" D.212 at 34; D.212-6 at 100 [SA105]. He then stated, "it is unfortunate that we have the potential conditional consent issue but oh, well … ." *Id.* Ian stated that, even before he started working at Day Pacer, he "understood TCPA compliance to mean that there had to be a – an opt-in box … ," and further he understood details about that requirement. D.235 at 3-4.

Day Pacer also received complaints that it was initiating calls to phone numbers on the Do-Not-Call Registry. D.212 at 11-12, and did not have proper express written authorization to call the numbers, D.212 at 13. Despite these concerns, Day Pacer continued to purchase consumer data from the same websites. *Id.*

All three Individual Defendants were aware of and involved in responding to complaints and multiple lawsuits regarding possible violations of the TSR and the TCPA, with Raymond and Cumming providing legal advice. D.212 at 36. They also knew that Day Pacer did not subscribe to the Do-Not-Call Registry. *Id.* Additionally, Raymond and Cumming were also both familiar with a 2014 Huffington Post article about EduTrek that described (1) how the company obtained consumer information from jobs and benefits websites using fine print disclosures and (2) examples of calls to consumers who had not consented. D.212 at 37; D.212-3 at 88-95 [SA045-52]. The article noted that EduTrek "may well be in violation of federal statutes prohibiting deceptive marketing and unwanted telephone calls" and that "schools sometimes expressed concern that the reps not violate FTC's Do-Not-Call Rules." D.212-3 at 88, 91[SA045, SA048].

## C.    Proceedings Below

The FTC filed this action in March 2019. Count I of the Complaint alleged that the Defendants violated the TSR by initiating or causing others to initiate telemarketing calls to phone numbers on the Do-Not-Call Registry. *See* 16 C.F.R. § 310.4(b)(1)(iii)(B). Count II alleged that

Defendants violated the TSR by providing substantial assistance to IBT Partners even though Defendants knew or consciously avoided knowing that those telemarketers were calling numbers on the Do-No-Call Registry in violation of the TSR. *Id.* §310.3(b). The FTC sought permanent injunctive relief, *see* 15 U.S.C. § 53(b), and civil penalties, *see id.* § 45(m)(1).

### 1.    Summary Judgment on Liability

Following discovery, the parties cross-moved for summary judgment. The district court largely granted the FTC's motion and denied Defendants' motions, holding that all Defendants were liable on both counts of the Complaint and that an award of civil penalties was proper.[3] We discuss only those parts of the opinion that are relevant to this appeal.

At the outset, the court noted that there was no dispute that Day Pacer made at least 3,669,914 calls to numbers on the Do-Not-Call Registry. A33. It rejected Defendants' argument that Day Pacer was not

---

[3] The district court granted summary judgment for Defendants on Count I insofar as it alleged that Defendants were liable for calls made by IBT Partners on an agency theory. A49. That ruling is not at issue here.

a "telemarketer" because it did not make sales pitches or offers on calls, explaining that the TSR definition of telemarketing does not require that a direct sale or sales offer be made. A34-35. It held that Day Pacer engaged in telemarketing, and hence was subject to the TSR, because there was no dispute that it placed calls as "part of a plan between multiple businesses [Day Pacer and the schools] to connect consumers to various for-profit programs." A35-36. Additionally, the court held that Defendants had produced no evidence that any call recipients had provided the express written agreement necessary to avoid a finding of liability. A41-46; 16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

The court held that Day Pacer satisfied the standard required for assessment of civil penalties: "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its conduct was unfair or deceptive and prohibited by the TSR. A47; 15 U.S.C. § 45(m)(1)(A). It rejected Defendants' argument that Day Pacer did not know or have reason to know that the TSR applied to its business, focusing on party admissions and objective circumstances showing that no reasonable company in Day Pacer's position could have concluded that its activities were outside the TSR's scope. A38-41. It further held

that based on the undisputed evidence, Day Pacer had "at a minimum … knowledge fairly implied under the circumstances that there were not valid written consents for at least a portion of the numbers they purchased and dialed." A46.

The court next held that Day Pacer also violated the TSR by paying the IBT Partners to make calls in violation of the do-not-call rule. The court held that this conduct amounted to substantial assistance and that undisputed evidence showed Day Pacer "knew or consciously avoided knowing that at least one of its IBT Partners was violating the TSR." A50. The court found it "unnecessary to determine whether [Day Pacer] substantially assisted with each and every one of the IBT Partners" because the FTC was not seeking penalties for the roughly 40 million untransferred calls made by the IBT Partners or injunctive relief concerning the IBT Partners directly. A51. For purposes of liability, substantially assisting one IBT Partner was enough. A51-52.

Finally, the court held that the Individual Defendants were liable for both injunctive relief and civil penalties because undisputed evidence showed that all three of them (1) directly participated in the

companies' TSR violations or had authority to control them, and (2) knew or should have known about the violations. A52-56.

## 2. Substitution

Shortly after summary judgment briefing concluded, Cumming died. D.244.The FTC filed a motion to substitute the personal representative of his estate as a defendant. D.247. The court granted the motion. It applied federal common law, under which "remedial" claims survive a defendant's death, while actions on "penal" statutes do not. *See Schreiber v. Sharpless*, 110 U.S. 76, 80 (1884). The court noted, however, that "it is not always easy to tell if a statutory claim is remedial or penal" and that just because the FTC sought civil penalties, that did not necessarily make the action penal for substitution purposes. A13-14. Surveying the relevant case law and applying the three-factor test articulated by this Court in *Smith v. No. 2 Galesburg Crown Financial Corp.*, 615 F.2d 407, 414 (7th Cir. 1980), the court determined that an FTC action to enforce the TSR is primarily remedial, rather than penal, even where the FTC seeks civil penalties. A13-21. The court also rejected the Estate's argument that it would be inequitable to order substitution because Day Pacer supposedly lost

money, the money in the Estate did not result from ill-gotten gains, and Cumming's heirs had nothing to do with the TSR violations. A22-23. Rather, the court concluded that it would be inequitable to allow the Estate to avoid any liability while leaving the Fitzgeralds responsible for the full civil penalty amount. A23.

### 3. Permanent Injunction

In its summary judgment opinion, the court said that it was "inclined to issue injunctive relief against" Day Pacer and the Fitzgeralds "for the same reasons that the Fitzgeralds are properly held responsible for the acts of" the company. A58. The court indicated that it would not order injunctive relief against the Estate, because the Estate had no ongoing involvement in the conduct of Day Pacer's business. *Id.* Because of the amount of time that had elapsed since the case was filed, however, the court ordered the parties to submit updated information about the proper scope of injunctive relief. *Id.* After receiving and reviewing those submissions, the court entered an injunction that "permanently restrain[s] and enjoin[s]" the Fitzgeralds and Day Pacer "from participating in Telemarketing or assisting others engaged in Telemarketing, whether directly or through an

intermediary." A68. The injunction defines "Telemarketing as "any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the [TSR]." *Id.*[4]

### 4. Civil Penalties

The FTC Act provides for penalties to be assessed on a per-violation basis and sets a statutory cap that is adjusted for inflation. *See* 15 U.S.C. § 45(m)(1)(A); 28 U.S.C. § 2864 note. Although the maximum civil penalty authorized for Defendants' violations would have exceeded $100 billion, the Act does not permit automatic assessment of the maximum. Rather, the district court must "take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice requires." 15 U.S.C. § 45(m)(1)(C). In its summary judgment papers, the FTC analyzed these factors and recommended a total penalty of $28,681,863.88, corresponding to Day Pacer's revenue from the misconduct, and working out to $6.88 per call

---

[4] The district court later partially stayed the Injunction insofar as it bars telemarketing to businesses pending this appeal. A81.

for each of the 4,168,511 unlawful calls placed by or transferred to Day Pacer. The court stated that it was inclined to impose this penalty but deferred a final ruling, ordering further proceedings to receive updated information, including whether Day Pacer was still in business and information about Defendants' ability to pay and the effect of any penalty on their business. A61.

Following supplemental briefing by the Estate and a response by the FTC, A87-88, the court held all Defendants jointly and severally liable for the amount the FTC had requested. A89. The court held this penalty was reasonably connected to the required factors—"basically, given the scope of Defendants' TSR violations, their knowledge of those violations, and the high culpability of trying to mask those violations, all revenue from those calls should be forfeited." A87. It held that a penalty of $6.88 per unlawful call fell "well within the range for the difficult-to-quantify harm from TSR violations." A87-88. The court rejected the Estate's various arguments, ruling that several were simply an effort to relitigate issues decided on summary judgment and the remainder lacked merit. A86-87.

## SUMMARY OF ARGUMENT

1. The district court correctly granted summary judgment on liability. The undisputed facts establish that Day Pacer was engaged in telemarketing and that it violated the TSR by calling consumers whose numbers were listed on the Do-Not-Call Registry without proper consent. Defendants' assertion that the TSR does not apply unless an offer to sell is made on the call is contrary to the plain text of the rule. Day Pacer's calls were telemarketing because they were part of a plan, program or campaign to induce the purchase of educational services. To avoid liability, Defendants had to show that consumers expressly agreed to receive calls in a signed writing. They produced no evidence of such written agreements.

The undisputed facts showed that Day Pacer had actual knowledge or knowledge fairly implied on the basis of objective facts that its conduct violated the TSR, as required for the imposition of civil penalties. Defendants' documents show they knew about the TSR, and they admitted that they knew they were subject to nearly identical restrictions in the TCPA. Contrary to Defendants' argument, the

district court did not make credibility determinations. Instead, it held that the objective evidence fairly implied a showing of knowledge.

Undisputed facts also showed that all three Individual Defendants are liable for Day Pacer's TSR violations. Individual Defendants had authority to control the violations based on their management positions with the company and responsibilities for its operations. They also participated in the violations, including by directing the activities of IBT Partners and failing to take steps necessary to prevent calls to numbers on the Do-Not-Call Registry. And the Individual Defendants had knowledge from several sources about the TSR violations, including the absence of valid consent to call consumers.

2. Having found liability, the district court did not abuse its discretion in entering a permanent injunction banning Day Pacer and the Fitzgeralds from all telemarketing, whether or not covered by the TSR. It is well settled that an injunction under the FTC Act should not be limited to prohibiting the precise conduct for which defendants are liable; those violating the Act are subject to "fencing in" relief to ensure they do not engage in similar misconduct. Given Defendants' blatant disregard for the TSR's requirements and the ease with which

telemarketing operations can be transferred to new products or services, a broad ban was appropriate here.

3. The district court did not abuse its discretion in awarding civil penalties. Do-Not-Call violations cause harm to consumers that is very real (*e.g.*, invasion of privacy, lost time) but hard to quantify. Accordingly, the district court properly calculated penalties based on Defendants' gross revenues, taking into consideration the mandatory factors specified in the FTC Act, including Defendants' culpability and the need for deterrence. The $28 million penalty works out to $6.88 per illegal call, which the court properly found was not disproportionate to the harm. And because the Defendants were all involved in running EduTrek and Day Pacer, which were a common enterprise, and they all knew of the TSR violations, the court properly imposed joint and several liability, rather than assessing each Defendant's penalty individually. The penalty should be affirmed, but if the Court finds an abuse of discretion, it should remand rather than accept the Estate's unsupported and unreasonable alternative penalty calculations.

4. The district court properly substituted the Estate for Cumming after his death. Substitution is appropriate where the purpose of an

action is primarily remedial, not penal, and the mere fact that a plaintiff seeks civil penalties is not enough to make an action "penal" for substitution purposes. A wealth of case law demonstrates that actions seeking penalties for violations of consumer protection statutes that protect individuals from harm, like the Telemarketing Act, are properly treated as remedial for substitution purposes, regardless of whether the plaintiff is the government or a private party.

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT HOLDING ALL DEFENDANTS LIABLE FOR THE TSR VIOLATIONS AND FOR CIVIL PENALTIES.

The undisputed evidence presented by the FTC shows that Day Pacer is a telemarketer that violated the TSR both by calling consumers whose numbers were on the Do-Not-Call Registry and by substantially assisting IBT Partners in making such telemarketing calls. The undisputed evidence also shows that Defendants acted with either "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its conduct was unfair or deceptive and is prohibited by the TSR, as required for an award of civil penalties. 15 U.S.C. § 45(m)(1). Finally, the undisputed evidence shows that the Individual Defendants are liable because they either participated in or

had authority to control the violations and they knew or should have known about the violations. *See FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 769 (7th Cir. 2019).[5] Defendants' attacks on the district court's summary judgment ruling are meritless.[6]

## A.    Standard of Review.

This Court reviews a district court's grant of summary judgment *de novo. Vargas-Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 970 (7th Cir. 2001). The judgment must be affirmed if there is "no genuine dispute as to any material fact and [the FTC] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). That party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue [of fact] for trial." *Id.*

---

[5] Some courts have held that a showing of knowledge is not required where the FTC does not seek monetary relief. *See FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101-02 (9th Cir. 2014).

[6] The Estate adopts the arguments in much of the Day Pacer Defendants' brief. Estate Br.44. When addressing those, we cite to the Day Pacer brief ("DP Br.) only, except where cites to the Estate's brief ("Estate Br.") are needed.

at 250. Affidavits on which the party relies must "be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). "[C]onclusory statements, unsupported by evidence of record, are insufficient to avoid summary judgment." *Cooper-Shut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004). Evidentiary issues addressed in the summary judgment decision are reviewed for abuse of discretion. *Id.*

### B.  Undisputed Evidence Shows That Day Pacer Is a Telemarketer That Violated the TSR By Calling Numbers on the Do-Not Call-Registry.

The district court properly held that "the undisputed facts show that [Day Pacer] engaged in telemarketing as defined by the TSR." A36. It is undisputed that Defendants' "business model was designed to generate consumer leads in order to sell them" to for-profit schools that "used those leads in an effort to enroll people in their programs." A35. Cumming, for example, described the purpose of Day Pacer's call centers as selling leads. D.230-1 at 4 [SA143]. The companies described themselves as offering educational marketing services. D.229 at 11-14; D.232 at 6-8. Defendants identify no evidence disputing the district court's conclusion that Day Pacer's "entire business model depended on

being a marketing partner as part of a plan between multiple businesses to connect consumers to various for-profit programs." A36. In other words, Day Pacer was making telephone calls as part of a "plan, program, or campaign" to induce the purchase of educational services. That is "telemarketing," *see* 16 C.F.R. § 310.2(hh), which makes Day Pacer a "telemarketer" within the meaning of the TSR. *See id.* § 310.2(gg) ("telemarketer" means "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer."). It follows that the Day Pacer violated the TSR by calling numbers on the Do-Not-Call Registry, which it does not dispute doing. *See* 16 C.F.R. § 310.4(b)(1)(iii)(B); D.229 at 17-19; D.232 at 11-12.[7]

Defendants' argument that there is a genuine dispute of fact as to whether Day Pacer's business model was subject to the TSR (DP Br.15-16) fails for three reasons. First, Defendants mistakenly read the TSR to apply only if an actual offer to sell goods or services is made on the call to consumers. According to the Defendants, because Day Pacer's calls involved trying to identify consumers interested in educational

---

[7] By the same reasoning, the IBT Partners are also "telemarketers," and their calls to numbers on the Do-Not-Call Registry violated the TSR.

opportunities, they were "purely informational" and did not involve an offer to sell goods or services. DP Br.6-7, 15-16. But as the plain text of the TSR makes clear, the relevant question in determining whether a call is "telemarketing" is not whether an offer to sell goods or services is made during the call but whether the call is part of a "plan, program, or campaign which is conducted to induce the purchase of goods or services." 16 C.F.R. § 310.2(hh). Thus, the district court correctly ruled that "[n]either the definition of telemarketer nor telemarketing requires a direct sale or sales offer between the person placing the call and the consumer." A35. That ruling is consistent with *Golan v. Veritas Ent., LLC*, 788 F.3d 814 (8th Cir. 2015), which held that calls initiated for the purpose of promoting a film "qualified as telemarketing" under the analogous provisions of the TCPA "even though the messages never referenced the film." *Id.* at 820.

Second, as the district court observed (A34-35), Defendants' argument is based on a misreading of FTC guidance. In the statement of basis and purpose that accompanied the TSR, the FTC explained that the term "telemarketer" "does not include persons *making or receiving customer service calls or similar tangential telephone contacts*, unless a

sales offer is made and accepted during such calls." 60 Fed. Reg. 43,842, 43,844 (Aug. 23, 1995) (emphasis added). Here, Day Pacer was not making customer service calls or engaged in similar tangential telephone contacts—it was reaching out to potential customers as part of a campaign to generate leads for for-profit schools. Thus, as the district court held, the guidance Defendants identify "has no application here." A35. Defendants' suggestion that the calls were outside the scope of the TSR because they were "purely informational" is likewise unfounded. DP Br.16. As the district court explained, the FTC has published FAQs which advise that "purely informational" calls refer to incidental contacts "like your cable company confirming a service appointment"—not calls for generating sales leads. A35 (citing D.227-7 at 3-4).

Finally, Defendants receive no support from the various unreported district court cases involving the TCPA that they cite for the proposition that "purely informational calls are not subject to the TSR." DP Br.16 (citing cases). None of the cases involved calls conducted to generate sales leads. For example, *Hulce v. Zipongo, Inc.*, 2024 WL 1251108, at *6 (E.D. Wis. Mar. 18, 2024), involved free nutritional

counseling provided by the consumers' health plan. *Trujillo v. Free Energy Savings Co.*, 2020 WL 7768722, at *3 (C.D. Cal. Dec. 21, 2020), involved the offer of free weatherization paid for by the consumer's utility. By contrast, defendants ignore the Eighth Circuit's decision in *Golan*, which makes clear that a call can be "telemarketing" under the TCPA even if it does not reference the product or service it is promoting. *Golan*, 788 F.3d at 820-21.

## C. Defendants Failed to Meet Their Burden To Establish Express Written Agreement.

Under the TSR, a telemarketer may avoid liability for calling numbers to the Registry if it can demonstrate that the seller on whose behalf it is telemarking obtained "the express agreement, in writing, of [the call recipient] to place calls to that person." 16 C.F.R. § 310.4(b)(1)(iii)(B)(1). The written agreement must "clearly evidence [the call recipient's] authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person." *Id.* The district court concluded that Defendants had not "demonstrate[d] that they have obtained such consent." A43.

As the court explained, Defendants purchased consumer phone numbers from various websites but did not introduce "screenshots or other contemporaneous evidence to establish the contents of the websites on which the customers supposedly provided express written consent." A43. Instead, Defendants relied on call records purportedly showing the URLs, or website locations, where consumers entered their phone numbers. But the FTC's review of a random sample of these records "indicated that in nearly all cases, the URL records were blank, contained text that was not a web page, or did not point to an active web page," and "[e]ven when they did point to an active web page, they did not contain any language about telephone calls." A44. And evidence submitted by the FTC, including statements of Day Pacer's own employees, indicate that the consumers did not provide express written agreement. A45.

Defendants failed to present any evidence that consumers provided express written agreement to be called—much less evidence that meets the strict standards set forth in the TSR. This is fatal to Defendants' consent argument since, as the text of the TSR makes

clear, it is the defendant's burden to demonstrate that express written agreement was obtained.

Defendants launch a series of attacks on the district court's ruling, but none comes close to hitting its target. Defendants are simply wrong that the district court "made impermissible credibility determinations at summary judgment regarding whether [the LLC] Defendants spoke with consumers who solicited conversations with them." DP Br.20. The district court made no credibility determinations. It relied on the absence of probative evidence submitted by Defendants. A44. In any event, the issue is not whether Day Pacer CSAs spoke with consumers, but whether Defendants produced evidence of express written agreement. They did not.

Defendants are also wrong that consumers provided express written agreement merely by submitting their telephone numbers to the websites from which defendants purchased the numbers. DP Br. 20. As explained above, the TSR imposes specific requirements for express written agreement, including evidence of consent to be called by or on behalf of a specific party. Defendants ignore these detailed requirements. Defendants also misplace their reliance on an FCC

Report and Order interpreting the TCPA. DP Br. 20-21 (citing *In re R&R Implementing the Tel. Consumer Protect Act of 1991, Report and Order*, 7 F.C.C. Rcd. 8752, 8769 (1992)). That document is from 1992—two years before the Telemarketing Act was enacted and 11 years before the FTC amended the TSR to create the Do-Not-Call Registry. It thus says nothing about how the do-not-call provisions of the TSR should be interpreted, and certainly cannot override the TSR's plain text. Furthermore, Defendants ignore critical language from that FCC document, which explains that release of a phone number may be deemed consent only to be called "by the entity to which the number was released." 7 F.C.C. Rcd. at 8769; *see also Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 737 (N.D. Ill. 2014) ("Consent for one purpose does not equate to consent for all purposes."). Here, consumers did not release their phone numbers to Day Pacer. Instead, they submitted contact information to websites advertising job opportunities and benefits, which made no mention of Day Pacer.

Defendants do not even attempt to explain how the call records and transcripts they cite (DP Br. 21) could satisfy their burden to establish express written agreement. It does not. Defendants disparage

the FTC's analysis of their call records as representing a "miniscule sample" of the more than 11 million call records and fault the FTC for not reviewing the webpages as of the time consumers accessed them. DP Br. 21-22. As the district court pointed out, Defendants had "the burden to show consent" and "besides a handful of call transcripts indicating that some customers were interested in the educational opportunities they marketed," Defendants produced "no evidence that consumers wanted to receive calls from [Day Pacer] and [its] dialing vendors or consented to receiving such calls." A44.[8]

Defendants quote from various call transcripts, (DP Br. 22-23), but as the district court noted, those communications came after "the train had left the station. The dialing vendors had already initiated a call to a number on the Do Not Call List." A45-46. Even if they were in writing and signed (which they were not), these after-the-fact communications could not serve as "consent to be called in the first

---

[8] In any event, the FTC's analysis of Defendants' call records was done by Kenneth H. Kelly, an FTC economist with a Ph.D. in Economics and an M.S. in applied mathematics and statistics. His analysis explained why the random sample used supported with a high degree of confidence a conclusion that Defendants' call records did not show consent. D.212-8 at 79-83 [SA135-39]. Defendants did not rebut this evidence.

place." A45-46. Indeed, Cumming conceded as much, stating in an email to the Fitzgeralds in 2016 that he did not believe a person could retroactively consent. D.235 at 3; D.212-6 at 100 [SA105].

### D. Undisputed Evidence Shows That Day Pacer Had the Requisite Knowledge Necessary To Support Penalties.

A court may assess civil penalties against a defendant for violations of the TSR only where the defendant had "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its conduct was unfair or deceptive and violated the rule. 15 U.S.C. § 45(m)(1)(A); *see also United States v. Dish Network L.L.C.*, 954 F.3d 970, 978 (7th Cir. 2020). The district court properly applied this standard and correctly held that the undisputed evidence showed that Day Pacer had the requisite knowledge. A37-41.

The knowledge standard is ultimately objective. "A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *United States v. Nat. Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996). Here, undisputed evidence shows that a reasonable company in Day Pacer's position would have known both of the TSR's existence and that initiating calls to numbers on the Do-

Not-Call Registry without express written agreement or an established business relationship violated the Rule.

Undisputed evidence shows that the Defendants were aware of the TSR. As early as 2011, their contracts required compliance with the TSR, prohibited IBT Partners from calling numbers on the Do-Not-Call Registry, and required the Partners to maintain written policies and provide training on do-not-call requirements. D.212 14-15, 38-39; D.212-3 at 42 [SA039]. Defendants even maintained their own Do-Not-Call Policy purporting federal and state law. D.212-4 at 91 [SA093].

All three Individual Defendants, as well as EduTrek's former president, attested in affidavits that they knew about the TCPA but did not understand Day Pacer was also subject to the TSR. D.227-2 at 8; D.227-4 at 8; D.227-6 at 6; D.230-1 at 6-7 [SA145-46]. As the district court held (A39), Defendants offered no explanation as to how they could have reasonably known they were subject to the TCPA but believed they were not subject to the TSR, since a "telephone solicitation" under the TCPA rule is essentially equivalent to "telemarketing" under the TSR. *Compare* 47 C.F.R. § 64.1200(f)(15) *with* 16 C.F.R. § 310.2(hh). Defendants argue that Cumming's

"research" led them to believe that Day Pacer was exempt (DP Br. 17), but as the district court explained, they "provide[d] no details concerning the research that Cumming (or any other attorneys) performed or why it led them to believe that Day Pacer was exempt from the TSR." A39. To the extent that Cumming relied on the FTC guidance document discussed above, "no reasonable and prudent person under the circumstances would have concluded that they authorized Defendants' telemarketing activity." *Id.*

As the district court held, Defendants' assertion that they did not understand the TSR's definition of telemarketing is comparable to an argument that this Court rejected in *Dish Network*. A40. In that case, Dish (a provider of satellite TV service) was found liable for violating the TSR's do-not-call provisions through its agents. *Dish Network*, 954 F.3d at 977-78. Dish maintained that it did not have the knowledge necessary for imposition of civil penalties based on its interpretation of FTC guidance regarding the "established business relationship" defense, which Dish thought justified the calls. *Id.* at 978-79. The Court held that the text of the rule was unambiguous and that any mistake of law based on Dish's reading of the guidance was not reasonable. *Id.* at

979. Likewise here, as shown above, the plain text of the TSR shows that the Day Pacer's activities were "telemarketing." No company in Day Pacer's position could reasonably believe otherwise.

Additionally, the undisputed evidence shows that Day Pacer was told that it was improperly initiating calls to phone numbers on the Do Not Call Registry. It received complaints from consumers, website operators, and schools and other lead purchasers. D.229 at 20-22; D.232 at 14-16. A major lead purchaser refused to work with Day Pacer because it was concerned that Day Pacer had not properly obtained consent for calls. D.229 at 22; D.232 at 15-16. And Day Pacer admitted that it "continued to purchase consumer data generated from websites after receiving complaints regarding those websites depending on the particular complaint." D.212 at 13.[9]

---

[9] Defendants assert that they disputed some of this evidence in their response to the FTC's Statement of Material Facts. DP Br. 25. But their response to each sentence simply said, "Defendants dispute this sentence" and cited the same evidence relied upon by the FTC. D.229 at 22. Defendants cited no evidence that purported to create a factual dispute. Such "conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment." *Cooper-Shut*, 361 F.3d at 429. The district court properly treated the FTC's evidence as undisputed.

None of Defendants' attacks on the district court's analysis holds water. Defendants incorrectly argue, once again, that the district court made impermissible credibility determinations. DP Br. 18, 20, 25. In fact, the court's decision was based on an examination of objective circumstances, as the statute requires.

Defendants also fault the court for not accepting their argument that their supposed belief that the TSR did not apply was objectively reasonable because of an investigation by the Utah Division of Consumer Protection ("UDCP") in 2017, which did not result in any enforcement action. DP Br. 17-18. But Defendants' evidence of the investigation does not raise any genuine issue of material fact. Defendants do not claim that the UDCP made any finding that they were not engaged in telemarketing. Indeed, the UDCP told Defendants that it thought Day Pacer was a telephone solicitor under Utah law and that it could not determine otherwise unless Day Pacer provided more information about their business (which Defendants refused to do). D.235 at 6; D.236 at 55-56. In any case, an investigation in April 2017 about Defendants' compliance with the Utah telemarketing laws could

not have led Defendants to believe a year earlier that the TSR did not apply to them.

Finally, Defendants are not aided by their observation that the FTC "pointed to less than 20" examples of complaints from schools and lead purchasers about calls being made to consumers without proper consent. DP Br. 25. This evidence clearly shows that Defendants knew or had reason to know that they were subject to the TSR and were not complying with the do-not-call provisions. Moreover, Defendants submitted no evidence that they ever obtained valid consent from anyone. Defendants' argument does not create a genuine dispute of fact.

### E. Undisputed Evidence Shows That the Individual Defendants Are Liable for Day Pacer's Violations.

The district court properly held based on the undisputed facts that the Individual Defendants were liable for Day Pacer's TSR violations. At least in cases where the FTC seeks monetary relief, this Court has said that "[t]o impose individual liability on the basis of a corporate practice, the Commission must prove (1) that the practice violated the [FTC Act]; (2) that the individual either participated directly in the deceptive acts or practices or had authority to control them; and (3) that the individual knew or should have known about the deceptive

practices." *Credit Bureau Ctr.*, 937 F.3d at 769. The district court properly applied this test and held that all three prongs were satisfied as to each of the three Individual Defendants. The holding as to Day Pacer satisfied the first prong. A52. As to the second prong, the court held that "the undisputed facts in the record … show that each of the Individual Defendants either participated directly in the deceptive acts or practices or had authority to control them—Ian by running Day Pacer, and Raymond and Cumming by advising when [Day Pacer] w[as] faced with strategic business decisions and legal complaints." *Id.* Further, "undisputed evidence in the record also shows that each of the Individual Defendants knew or should have known their businesses were subject to the TSR but that they were not making any attempt to comply." A54. Defendants have not identified any dispute of material fact that would preclude summary judgment against the Fitzgeralds or Cumming.

1. *Authority to Control or Participation.* Authority to control a company "can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th

Cir. 1989). Defendants rely on conclusory affidavits (DP Br. 27-28) and quibbling over immaterial facts (Estate Br. 45) to downplay Raymond Fitzgerald's and Cumming's control and participation, but that does not suffice to overcome the undisputed record evidence (*e.g.* D.212 at 29-33). *See Cooper-Schut*, 361 F.3d at 429-30. It is undisputed that Raymond and Cumming both served as "managing members" of EduTrek and Day Pacer. D.212 at 3-4. As such, they were required to "devote the time and effort as is reasonably required in the business of the company" and to "do and perform all … acts as may be necessary to or appropriate to the conduct of the Company's business." D.212-3 at 8-10 [SA007-09]; D.212-4 at 10-12 [SA062-64]. Their broad authorities included the ability to hire and fire corporate officers. D.212 at 3-4, 31-32; D.212-3 at 12-13 [SA011-12]; D.212-4 at 14-15 [SA066-68]. They were the largest shareholders of both companies, as well as creditors who loaned money to both companies and had the power to, and did, foreclose on the loans. D.212 at 31-33. Through their company, Thorpe/Sandy LLC, they were Day Pacer's landlords. D.212 at 40. Moreover, contrary to the Day Pacer Defendants' and the Estate's characterization of Raymond's and Cumming's participation in the companies' affairs as minimal, the

many emails involving them show a much high degree activity. D.212 at 29-30.

Ian Fitzgerald does not dispute that he served as President of Day Pacer beginning June 1, 2016, or that in that capacity he oversaw the company's day-to-day operations and profitability, which included hiring and firing employees, signing contracts, and responding to compliance issues. A52-53. That by itself establishes his authority to control Day Pacer.

Defendants argue that Ian lacked authority to control Day Pacer before June 2016. DP Br. 28. But that ignores the undisputed fact that since at least 2010, Ian served as president of Dalsnan, the holding company for Raymond's interests in Day Pacer. D.212 at 30. Ian told vendors that he had "been involved in [Day Pacer] since 2009 while working for the investment group that owns it." D.212 at 4. Even though Defendants say that in 2015 Ian was just the director of human resources for the companies, DP Br.28, he was at that time sending emails to corporate officers urging that "we must make sure our system is not calling DNC numbers ever." D.212-6 at 108 [SA109].

The undisputed facts also establish that the Individual
Defendants directly participated in Day Pacer's violations. Cumming
and Raymond reviewed the Corporate Defendants' contracts with IBT
Partners, schools, and lead purchasers; they also provided direction and
guidance regarding business opportunities and legal compliance,
including issues related to telemarketing. D.212 at 29-35, 38-39. Ian
was especially involved in the Corporate Defendants' practice of
providing consumer data to IBT Partners, D.212 at 18-19, providing
scripts for them to use, D.212 at 19, and reviewing their scripts, *id*. All
Individual Defendants were aware the Corporate Defendants were
calling numbers on the Registry yet did nothing to stop the calls. D.212
at 10; D.291 at 34. Moreover, Raymond and Cumming both attempted
to hide the existence of successor companies violating the TSR from the
FTC. D.212 at 26-27, 35-36, 45.

2. *Knowledge*. As the district court held, all three Individual
Defendants admitted to knowing about the TCPA, which is
substantially similar to the TSR. A54. They actually knew about the
TSR at least as early as 2012. A54. That knowledge came from a variety
of sources ranging from Raymond's review of contracts representing to

schools and lead purchasers that Day Pacer and its IBT Partners were complying with the TSR and TCPA, A54, to Cumming's research into the applicability of the TSR to the companies' business model, A55.

Moreover, the district cited ample evidence that the Individual Defendants were aware of complaints and compliance reports raising concerns about potential TSR violations. For example, Cumming and Raymond knew about the 2014 article reporting on EduTrek's suspect business practices. A55. They were involved in lawsuits alleging that the companies had called numbers on the Do-Not-Call Registry. A54; D.212 at 36. Ian regularly received reports from a compliance company, Omniangle, indicating TSR violations. A55; D.212-8 at 122-132 [SA123-33]. Further, by 2016 they were aware that the FTC investigation into the companies' illegal practices specifically sought information regarding consent in compliance with the TSR, A56, yet their violations continued. D.212 at 31.

In short, the district court properly held that all three Individual Defendants "knew of the TSR and the penalties it imposed; knew that consumers were complaining about receiving calls from [Day Pacer] and IBT Partners despite having their numbers registered on the DNC List;

and knew or should have known that the 'consents' that they and the IBT Partners obtained from customers were not valid." A57. Defendants do not actually dispute any of this evidence, but merely argue that such "scant evidence" was not enough to put them on notice of the violations. DP Br. at 27-28. The district court properly held otherwise.

## II.    THE SCOPE OF THE PERMANENT INJUNCTION IS WITHIN THE SCOPE OF THE DISTRICT COURT'S DISCRETION.

The permanent injunction entered by the district court bars the Fitzgeralds and Day Pacer "from participating in Telemarketing or assisting others engaged in Telemarketing, whether directly or through an intermediary." A68. The injunction defines "Telemarketing" as "any plan, program or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule." A68. Such a ban on telemarketing is well within the scope of the district court's discretion. Defendants' overbreadth challenges (DP Br. 29-35) lack merit and should be rejected.

### A.    Standard of Review.

District courts enjoy "substantial flexibility" in fashioning effective equitable relief. *Brown v. Plata*, 563 U.S. 493, 538 (2011) (cleaned up).

This Court "will set aside an injunction only if the district court abused its discretion in imposing it." *SEC v. Yang*, 795 F.3d 675, 681 (7th Cir. 2015).

## B. The Injunction Is Not Overbroad.

The Day Pacer Defendants do not contend that the district court abused its discretion in issuing an injunction. Rather, they attack the Injunction's scope as unreasonably broad because it is not limited to the specific form of misconduct at issue in this case: telemarketing calls to numbers on the Do-Not-Call Registry or calls related to marketing for for-profit schools. But it is well-settled that those "caught violating the [FTC] Act … must expect some fencing in." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (cleaned up). Accordingly, injunctions must be framed "broadly enough" so they prohibit not just the conduct giving rise to the violations in the case but also related conduct "to prevent [defendants] from engaging in similarly illegal practices" in the future. *Id.*

Where defendants have violated the TSR, courts have long applied the foregoing principles to impose bans on telemarketing similar to the one entered here. For example, in *FTC v. Pukke*, 53 F.4th 80, 110 (4th

Cir. 2022), the Fourth Circuit recently affirmed an injunction permanently barring defendants from telemarketing, whether or not covered by the TSR, based on their history of TSR violations and other misconduct. *See id.* at 99, 106; *In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373, 466-67 (D. Md. 2020) (injunction details); *see also FTC v. Life Mgmt. Servs. of Orange Cty., LLC,* 350 F. Supp. 3d 1246, 1273, 1276 (M.D. Fla. 2018); *FTC v. John Beck Amazing Profits LLC,* 888 F. Supp. 2d 1006, 1011, 1013-15 (C.D. Cal. 2012); *FTC v. Think Achievement Corp*, 144 F. Supp. 2d 1013, 1018 (N.D. Ind. 2000).

The terms of the Injunction do not support Defendants' argument that the Injunction prohibits Raymond and Ian "from engaging in their current legitimate and legal businesses" (DP Br. 32) or that the FTC will argue that they "cannot engage in virtually any type of business that involves a telephone and the sale of goods or services" (DP Br. 34). The Injunction does not bar Defendants from all work or business activities that involve speaking on the telephone—only from activities that meet the definition of "Telemarketing," which requires a "plan, program, or campaign … conducted to induce the purchase or goods or services" using the telephone. A68. "Defendants are otherwise free to

use telephones in connection with any job or business." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1273 (S.D. Fla. 2019).

Moreover, the record does not support Defendants' professed concern that Raymond Fitzgerald may be found to have violated the Injunction if he speaks to a potential client on the phone (DP Br. 32-33) or that Ian Fitzgerald's "prospects for other employment [are] severely restricted" (DP Br. 33). Raymond told the district court: "I don't make calls to anybody anymore … I certainly don't make calls to consumers for revenue [and] I don't run any businesses that do that." D.291 at 32. Ian has a college degree and testified that he has held positions in other fields, including commercial real estate, data center project management, asset management, and e-commerce. D.227-5 at 7-11.

There is likewise no merit to Defendants' argument that the injunction is overbroad because it covers business-to-business telemarketing even though that conduct is not covered by the TSR (DP Br. 33).[10] These prohibitions are necessary to prevent Defendants from calling consumers in the Registry in violation in the TSR, and thus

---

[10] The district court stayed this portion of the injunction pending appeal, but that has no bearing on whether it exceeded the scope of the court's discretion.

constitute appropriate "fencing in." *Colgate-Palmolive*, 380 U.S. at 394-95. As the district court concluded, the Defendants' business model involved purchasing telephone numbers from websites and cold calling those numbers, while never subscribing to the Do-Not-Call Registry. *See* D.291 at 34. Even if Defendants claim to be calling only businesses, there is no reason to expect that they will scrub their phone lists to ensure that they do not call consumer numbers on the Registry.

Defendants' claims (DP Br.33) about Ian Fitzgerald's current business, Allied Capital Management illustrates the risk. Insofar as Allied is engaged in business-to-business telemarketing, there is no record that it has adopted safeguards, such as subscribing to the Registry, to ensure that its self-described "high volume cold calling" (D.303-1 at 8) is not to consumers whose numbers were on the Registry. Further, it is not enough for Ian to intend that Allied's telemarketing calls be solely to businesses; rather, those calls must, in fact, be so limited. *FTC v. INC21.com Corp.*, 745 F. Supp. 2d 975, 1007 (N.D. Cal. 2010). Accordingly, a ban on all telemarketing is legally and factually justified to protect consumers from further TSR violations.

Defendants also fault the Injunction for banning telemarketing of products other than for-profit education opportunities. DP Br.32. They ignore that injunctions properly reach not only conduct giving rise to violations but also related conduct "to prevent [defendants] from engaging in similarly illegal practices" in the future. *Colgate-Palmolive*, 380 U.S. at 395. Telemarketing operations are used to support sales of countless products, and courts have imposed broad bans based on the ease of transferring telemarketing practices to other products. *See John Beck*, 888 F. Supp. 2d at 1014-15. There is no reason why the Defendants here could not easily apply the same business model to telemarketing other products. Indeed, the undisputed evidence in this case shows that they began marketing home security systems in May 2016, D.235 at 5-6; D.236 at 53, which is far removed from for-profit education opportunities.

Finally, the Defendants' assertion that the injunction provides the FTC with relief it did not seek insofar as it bans the Fitzgeralds and Day Pacer from "assisting others engaged telemarketing, whether directly or through an intermediary" (A68) is incorrect. The FTC sought this exact relief from the very outset. D.211-1 at 5. Without such a

provision, the Injunction would be toothless, because Defendants could easily pay another entity to engage in telemarketing for them.

Defendants misconstrue the court's statement that the FTC's proposed injunction "does not contain any provisions concerning the IBT partners." DP Br. 35 (quoting A51). The court was simply stating, correctly, that since the FTC did not directly seek relief against the IBT Partners, there was no need to assess liability as to all of the IBT Partners.

## III. THE DISTRICT COURT PROPERLY AWARDED CIVIL PENALTIES.

The district court did not abuse its discretion in awarding $28,681,863.88 in civil penalties and holding all Defendants jointly and severally liable for that amount. As the court explained, the $28.7 million figure was equal to Defendants' gross revenue during the relevant time period—money they actually received—and works out to $6.88 for each of the 4,168,511 calls placed by or transferred to EduTrek and Day Pacer. (If the nearly 40 million illegal calls placed by the IBT Partners and not transferred were included, the per-call penalty would be substantially lower.) The court's analysis clearly shows that it considered the mandatory factors set forth in 15 U.S.C. § 45(m)(1)(C).

*See* A59 (citing factors and noting that the FTC's brief discussed each of them).

Apart from broad-brush arguments that they should not be subject to civil penalties, Defendants' summary judgment briefing did not address the § 45(m)(1)(C) factors. Nevertheless, the district court gave Defendants an opportunity to submit additional information about these factors, including information about whether Day Pacer was still in business and about "the Defendants' ability to pay and the effect any penalty would have on an ability to do business." A61-62. At the hearing on the penalty assessment, the Estate requested the opportunity to file a brief addressing its "distinct interests and arguments on remedies separate from Cumming," which the court granted. A85.

After receiving these submissions, the court ultimately concluded that the FTC's proposed $28.7 million award "has a reasonable connection to the Section 45 factors—basically, given the scope of Defendants' TSR violations, their knowledge of those violations, and their high culpability in trying to mask those violations, all revenue from those calls should be forfeited as a civil penalty." A87. Furthermore, a penalty of $6.88 per unlawful call fell "well within the

range for the difficult-to-quantify harm from TSR violations." A87-88.

The court rejected the Estate's arguments that the proper penalty

should be either $0.12 per call (based on a law review article) or $2.54

per call (the rate used by the district court in *Dish Network*). A87.

Defendants have not shown that the district court abused its discretion

in any aspect of this analysis.

## A.    Standard of Review.

This Court reviews a district court's civil penalty award for abuse

of discretion. *SEC v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019). "A court

abuses its discretion only if 'the record contains no evidence upon which

the court could have rationally based its decision; the decision is based

on an erroneous conclusion of law; the decision is based on clearly

erroneous factual findings; or the decision clearly appears arbitrary.'"

*Id.* (quoting *United States v. Z Inv. Props., LLC*, 921 F.3d 696, 698 (7th

Cir. 2019)).

## B.    The Court Did Not Abuse Its Discretion By Awarding a Civil Penalty Equal to Gross Revenue.

The district court properly considered the factors set forth in

§ 45(m)(1)(C). Having done so, it concluded that an appropriate penalty

would be to deprive Defendants of their gross revenue, which was $28.7

million or $6.88 per illegal call. Contrary to the Estate's argument (Estate Br. 24-27), the district court did not abuse its discretion by awarding a penalty equal to gross revenue. To the contrary, the district court must consider "such … matters as justice may require,"15 U.S.C. § 45(m)(1)(C), which certainly includes the need to fully and appropriately deter misconduct. Given Defendants' "high culpability" (A87) and the need for deterrence, an award equal to gross revenue was reasonable and appropriate, especially given the difficulty of quantifying the very real harms that do-not-call violations cause to consumers.

The Estate is incorrect in arguing that this Court's 2020 decision in *Dish Network* precluded the district court from awarding a penalty equal to gross revenue. In *Dish Network*, the court vacated and remanded a penalty determination where the district court relied "entirely" on the defendant's ability to pay. *Dish Network*, 954 F.3d at 980. The Court noted that while "[n]ormally" civil damages are based on harm, "[l]egislatures can change this norm," and that Congress had done so in the FTC Act by requiring courts to consider ability to pay— although ability to pay cannot be the "sole factor" supporting an award.

*Id.* The Court held that the "best way" generally to determine whether a civil penalty amount is "within a constitutionally allowable range" is to start with harm and add an appropriate multiplier, *id.,* but it did not suggest that this was the only permissible approach or rule that statutory factors are irrelevant.

This portion of *Dish Network* is not on point here because the district court did not base its penalty award solely on the Defendants' ability to pay. Nothing in *Dish Network* or the statute precludes the approach taken by the district court here. A fixed rule that district courts must always start with an estimate of harm and may not apply any other approach would be highly problematic as applied to do-not-call violations. This Court has recognized that unwanted calls cause real harm, because "[e]very call uses some of the phone owner's time and mental energy, both of which are precious." *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305-06 (7th Cir. 2017); *see also* 15 U.S.C. § 6101 (congressional findings of harm caused by telemarketing deception and abuse). But that harm can be very difficult to quantify precisely, and may vary significantly from one consumer to the next.

The approach the court used here is more reasonable and workable in this context.

The court's approach properly considered the harm to consumers. The court's conclusion that a penalty of $6.88 per illegal call fell "well within range for difficult-to-quantify harms caused by TSR violations" (A87-88) was well within its discretion. For example, the court cited *Parchman v. SLM Corp.*, 896 F.3d 728, 740 (6th Cir. 2018), which held that a penalty of $500 per call for TCPA violations is not "disproportionate to the harm suffered as a result of receiving these irritating and invasive calls, especially where the harm is hard to quantify and may vary significantly from person to person." *Parchman*, 896 F.3d at 740.

The Estate has not shown why a mere $6.88 per call is an unreasonable estimate of the very real harm to consumers resulting from Defendants' joint misconduct. Instead, the Estate merely points to a law review article estimating harm from calls to numbers on the Registry of no more than $0.12 per call. Estate Br.41-42. But that article is not evidence (it certainly does not qualify as an expert analysis for purposes of litigation), and the district court did not abuse its

discretion in declining to accept that extraordinarily low estimate of harm. Nor was the court required to accept the Estate's alternative calculation of $2.54 per call, which was based on the district court decision in *Dish Network*. A87. And no party offered any other calculation, much less one based on a reasonable methodology.

The Estate's argument that the district court was required to consider Defendants' net profits rather than their gross revenues (Estate Br. 40) is also wrong. The case the Estate cites, *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 178 (5th Cir. 2000), involved penalty factors under a different statute: the Commodity Exchange Act. *Compare* 7 U.S.C. § 9a *with* 15 U.S.C. § 45(m)(1)(C). And as the district court explained, "if we were to use net profits—which I think all agree are essentially zero—that there is no deterrent effect; that it would allow companies to engage in behavior that the regulations prohibit with essentially no consequence." D.291 at 49. Further, a net-profits rule would result in only successful businesses paying civil penalties, while unsuccessful ones would be off the hook for their TSR violations.

Finally, the Estate's argument that the civil penalties are prohibited by *AMG Capital Management, LLC v. FTC*, 593 U.S. 67

(2021), is wrong. Estate Br.27. *AMG* held that the FTC cannot obtain

monetary relief under Section 13(b) of the FTC Act, which authorizes

courts to issue a "permanent injunction." 15 U.S.C. § 53(b). The civil

penalties here are issued under 15 U.S.C. § 45(m), which expressly

authorizes monetary civil penalties (a form of legal relief). The fact that

the Court used gross receipts as the basis for the penalty award does

not make it equitable disgorgement, and as shown above, nothing in

§ 45(m) precludes the use of gross receipts as the measure of civil

penalties. *AMG* is irrelevant.

## C. The District Court Properly Held All Defendants Jointly and Severally Liable.

Contrary to the Estate's argument, the district court did not abuse

its discretion by holding all Defendants jointly and severally liable for

the penalties, rather than separately assessing penalties based on each

Defendant's individual degree of culpability. The district court found

that EduTrek and Day Pacer operated as a common enterprise and that

Day Pacer is liable for EduTrek's TSR violations as EduTrek's

successor. A33 n.5. As discussed above, undisputed evidence shows that

all three of the Individual Defendants were involved in running these

companies: they knew of the violations, had authority to control them,

and did nothing to stop them. Under these circumstances, the court did not abuse its discretion in holding all Defendants jointly and severally liable for a single civil penalty.

Where multiple defendants are held liable for FTC Act violations, that liability is typically joint and several. *See*, *e.g.*, *FTC v. QT, Inc.*, 512 F.3d 858, 864 (7th Cir. 2008). The Estate asserts that the district court erred in not applying the statutory civil penalty factors to each Defendant individually, contending that the "concept of joint and several liability does not apply to civil penalties." Estate Br.28. But the principal case it relies on, a district court decision in *Dish Network*, involved only a single defendant. *United States v. Dish Network LLC*, 2015 WL 9164539, at *2 (C.D. Ill. 2015). That case thus says nothing about whether joint and several liability is appropriate in a case like this, involving a common enterprise controlled by multiple individual defendants. The Estate's other cases involve punitive damages, not civil penalties. *E.g.*, *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1387 (7th Cir. 1984).

Defendants are certainly entitled to an individual assessment of whether they should be held liable for penalties—and the court in fact

conducted such an assessment in accordance with well-settled common enterprise and individual liability standards under the FTC Act—but the Estate cites no authority suggesting that once Defendants were found liable, it was improper for the court to impose joint-and-several liability. Where Congress wants to require individualized liability assessments for each defendant, it knows how to do so. *See, e.g.*, 15 U.S.C. § 77t(d)(2)(A) (penalty provision under securities laws requiring awards against defendant to be based on "the gross amount of pecuniary gain to such defendant"). It did not impose such a requirement in the FTC Act.

The fact that liability is joint and several, not individual, disposes of many of Defendants' arguments. For example, it does not matter if the award exceeds any individual Defendant's ability to pay—the question is whether it exceeds all Defendants' collective ability to pay. Defendants make no showing that it does. Similarly, differences in individual Defendants' level of knowledge or culpability do not matter because all the Defendants had sufficient involvement and knowledge to be jointly liable for all the misconduct.

**D. Defendants Have Not Shown Any Abuse of Discretion With Respect to the Statutory Factors.**

The Estate's analysis of the § 45(m)(1)(C) factors suffers from two fundamental flaws. First, the standard of review here is abuse of discretion. That means the Court is not to undertake the analysis for itself, but simply assesses whether the district court considered the proper factors. *See, e.g.*, *E. Natural Gas Corp. v. ALCOA,* 126 F.3d 996, 1002 (7th Cir. 1994). As discussed above, the decision plainly shows that the district court did consider the § 45(m)(1)(C) factors. Second, the Estate's arguments all assume that the court was required to assess the conduct of Cumming and/or the Estate individually. But as shown above, that is not correct, because the court properly held the Defendants jointly and severally liable based on their joint participation in an unlawful endeavor. And even if the Estate were correct, as a practical matter and as shown throughout this brief, the court assessed the conduct of each Individual Defendant. In any event, the Estate's analysis of the factors cannot withstand scrutiny. [11]

---

[11] The DP Defendants join in the challenge but offer no arguments of their own. DP Br.38-40.

## 1. Defendants were highly culpable.

The court properly found that the Defendants were highly culpable, having ignored the TSR's requirements in committing millions of violations and deliberately misleading their business partners and the FTC to shield their illegal conduct from scrutiny. A87. Defendants' failure to implement any procedures to comply with the TSR speaks to a high level of culpability and resulted in over 4 million violations just counting the calls initiated by or transferred to Day Pacer. D.291 at 34, 39. Beyond failing to implement these safeguards, Defendants were dishonest and evasive in response to regulatory scrutiny, compliance monitoring efforts, and in this litigation. D.229 at 40-41, 65; D.232 at 33-34; D.235 at 6; D.236 at 55-56.

The Estate uses the culpability factor to try to re-litigate Cumming's individual liability. Estate Br.31-36. The district court properly rejected that attempt in its order on civil penalties, A86, and this Court should do the same. Regardless, the undisputed evidence and Cumming's own testimony demonstrated that he was an engaged and active participant in the enterprise with an understanding of the industry whose advice Ian and Raymond both solicited. D.212-6 at 65-

68 [SA095-98]; D.212-7 at 125-132 [SA114-21]. He was formally designated a "corporate manager" for Day Pacer, and their operating agreements gave him broad rights, powers, and duties without regard to his ownership interest. D.212-4 at 11-12 [SA063-64]; D.212-3 at 9-10 [SA008-09]. Even if Cumming did not work on site, he understood the nature of Day Pacer's business, admitting that he was "a member and manager of companies that operate call centers," D.230-1 at 4 [SA143], and that "[t]he goal of the two call center companies was to sell leads," *id*. Further, record evidence of his numerous emails shows substantial involvement with company decisions, *see* D.212 at 30, which Cumming's unsupported denials (see Estate Br.32) cannot overcome. All of that undisputed evidence was more than enough to establish Cumming's involvement and subject him to joint and several liability.

The Estate also argues that the district court erred by not allowing the Estate to make new arguments after the summary judgment decision had been entered or to raise those same arguments in connection with the penalty assessment. But Cumming fully participated in the summary judgment briefing and other district court proceedings before his death, and was not entitled to make new

arguments. Furthermore, once the Estate was substituted, it stood in Cumming's shoes and is liable to the same extent he would have been. *See Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc.*, 53 F.3d 851, 852 (7th Cir. 1995).

The Estate's argument that the district court should have considered how Cumming's subjective state of mind bears on his culpability is also wrong. Again, the issue here is the collective culpability of participants in a joint enterprise, not the relative culpability of each individual defendant.[12] In any event, the only case cited by the Estate, *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 976 (C.D. Ill. 2017), does not support the position that consideration of subjective intent was required. There, the district court assessed Dish's culpability by considering objective facts regarding the company's actions, not the subjective state of mind of those acting on the company's behalf. *See id.* at 976-78. That is consistent with the FTC Act's objective knowledge standard for imposing civil penalties. 15 U.S.C. § 45(m)(1)(A).

---

[12] Nevertheless, the court assessed the culpability of each Defendant. *See* A54-57.

Finally, the Estate complains that the district court did not consider evidence of Cumming's culpability because the court deemed the FTC's statement of material facts admitted due to the Defendants' failure to comply with the requirements of Local Rule 56.1. Estate Br.33; *see also* Estate Br.42-44. The Estate suggests that Cumming's affidavit denying personal involvement in Day Pacer's actions sufficed to satisfy LR 56.1, Estate Br.33, but an examination of the affidavit, D.230-1 [SA140-51], readily reveals its deficiency. Most glaringly, it contains no citations to evidence in the record supporting Cumming's denials. *See Cooper-Shut*, 361 F.3d at 429-30. Circuit precedent amply supports the district court's deeming the FTC's facts admitted under these circumstances. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000); *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993). And contrary to the Estate's view, there was no unfairness in not giving the Estate a second chance to contest the FTC's facts.

## 2. Defendants have a long history of misconduct.

The district court's opinion does not indicate that it relied heavily on Defendants' history of prior misconduct, as opposed to their high degree of culpability and the need for deterrence. But it is undisputed that the misconduct here dates back to 2010, even though the penalty is only for conduct starting in 2014. The Estate incorrectly asserts that prior misconduct for which penalties are time-barred cannot be considered. Estate Br.37. Such a rule would mean a court could not consider pre-limitations conduct even if it reflected a lifetime of violations. The Estate cites no authority for this proposition, and in other contexts the Supreme Court has held that conduct outside the limitations periods may be considered "as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Moreover, here, the statute authorizing penalties expressly requires consideration of prior conduct and places no time bar on doing so. To the extent the district court relied on time-barred misconduct or otherwise considered the duration of the misconduct, that was not an abuse of discretion.

### 3. Defendants have not shown the penalty exceeds their collective ability to pay.

The Estate's argument on ability to pay seems to be that the $28.7 million civil penalty is unjustified because it exceeds the Estate's value of less than $12 million. Estate Br.37. The Day Pacer Defendants make a similar point. DP Br.38-39. But the award here is joint and several, so the question is whether the award exceeds the Defendants' collective ability to pay (including both individual and corporate assets). Moreover, a defendant's ability to pay is not limited to its current assets and can include dissipated assets. *See United States v. Daniel Chapter One*, 89 F. Supp. 3d 132, 153 (D.D.C. 2015); *see also United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988, 995 (11th Cir. 1984) (refusing to limit ability to pay to current assets or net profits). Defendants have not shown that the award exceeds their collective ability to pay. Anyway, "ability to pay is not a determinative factor" and "does not prevent the court from imposing a significant penalty, if the other factors so warrant." *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 824 (N.D. Tex. 2008).

The Estate cites the district court's analysis in *Dish Network*, Estate Br.37, but that case had very different facts; Dish was a vastly

larger company that earned revenues legitimately by offering broadcast satellite service. 256 F. Supp. 3d at 978. Here, Day Pacer's entire business and the source of all of its income derives from telemarketing. Given the gravity and duration of the misconduct and the need for deterrence, an award of $28 million is not an abuse of discretion here.

### 4.    Day Pacer is no longer in business.

Day Pacer's business was telemarketing and the district court properly enjoined the company from continuing in that business, since the failure to comply with the TSR pervaded all its operations. The ability to continue in business factor is entitled to little or no weight in these circumstances. *See Cornerstone Wealth Corp.*, 547 F. Supp. 2d at 824 ("ability to do business" factor had no impact on analysis where defendants' conduct warranted a ban). In any event, Day Pacer is no longer in business. D.291 at 30-31.[13] Defendants have not shown any abuse of discretion with respect to this factor.

---

[13] The Estate's argument that its "business" is to pay Cumming's debts and distribute any remaining assets according to his wishes ignores the fact that one of those debts is to the United States government for Cumming's misconduct in this case. *See, e.g.*, 755 Ill. Comp. Stat. § 5/18-13 (requiring personal representative to "pay from the estate all claims entitled to be paid therefrom, in the order of their classification") The Estate is obligated to pay a meritorious government claim.

### 5. The need for general and specific deterrence supports the penalty.

Other factors relevant to the penalty analysis include the need for both general and specific deterrence of misconduct. The district court's decision makes clear that it gave significant weight to this factor, and thus determined that gross revenues represented an appropriate civil penalty. The Estate's argument that the civil penalty here will have no specific deterrence on Cumming given his death (Estate Br.22-23, 38) ignores that a civil penalty has a general deterrence effect: it deters others from violating the TSR. *See Krueger v. Cuomo,* 115 F.3d 487, 493 (7th Cir. 1997) (upholding an award of civil penalties that included in its analysis the need to deter other landlords). As to the other Defendants, the penalty serves both general and specific deterrence functions. The district court did not abuse its discretion by considering deterrence.[14]

---

[14] The district court was not required to consider whether the Estate's assets are tainted by misconduct or whether Defendants benefited from the violations. Estate Br.38-40.

### E. The Award Does Not Exceed the Relief the FTC Requested.

Contrary to the Day Pacer Defendants' argument (DP Br. 36), the award does not exceed the amount requested by the FTC. A penalty of $28,681,863.88 is precisely what the FTC requested. Defendants' argument appears to be that the district court should have awarded penalties only on the 3,669,914 calls made by Day Pacer, not on the 498,857 additional calls made by IBT Partners and transferred to Day Pacer. The district court reasonably included the 498,857 inbound transfer calls because Day Pacer directly participated in those calls, as opposed to the calls that were never transferred. But in any event, it does not matter because the court based the penalty on Defendant's gross revenues. Eliminating the inbound transfers from the base would simply have increased the penalty per-call by a small amount (less than $1 per call).

### F. If the Court Finds an Abuse of Discretion, the Proper Course Is To Remand.

For all the reasons set forth above, the district court did not abuse its discretion in imposing a $28.7 million civil penalty jointly and severally on all Defendants. If the Court disagrees for any reason, however, the proper course is to remand to the district court for

recalculation. The Court should not accept the Estate's alternative calculation of between $0 and $900,000. Estate Br.40-42. That calculation is flawed for two reasons. First, it is based on the law review article discussed above, which estimated harm of only $0.12 per call from unwanted call. As discussed above, that article does not meet the requirements for expert analysis and should not be considered as evidence of harm. Second, the Estate's argument that it should not be liable for penalties on calls in 2014 and 2015 misreads the district court's decision by taking out of context the court's description of one example of Defendants' knowledge, *i.e.*, their April 2016 examination of selling products directly. A54-55. The court made many other findings that Defendants' knowledge predated 2016 or even 2014. For example, the court noted that Defendants had entered into contracts since 2012 representing that they would comply with the TSR and had notice since at least 2014 that they were calling consumers who submitted their information on deceptive websites. A54-56. Cumming himself knew in 2014 and before about the TSR and had reason to believe Day Pacer was violating the rule. A55; D.212 at 34; D.212-10 at 218; D.230-1 at 8 [SA147].

## IV. THE DISTRICT COURT PROPERLY SUBSTITUTED THE ESTATE FOR CUMMING.

Following Cumming's death, the district court properly substituted the Estate as a defendant under Fed. R. Civ. P. 25.[15] Substitution is proper where the action is primarily remedial, rather than penal. *Smith*,615 F.2d at 414-15 (7th Cir. 1980). The fact that the plaintiff seeks a statutory civil penalty "does not end the analysis" because "the term 'penal' is used in different contexts to mean different things." *Id.* at 414. Courts have frequently held that actions seeking civil penalties under consumer protection statutes that protect individuals are remedial for substitution purposes, regardless of whether a private party or the government is the plaintiff. *See, e.g.*, *Parchman*, 896 F.3d at 740-41 (action seeking statutory penalty under TCPA was primarily remedial); *Smith*, 615 F.2d at 414-15 (action seeking penalties under Truth in Lending Act was primarily remedial); *FTC v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16 (D.D.C. 2004) (FTC action seeking civil penalties for violations of Equal Credit Opportunity Act was remedial). Likewise here, because the government

---

[15] Rule 25(a) provides in relevant part: "If a party dies and the claim is not extinguished, the court may order substitution of the proper party."

here is seeking penalties under the Telemarketing Act and TSR—a remedial statute designed to protect individual consumers from harm—the action is properly treated as primarily remedial rather than penal for substitution purposes.

## A. Standard of Review.

On review of a FRCP 25(a) substitution, the court reviews legal issues *de novo* and factual findings for clear error. *See Russell v. City of Milwaukee*, 338 F.3d 662, 665 (2003). To the extent that the court may consider equitable factors, its weighing of those factors should be subject to abuse of discretion review. *See, e.g.*, *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 715 (7th Cir. 2005).

## B. The District Court Properly Applied the Three-Part Test For Determining Whether an Action is Penal or Remedial for Substitution Purposes.

In *Smith*, this Court held that whether an action is primarily remedial or penal for substitution purposes turns on "(1) whether the purpose of the action is to redress individual wrongs or wrongs to the public; (2) whether recovery runs to the individual or the public; (3) whether the authorized recovery is wholly disproportionate to the harm suffered." 615 F.2d at 414. The district court correctly applied this test (which has also been widely adopted by other courts) and determined

that an FTC action to enforce the TSR is primarily remedial for substitution purposes, even where the relief sought includes civil penalties under 15 U.S.C. § 45(m). The Estate has not shown any error in this analysis.

### 1. FTC actions to enforce the TSR protect individual consumers from harm.

Under the first prong of *Smith*, the fact that an action redresses harm to individuals rather than simply harm to the general public weighs in favor of treating it as remedial rather than penal for substitution purposes. The district court concluded that this factor weighed in favor of substitution, explaining that "when a consumer receives a telemarketing call after placing her name on the [Do-Not-Call] List, but a telemarketer calls her anyway, the harm is felt by the individual consumer, not the public generally." A.16. That conclusion was correct.

When the Commission sues in district court to enforce the TSR and the Telemarketing Act, it is acting both to protect the public and to safeguard individual rights. Such an action protects individual consumers from harm regardless of whether the relief sought is an injunction, *see* 15 U.S.C. § 53(b), the refund of money or other

restitution, *see id.* § 57b(b), civil penalties, *see id.* § 45(m), or some combination of these remedies. In particular, civil penalties for TSR violations protect individual consumers from harm by discouraging similar misconduct going forward. *See Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 186 (2000) (civil penalties "afford redress" insofar as they "encourage defendants to discontinue current violations and deter them from committing future ones.").

As the district court held, the Sixth Circuit's decision in *Parchman* is highly instructive as to the first factor because it involves provisions of the TCPA that are closely analogous to the TSR and the Telemarketing Act. In *Parchman*, private plaintiffs sued companies that violated the TCPA by making automated telephone calls (*i.e.*, robocalls). They sought relief under a TCPA provision that authorizes the recovery of actual damages or $500 per call, whichever is greater, and gives the district court discretion to triple that amount for knowing or willful violations. *Parchman*, 896 F.3d at 731; *see* 47 U.S.C. § 227(c)(5). The court held that the first factor suggested the TCPA was remedial because its "primary purpose," as reflected in express

Congressional findings, was "to protect individuals from the harassment, invasion of privacy, inconvenience, nuisance, and other harms associated with unsolicited, automated calls." *Parchman*, 896 F.3d at 738. These harms are "felt by identifiable individuals," not by "the general public, as a community" even though the TCPA "can also be described as attempting to deter socially undesirable calling practices." *Id.* at 739.

As the district court correctly held, this same reasoning applies to the TSR and the Telemarketing Act, which serve the same basic purpose and prohibit much of the same conduct. In enacting the Telemarketing Act, Congress made explicit findings that "[c]onsumers and others are estimated to lose $40 billion a year in telemarketing fraud," that "[c]onsumers are victimized by other forms of telemarketing deception and abuse," and consequently that Congressional action was necessary to "offer consumers necessary protection from telemarketing deception and abuse." 15 U.S.C. § 6101(3)-(5). As this language shows, Congress's focus in enacting the Telemarketing Act, like its focus in the TCPA, was protecting individual consumers from harm. The legislative history surrounding Congress's later ratification of the Do-Not-Call

Registry is also replete with statements emphasizing that the Registry is intended to protect individuals from harm.[16] As in *Parchman*, this factor thus suggests that an FTC Action to enforce the TSR is primarily remedial for substitution purposes.

Other decisions, including *Smith* and *Capital City*, reinforce this conclusion. In *Smith*, this Court held that the first factor favored treating an action for a civil penalty under the Truth in Lending Act ("TILA") as remedial. Even though the law redressed a "perceived social ill," Congressional findings and prior Supreme Court analysis of the statute showed that the "primary purpose" of a TILA action was to "redress individual wrongs." *Smith*, 615 F.2d at 414; *accord Murphy v.*

---

[16] *See, e.g.*, Do-Not-Call Registry, 149 Cong. Rec. S11957-01, S11965, 2003 WL 22217295, at *22 (statement of Sen. Olympia Snowe) ("The Do-Not-Call registry provides a very important service-preventing undue intrusions from marketers. Citizens should have the right not to be disturbed by unsolicited calls in their own homes and the Do-Not-Call registry *empowers citizens* to stop these calls." (emphasis added)); *id.*, at S11958, at *5 (statement of Sen. John McCain) ("Obviously, we urge our colleagues to support the measure, give consumers what they want by *empowering them to say no to what they clearly do not want.*" (emphasis added)); *id.*, at S11965, at *21 (statement of Sen. Chris Dodd) ("[T]he right to be left alone is really at the heart of what we are talking about-the right to say to someone: You don't have the right to call me anytime you want. *I should have some ability to control that intrusive invasion in the privacy of my family's life.*" (emphasis added).

*Household Fin. Corp.*, 560 F.2d 206, 208-11 (6th Cir. 1977). And in

*Capital City*, the court held that the first factor supported treating as

remedial the FTC's action seeking civil penalties for violations of the

Equal Credit Opportunity Act and its implementing regulations

violations because the ECOA was "clearly intended to protect

individual[s]" from "having their credit applications denied for

discriminatory reasons." *Capital City*, 321 F. Supp. 2d at 21-22. "While

the overall enforcement of the ECOA may deter discrimination-based

lending practices, the Act was clearly intended to protect individual

consumers from discriminatory credit practices." *Id.* at 22; *see also Dish

Network*, 256 F. Supp. 3d at 934 (civil penalties under FTC Act for TSR

violations deemed remedial, rather than punitive, such that actions of

agent could be imputed to principal).[17]

---

[17] The Supreme Court recently ruled in *SEC v. Jarkesy*, No. 22-859 (S. Ct. June 27, 2024), that civil penalties for fraud under the securities law are a legal remedy and that defendants thus have a Seventh Amendment right to a jury trial where the SEC seeks such penalties. The Court explained that in the Seventh Amendment context "a civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can *only be explained* as also serving either retributive or deterrent purposes, is punishment." Slip Op. at 9 (emphasis added; citation omitted). But the fact that a defendant facing civil penalties that are not solely remedial is entitled to a jury trial under the Seventh

The Estate's attacks on the district court's analysis of the first *Smith* factor do not withstand scrutiny. To begin with, the Estate's argument that the inquiry should focus solely on the purposes of the "action" without regard to the purposes of the TSR and the Telemarketing Act (Estate Br.12-13) is incorrect. One cannot understand the purpose of an action without considering the statutory scheme authorizing it, and indeed in *Smith* the Court explicitly addressed the "focus of the legislation." *Smith*, 615 F.2d at 414.[18] While

---

Amendment is not determinative of whether an action is penal or remedial for substitution purposes under Rule 25. In the substitution context, this Court has recognized that an action can be treated as remedial even if it has some penal aspects. *See Smith*, 615 F.2d at 415 (TILA action is "primarily not penal, but rather remedial").

[18] The unreported district court cases that the Estate cites (Br.12-13) are not to the contrary. In both cases, district courts held that although a complaint for actual damages under the Fair Credit Reporting Act survived the plaintiff's death, claims for punitive damages did not. See *Irvin-Jones v. Equifax Info. Servs., LLC*, 2019 WL 4394684, at *2-3 (S.D. Tex. Sept. 13, 2019); *Beaudry v. Telecheck Servs., Inc.*, 2016 WL 11398115, at *11-16 (M.D. Tenn. Sept. 29, 2016). Regardless of whether those holdings are correct, they are immaterial because civil penalties for TSR violations serve "a markedly different purpose than punitive damages" and have been treated as remedial. *Dish Network*, 256 F. Supp. 3d at 934-35. Notably, *Irvin-Jones* did not expressly apply the three-prong test at all, while *Beaudry* properly recognized that the first prong focuses on "the purpose of the statute in question." 2016 WL 11398115, at *12.

*Smith* refers to the "purpose of the action," 615 F.2d at 414, the case it relied upon, *Murphy*, referred to the "purpose of the statute." *See Murphy*, 560 F.2d at 209. There is no meaningful difference between these formulations. Notably, other circuits also refer to the "purpose of the statute." *See, e.g.*, *Malvino v. Delluniversita*, 840 F.3d 223, 229 (5th Cir. 2016); *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993). Thus the district court properly considered the purpose of the TSR and the Telemarketing Act.

The Estate's attempt to distinguish *Parchman* also falls flat. Contrary to the Estate's assertion, the plaintiffs in *Parchman* did not allege actual damages. The plaintiffs sought statutory damages of $500 per call—a penalty—for the defendant's unlawful robocalls, and like the FTC here they did not seek recovery for any actual pecuniary harm. *See Parchman*, 896 F.3d at 731; Amended Complaint at 10, *Parchman v. SLM Corp.*, No. 2:15-cv-2819 (W.D. Tenn.), ECF 27. The Estate also argues that *Parchman* involved a private plaintiff, rather than a governmental one, but that is irrelevant to the first factor of the *Smith*

test, which looks to the purpose of the action rather than the identity of the plaintiff. [19]

Finally, contrary to the Estate's view, a civil penalty that serves a deterrent function can still redress wrongs to individuals, such that it is properly treated as remedial for substitution purposes. *See Laidlaw*, 528 U.S. at 185-86. As the court explained in *Capital City*: "While it is true that some courts have considered that civil penalties can act as a general deterrent to the public, those courts have also recognized that individual consumers are protected by the government's enforcement of consumer protection statutes." 321 F. Supp. 2d at 21 (citing *Danube Carpet Mills*, 737 F.2d at 994). Deterring future violations by both the defendants and other would-be violators protects individual consumers from harm.

### 2. Recovery by the government is not determinative.

Under the second *Smith* factor, the fact that recovery runs to the government rather than individuals weighs in favor of treating an

---

[19] The Estate's reliance (Br.13-14) on *Hannabury v. Hilton Grand Vacations Co.*, 174 F. Supp. 3d 768 (W.D.N.Y. 2016), which considered the survivability of private TCPA claims, is misplaced because that decision's reasoning was later explicitly rejected by the same court, *Sharp v. Ally Financial, Inc.*, 328 F.Supp.3d 81, 97, 92 (W.D.N.Y. 2018), and by the Sixth Circuit in *Parchman*, 896 F.3d at 738.

action as punitive, but as the district court held, this factor is not determinative. A.17-19. The Estate concedes that "no single factor is determinative" (Estate Br.17), although it then immediately reverses course and says that the second factor "appears critical," citing *United States v. Edwards*, 667 F. Supp. 1204, 1215 (W.D. Tenn. 1987). If the second factor were "critical" or dispositive, however, there would be no need for a three-part test.

Furthermore, as the district court held, *Capital City*, is more closely analogous to this case than *Edwards* because it involved an action by the FTC to recover fees for violations of a consumer protection statute. A19. *Capital City* held that "payment to the government 'weighs in favor of characterizing th[e] relief as penal,'" but does not compel that conclusion where the penalties "derive[]from … social welfare legislation [that] is remedial.'" *Capital City*, 321 F. Supp. 2d at 22 (quoting *Citronelle-Mobile Gathering, Inc. v. O'Leary*, 499 F. Supp. 871, 887 (D. Ala. 1980)). Where a statute is "remedial, not penal, in nature," the fact that money will be paid to the government rather than individual consumers is not enough to make the remedy "penal" for substitution purposes. *Id.*

The Estate's attempt to distinguish *Capital City* mischaracterizes that case's facts. The FTC was not seeking a penalty for the ECOA violations "measured by the extra fees [consumers] paid to the defendant." Estate Br.18. Rather, the FTC sought penalties based on the defendants' failure to take written applications, collect required information, or properly provide notice of adverse actions. *Capital City*, 321 F. Supp. 2d at 23; Complaint, *FTC v. Capital City Mortg. Corp.*, No. 98-cv-237 (D.D.C.), ECF-1. The Estate thus has not shown any basis for distinguishing *Capital City*'s conclusion that the second factor is not determinative.

> ### 3. The civil penalty here is not wholly disproportionate to the harm caused by millions of unwanted calls.

Under the third *Smith* factor, authorized recovery that is disproportionate to the harm suffered weighs in favor of treating an action as penal. Here, the district court properly focused on the roughly $28.7 million in civil penalties sought by the FTC after taking into consideration the factors listed in 15 U.S.C. § 45(m)(1)(C). A.19-21. It concluded that this amount was not disproportionate to the harm, and that this factor also weighted in favor of treating the action as remedial.

A.21-22. That conclusion was also correct. As discussed above, the precise harm suffered by individual consumers from do-not-call violations is difficult to quantify, but a penalty of $6.88 per call is plainly not disproportionate. Indeed, in *Parchman*, the Sixth Circuit concluded that a penalty of $500 per illegal call was not "disproportionate to the harm suffered as a result of receiving these irritating and invasive calls, especially where the harm is hard to quantify and may vary significantly from person to person." 896 F.3d at 740.

The Estate's argument that the inquiry must focus solely on the statutory maximum penalty is incorrect. Although the FTC Act places a statutory cap on civil penalties, courts are not authorized to automatically award the statutory cap. Rather, they must consider the five factors set forth in 15 U.S.C. § 45(m)(1)(C) to arrive at an appropriate penalty within the statutory cap. As discussed above, part of that inquiry involves making sure that the penalty is not wholly disproportionate to the harm suffered. The district court correctly found *Parchman* instructive on this point as well. A.20. Focusing on the treble damages provision of the TCPA, the Sixth Circuit emphasized that the

court had "discretion to decide in each case whether and how much to increase damages, unlike the provisions in the other statutes which automatically provide multiple recovery," and that this discretion "allows the court to evaluate the facts of a particular case and, perhaps, the harm caused to the plaintiff by the defendant's violation in determining the appropriate level of damages," suggesting that the penalty was "more remedial." *Parchman*, 896 F.3d at 740. By the same reasoning, the fact that the FTC Act gives the district court discretion to determine an appropriate penalty, rather than automatically imposing the statutory maximum, weighs in favor of finding the penalties to be remedial.

### C.  Equity, If Relevant, Supports Substitution.

The Estate's final salvo is an appeal to equity. Estate Br.20-21. Nothing in *Smith*, or any other case cited by the Estate suggests that equitable considerations can override the Rule 25 analysis. In any event, the district court reasonably held that it would not be equitable to let the Estate off the hook for Cumming's misconduct because that would require the other Defendants to shoulder the entire burden of the civil penalty award. A.23. It considered the Estate's argument that

substitution would be unfair because Day Pacer was supposedly unprofitable, Cumming supposedly invested more than he earned, and Cumming's heirs were innocent. But the court viewed the harm to the Fitzgeralds as outweighing those considerations. A.22-23. To the extent the court had discretion to consider equitable considerations, it did not abuse its discretion in reaching this conclusion.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

ANISHA DASGUPTA
   *General Counsel*

MARIEL GOETZ
   *Acting Deputy General*
   *Counsel for Litigation*

July 9, 2024

/s/ *Mark S. Hegedus*
MARK S. HEGEDUS
MATTHEW M. HOFFMAN
   *Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580


Of Counsel:
MARK GLASSMAN
PATRICK ROY
   *Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with Federal Rule of
Appellate Procedure 32(a)(7) and this Court's June 27, 2024, Order
(Document 32) in that it contains 17,627 words.

July 9, 2024

/s/ *Mark S. Hegedus*
Mark S. Hegedus
Attorney
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580